UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID PORTNOY,<br><br>                Plaintiff,<br><br>INSIDER, INC., HENRY BLODGET,<br>NICHOLAS CARLSON, JULIA BLACK,<br>and MELKORKA LICEA,<br><br>                Defendants. | Civil Action No. |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

**ANDREW B. BRETTLER**
**JAKE A. CAMARA**
**LAVELY & SINGER P.C.**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
abrettler@lavelysinger.com
jcamara@lavelysinger.com
(*pro hac vice* applications forthcoming)

**HOWARD M. COOPER**
**CHRISTIAN G. KIELY**
**TODD & WELD LLP**
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 720-2626
Facsimile: (617) 227-5777
hcooper@toddweld.com
ckiely@toddweld.com

*Counsel for Plaintiff David Portnoy*

## I.  <u>INTRODUCTION</u>

1.      This case arises from Defendants' knowing publication of two false and defamatory exposés into the private life of the well-known founder of Barstool Sports, Plaintiff David Portnoy ("Mr. Portnoy"). On February 3, 2022, a representative for Defendant Insider, Inc. ("Insider") gave an interview to *Variety*, boasting, "If we get sued, we will defend the case vigorously. News organizations regularly get sued; ***it's the cost of doing business***." Perhaps it is the cost of doing business for Insider, a publication that generates its revenue through clickbait journalism and the publication of false and defamatory hit pieces concerning the country's most well-known figures. To Insider, the truth has always played second fiddle to the dollar.

2.      Defendants published, as fact, that Mr. Portnoy had "violently" raped and sexually assaulted three unnamed females -- an outright fabrication. Defendants perpetrated their "hit pieces" as part of a preconceived plan to sensationalize a story in order to drive reader traffic to an Internet location where they could then be solicited to subscribe to Defendants' tabloid-like publication.  Further demonstrating Defendants' malicious intent, each of Insider's stories was published on a date coinciding with Penn National Gaming's quarterly earnings announcements (Penn National Gaming owns a 36% stake in Barstool Sports). Defendants' actions were outside any conceivable notion of actual journalism. Mr. Portnoy seeks to hold Defendants accountable for their willful and unlawful defamation and privacy rights violations.

3.      Defendants calculated that "cancelling" Mr. Portnoy would be lucrative business for Insider. Insider and its staff were willing to cash in on their stories while knowingly disregarding the truth. In publishing the false and defamatory stories aimed at destroying Mr. Portnoy's reputation, Insider sought to cause the downfall of one of Massachusetts's most well-known entrepreneurs and media personalities. Indeed, Mr. Portnoy's life has been nothing short

of remarkable. In 2003, in Milton, Massachusetts, Mr. Portnoy created a small sports newspaper named Barstool Sports. In the publication's early days, Mr. Portnoy self-authored and printed the newspaper's first issues and distributed them to commuters on the Boston subway system. Since its humble beginnings eighteen years ago, and under Mr. Portnoy's leadership, Barstool Sports has become one of the most widely known sports media and pop culture enterprises in the world. Because of Mr. Portnoy's celebrity and notoriety, Insider viewed him as the perfect target for its false, albeit scandalous, hit pieces into a celebrity's private life. Insider's defamatory scheme was well-planned and nearly a year in the making, and the defamatory stories would serve as the launch for Insider's promotion on discounted premium subscriptions to its online publication, *Business Insider*.

4.      Without a modicum of journalistic integrity, with Insider's Chief Executive Officer Henry Blodget at the helm, Insider, its reporters, Julia Black and Melkorka Licea, and their editor, Nicholas Carlson (collectively, "Defendants"), engaged in a calculated smear campaign against Mr. Portnoy by publishing, and thereafter refusing to retract and/or correct, two false and defamatory stories on its website at least suggesting, if not blatantly stating, that Mr. Portnoy sexually assaulted three women. Insider's allegations are patently false, and, critically, are belied by the evidence actually in Insider's possession.

5.      Over the last ten months, Defendants have engaged in targeted smear campaign designed to destroy Mr. Portnoy's reputation and boost Insider's viewership and subscription revenue, which includes the following:

(i)      Defendants knowingly and repeatedly published two false, stand-alone headlines to lure readers and potential subscribers to their website, stating, for example, '*I was literally screaming in pain': Young women say they met Barstool*

*Sports founder Dave Portnoy for sex and it turned violent and humiliating*. Insider thereby suggested actual criminal wrongdoing on Mr. Portnoy's part without further explanation, a tactic which is known as "clickbait" journalism, giving rise to a claim here for "clickbait" defamation;

(ii)     Defendants published directly and via innuendo that Mr. Portnoy had committed the crimes of rape, sexual assault, and surreptitious recording while in possession of text and social media messages showing just the opposite;

(iii)     Defendants pursued a preconceived and biased agenda aimed at damaging Mr. Portnoy to drive online traffic and subscription revenue to Insider;

(iv)     Defendants improperly and knowingly relied upon biased sources who demanded anonymity, all while being in possession of documentary evidence that each source's story was incredible and unreliable; and

(v)     Defendants published highly personal and private information in violation of the Massachusetts privacy statute and Mr. Portnoy's common law right of privacy, while affording confidentiality and anonymity to Defendants' alleged sources.

6.     Mr. Portnoy has never sexually assaulted anyone, and Defendants are well-aware of this fact. Nevertheless, Insider is attempting to cash in on the climate of fear and "cancel culture" permeating the media, whereby it has become open season for anyone to make any claim (no matter how vile and unsupported) about anyone seemingly without consequence. There are, however, consequences for unlawfully defaming someone. Mr. Portnoy will not stand idly by while Insider and its Twitter army of executives, editors, and reporters attempt to drive clicks, viewership, and subscription revenue for themselves by recklessly spreading malicious

and defamatory lies that Mr. Portnoy engaged in egregious criminal conduct by sexually assaulting three women and/or recording them without their knowledge or consent.

7.     Even after being confronted with the exculpatory evidence that contradicts the maelstrom of false allegations in its stories, rather than admitting to its misconduct and irresponsible journalism, Insider refused to retract, correct, or even update its stories about Mr. Portnoy, and is instead maliciously standing by its false and defamatory reporting. Now, months after its initial publication, Insider continues to use Mr. Portnoy as bait to attract consumers to its subscription service.

8.     Insider's conduct here is shameful, but given Defendants' track records, it is not surprising. Mr. Portnoy brings this action to clear his name, to set the record straight, and to recover the substantial damages that Defendants caused him as a result of the irresponsible and defamatory stories they published about him.

## II.     THE PARTIES

9.     Plaintiff Mr. Portnoy is an individual and resident of Nantucket, Massachusetts. He is the founder of sports and pop culture blog Barstool Sports.

10.     Defendant Insider, Inc. is a Delaware corporation with its principal place of business in New York, New York. Over the course of 2020, traffic across all of Insider's websites, including Businessinsider.com and Insider.com, averaged 114 million unique U.S. visitors per month, as well as over 100,000 paid subscribers.

11.     Defendant Henry Blodget ("Blodget") is an individual who resides in New York, New York. At all times material hereto, Blodget was co-founder and Chief Executive Officer of Insider.

7199-2

12.     Defendant Nicholas Carlson ("Carlson") is an individual who resides in New York, New York. At all times material hereto, Carlson was the Global Editor in Chief of Insider and acted within the scope of his employment at Insider in reviewing, and ultimately approving the headline and contents of the stories at issue here. Further, Carlson authored and published the February 2, 2022 "Editor's Note" titled, *Why Insider Published Its Dave Portnoy Articles*.

13.     Defendant Julia Black ("Black") is an individual who resides in New York, New York. At all times material hereto, Black was a reporter for Insider and acted within the scope of her employment at Insider in writing the stories at issue here.

14.     Defendant Melkorka Licea ("Licea") is an individual who resides in New York, New York. At all times material hereto, Licea was a reporter for Insider and acted within the scope of her employment at Insider in writing the stories at issue here.

## III.     <u>JURISDICTION AND VENUE</u>

15.     The subject matter jurisdiction of this Court is properly based upon the existence of complete diversity between the parties and an amount in controversy which exceeds $75,000.00, exclusive of costs and interest pursuant to 28 U.S.C. § 1332. Personal jurisdiction over Defendants is lawful and proper here, where Defendants each transact business in Massachusetts generally and/or engaged in tortious conduct which caused injury in Massachusetts. The false and defamatory Insider publications were directed to individuals and entities in Massachusetts and caused damage to Mr. Portnoy in Massachusetts, as well as elsewhere.

7199-2

16.     The venue for this action properly lies in this district pursuant to 28 U.S.C.

§ 1391, because a substantial part of the events or omissions giving rise to the defamatory story

occurred in Nantucket, Massachusetts and in this District.

## IV.   **FACTS**

17.     Despite being in possession of overwhelming evidence that Mr. Portnoy never

sexually assaulted anyone, Defendants maliciously and recklessly concocted a sensationalistic,

false, and damaging depiction of Mr. Portnoy to commercially exploit his name and celebrity, all

in an effort to boost Insider's online viewership and paid subscription revenue.

18.     Indeed, Defendants' hit pieces were nearly a year in the making. In April 2021,

Black sent an email to Mr. Portnoy requesting an interview for an upcoming "profile" in

*Business Insider*. In her email, Black falsely proclaimed, "There's no particular angle here – I'd

like to cover the full gamut, from building a media empire to becoming the face of the meme

stock movement." Mr. Portnoy respectfully declined the interview.

19.     Shortly thereafter, Mr. Portnoy learned that Defendants did have a "particular

angle" for their story. In the weeks and months following her April 2021 email, Mr. Portnoy

began receiving unsolicited messages from friends, acquaintances, and complete strangers

regarding Defendants' proposed "profile" piece. In those messages, both friends and strangers

alike informed Mr. Portnoy that Black had reached out to them for comment, that Black was

working on an article about how Mr. Portnoy is a sexual predator, and that Black had been in

contact with numerous women that Mr. Portnoy allegedly had associated with.

20.     After a full eight months of "investigating" Mr. Portnoy for Defendants' story, on

November 1, 2021, Black again emailed Mr. Portnoy requesting that he provide a comment for

7199-2

her story. Black's comment request email contained thirty-eight bullet points of false and unsubstantiated allegations. In her email, Black informed Mr. Portnoy that Insider was ready to publish the story, and she demanded that he respond within 24 hours to the maelstrom of false allegations contained therein.

### Insider Publishes the False and Defamatory Hit Piece

21.     On November 4, 2021, Defendants published their first defamatory hit piece on Businessinsider.com, titled "*I was literally screaming in pain": Young women say they met Barstool Sports founder Dave Portnoy for sex and it turned violent and humiliating.* (https://www.businessinsider.com/barstool-sports-dave-portnoy-sex-choking-violent-stoolies) (the "First Story").[1] For search engine optimization and "clickbait" purposes, the First Story's URL included the words "portnoy," "choking," "violent," "sex," and "stoolies" (collectively, the "URL Tags"). Further, the First Story was published behind a paywall, requiring readers to sign up for Insider's paid subscription service to access it. This revenue generating scheme was all part of Defendants' nefarious plan.[2]

22.     Defendants knowingly and repeatedly published the false, stand-alone headline, including its publication of the URL Tags, to lure readers and potential subscribers to their website, thereby suggesting actual criminal wrongdoing on Mr. Portnoy's part without further explanation. Defendants' conduct constitutes a tactic known as "clickbait" journalism, giving rise to a claim here for "clickbait defamation."

---

[1] A true and correct copy of the Story is attached hereto as "Exhibit A."

[2] Indeed, the date Insider published the Story also happened to coincide with Penn National Gaming's quarterly earnings announcement. Penn National Gaming owns a 36% stake in Barstool Sports.

7199-2

23.     Adding insult to injury, the First Story contained alleged screenshots and quotations from Mr. Portnoy's private text and social media messages, in violation of his privacy rights.

24.     The defamatory allegations of sexual assault and forcible rape leveled against Mr. Portnoy are patently absurd and provably false. While the First Story is replete with false and defamatory lies about Mr. Portnoy, the references to his alleged encounters with two women, referred to therein as "Allison" and "Madison," are particularly egregious and defamatory *per se*.

**"Allison"**

25.     Defendants dedicate a significant portion of the defamatory First Story to an entirely fabricated account of Mr. Portnoy's alleged encounter with a woman referred to in the First Story by the pseudonym "Allison." In short, Defendants falsely reported that after a violent and impliedly non-consensual sexual encounter with Mr. Portnoy, Allison suffered from severe depression and suicidal thoughts, which allegedly resulted in her seeking treatment at the hospital. As Defendants were well-aware prior to the First Story's publication, Allison's account is pure fiction.

26.     According to the First Story, in July 2020, Allison messaged Mr. Portnoy notifying him that she was in Nantucket and "would love to see him." Allison met Portnoy at his home, where they spent the day by the pool. According to Defendants, Portnoy and Allison then began having violent sex, with the implication that the encounter was not consensual:

> "He leaned in and started kissing me and I didn't know what to do at that point…And we went upstairs and he was really aggressive and I didn't know what to do and we had sex and he kicked me out."… She said Portnoy choked her. "He kept spitting in my mouth, which was really gross … I was kind of scared. I didn't want to disappoint him."

27.     Insider implied that Allison's encounter with Mr. Portnoy was not consensual and so impermissibly violent as to constitute a sexual assault. Defendants went on to state that

9

Allison was so distressed by the events that she could barely talk the next day. Defendants further reported that Allison was hospitalized and became suicidal due to the allegedly violent sexual encounter.

28.     Moreover, Defendants published that Allison's mother reported Mr. Portnoy to the Nantucket Police Department and falsely suggested that he was under criminal investigation for sexual assault. Prior to publication, however, Defendants were in possession of the so-called "police report," which highlights the outrageous nature of the allegations that Allison's mother made against Mr. Portnoy, namely, that he was often seen in public with younger women. Defendants failed to include these facts from police report in their First Story, and for good reason – the police report does not accuse Mr. Portnoy of any criminal conduct whatsoever.

29.     The allegations concerning Allison are false and belied by documentary evidence in Defendants' possession. Indeed, Defendants had all of Allison's communications with Mr. Portnoy prior to and after her alleged encounter with him. Further, Defendants were in possession of the police report filed by Allison's mother, which, critically, contained no allegations of rape, sexual assault, or any other crime for that matter. Even a cursory review of the police report and Allison's subsequent communications with Mr. Portnoy reveal that her story was entirely fabricated. Defendants published it anyway.

30.     The day before she visited Mr. Portnoy, Allison begged him to let her come to his house: "I'm on island with all my friends and really want to see you…would do anything…Let's hang tonight." When Mr. Portnoy stated he was unavailable, Allison stated, "Noooo it's your last week [in Nantucket]."

31.     The following day, Allison messaged Mr. Portnoy again and stated that she wanted to have sex with him: "What u doin today…can we bang?"



32.     Allison and Mr. Portnoy made plans to see each other that day. Just prior to arriving at Mr. Portnoy's house, he texted her, "Don't be [nervous]. It'll be fun. And if you don't wanna do anything, we won't."

33.     After spending time at the pool, Mr. Portnoy and Allison had consensual sex in his home.

34.     Critically, **_after_** Allison was allegedly in the hospital and suicidal due to her encounter with Mr. Portnoy, she continued to contact him via text message and Instagram. None of her messages indicated that she was in any distress. In fact, Allison sought to continue her relationship with Mr. Portnoy.

35.     On August 1, 2020, Allison replied to Mr. Portnoy's Instagram story in which he announced he was leaving Nantucket to spend the summer in the Hamptons. Allison stated, "Aww bye :( Nantucket is better." After Mr. Portnoy responded to her unsolicited message, Allison replied, "I'm in shock that ur still dming [direct messaging] me rn [right now]…like whats up Dave Portnoy?" The next day, on August 2, 2020, Allison messaged Mr. Portnoy again, stating, "If you ever want to text me my number is [redacted]."

36.     As is clear by the evidence in Defendants' possession, *after* Allison was purportedly hospitalized due to Mr. Portnoy's alleged conduct, she repeatedly contacted Mr. Portnoy in hopes of seeing him again, gave Portnoy her phone number, and encouraged him to continue their relationship. Defendants were in possession of these messages prior to the First Story's publication, yet Defendants included Allison's false allegations in the First Story anyway.

37.     Further, despite that the police report did not contain *any* accusations that Mr. Portnoy committed a crime, Defendants included references to the police report in the First Story, falsely implying that Mr. Portnoy was under criminal investigation for sexual assault.

38.     Mr. Portnoy was not the only person shocked by the allegations of criminal conduct. Indeed, on November 5, 2021, in response to the First Story's allegations concerning the police report, Nantucket Police spokesman Lt. Angus MacVicar issued a statement to NBC News, clarifying that *Portnoy was not under any criminal investigation whatsoever*.


## "Madison"

39.     Defendants' smear campaign did not stop there. Additionally, the First Story described Mr. Portnoy's alleged encounter with a woman referred to by the pseudonym "Madison," wherein Mr. Portnoy is falsely accused of sexual assault and forcible rape. Such allegations are equally preposterous.

40.     Defendants reported that Madison traveled to visit Mr. Portnoy at his home in Nantucket. Prior to visiting Mr. Portnoy, Madison messaged Portnoy for several weeks, wherein she described to Mr. Portnoy her "rape" fantasy.

41.     Defendants went on to describe an entirely fabricated series of events, namely, that Portnoy choked and raped Madison.

> "It was so rough I felt like I was being raped…It hurt and I was literally screaming in pain'… She recalled crying and shouting, "Too much! Too much!" and "It hurts!"… "I kept trying to get away and he was like, 'stop running away from me. Stop running away from me.'"

42.     After the purported rape, Defendants reported that Madison slept on the couch for two additional nights before flying back home.

43.     The allegations concerning Madison are provably false. In reality, Portnoy and Madison engaged in consensual sex, and Defendants were fully aware of that fact. Indeed, prior to publishing the First Story, Defendants were or should have been in possession of all of Madison's communications with Portnoy, as well as her social media posts. Moreover, it is beyond dispute that as of November 11, 2021, when Portnoy publicly disclosed those communications (while taking steps to conceal his accuser's identity), Defendants have been in possession of Allison's social media correspondence, yet continue to refuse to retract, correct, update, or in any way modify their defamatory First Story.

44.     Madison operates a "Finsta" account (slang for "Fake Insta"), a term used to describe secondary Instagram accounts, where the user's identity — and, often, the content of the user's posts — is unknown to all but a small, carefully chosen group of followers. The posts on Madison's Finsta account unambiguously contradict Defendants' false report.

45.     On July 19, 2020, Madison uploaded a picture of her and Mr. Portnoy playing scrabble together. The photograph depicts Madison and Mr. Portnoy together in Nantucket on the weekend of the alleged sexual assault. In the post, Madison gloated, "Me beating Dave Portnoy in scrabble."

46.     On July 20, 2020, after having consensual sex with Mr. Portnoy, Madison then posted a video to her Finsta account, revealing her true motivations with Mr. Portnoy. In the caption to the video, Madison wrote:

> Portnoy was a dick and lame and grumpy. He gets a 2/10 from me. If he ever truly pisses me off I have lots of content to expose him with. I am going to stick to athletes. 🤑 🤑 🤑 🤑 🤑 🤑 🤑.

47.     Later, Madison posted a picture of Mr. Portnoy with Donald Trump. In the caption to the photograph, Madison wrote, "Ok. Not my proudest fuck."

48.     Notably, in the days following the First Story's publication, Madison sought to take advantage of her new-found notoriety by setting up an OnlyFans account, an online platform whereby the general public can pay Madison for personalized content (photos, videos, and live streams) via a monthly subscription membership.

49.     Despite the fact that Defendants had access to Madison's social media and should have been fully aware of the problems with her false and sensationalistic account of events, Defendants published the defamatory First Story anyway.

50.     On November 11, 2021, after taking steps to protect the anonymity of the two women who purportedly accused Mr. Portnoy of sexual assault, Mr. Portnoy published redacted versions of Madison's Finsta posts to all of his social media accounts. Despite having access to this information, Defendants have failed and refused to retract, correct, update, or in any way modify their defamatory First Story.

51.     Critically, Mr. Portnoy provided Defendants with the true facts and documentation concerning Allison and Madison, including through Mr. Portnoy's various press conferences (which Insider admits it viewed), but Insider ignored the information because of their preconceived agenda to harm Mr. Portnoy's reputation. In particular, Insider was made

aware that critical text messages were available to them, but Insider did not demand them. Where Insider did include information from Mr. Portnoy, Insider made an affirmative effort in its presentation to minimize its import.

52.     Readers of Insider's First Story were misled into believing something that Defendants knew prior to publication was plainly false. The false statements concerning Allison and Madison cast Mr. Portnoy in a negative and defamatory light to all readers and have had a disastrous effect on Mr. Portnoy's personal and professional reputation.

<u>**Insider's Promotional Campaign**</u>

53.     As if Defendants' nefarious intent was not already apparent through their actions prior to and through the publication of the Story, just minutes after Insider published the First Story, Defendant Black tweeted to her thousands of Twitter followers, soliciting more unsubstantiated "tips" regarding Mr. Portnoy's private life. Insider made it clear that they intended to double-down on their defamatory allegations by planning to publish a follow-up story concerning Mr. Portnoy. To ensure that her tweet reached the widest audience possible, Black "pinned" her tweet to her Twitter profile, ensuring that her message remained at the top of her feed for all to see. Through February 1, 2022, Black's tweet remained "pinned" to the top of her Twitter page.



7199-2

54.      Seemingly aware that those who live in glass houses should not throw stones, prior to the publication of the First Story, Black took steps to protect herself from online scrutiny. Prior to the First Story's publication, Black's public Twitter profile contained 4,151 tweets. Just prior to publication, however, Black deleted nearly all her prior tweets, leaving only 132 tweets visible to the public.

55.      Simultaneously, Insider unleashed its Twitter army of executives, editors (including Defendant Carlson), reporters, and employees, shamelessly tweeting and re-tweeting the First Story in a transparent attempt to drum up buzz, and, notably, to attract new paid subscription customers.

56.      Indeed, the nefarious hit piece served as the launch for Defendants' new promotion on premium subscriptions. On the day of the First Story's publication, Insider circulated its "68% off" subscription promotion, encouraging the public to sign up using Insider's libelous hit piece as bait. For example, Insider's Senior Politics Reporter, Grace Panetta tweeted a screenshot of the promotion, along with the message "heads-up that insider is currently offering a huge discount on annual Premium subscriptions, so you can currently pay just $4/month to read incredible journalism like [Defendant Black's] investigation into Dave Portnoy!"



57.     Concurrently, Insider launched promoted paid advertisements for its subscription service, using Mr. Portnoy's photograph in conjunction with a new defamatory headline, "Dave Portney [sic], Barstool Sports founder, accused of allegations involving sexual violence and humiliation."



17

58.     Concurrently, having been publicly questioned regarding Insider's true motives in publishing the first hit piece as a vehicle to generate new subscribers, Defendant Licea immediately took to Twitter to defend Insider's decision to run a promotion at Portnoy's expense: "*Broken record here, but the reason big important stories like these are behind a paywall is because people spend months working their asses off and need to make a living.* ***Anyways, subscribe to Insider***."



59.     The next day, on November 5, 2021, Defendant Carlson tweeted a story from Business Insider concerning Penn National Gaming, which owns a 36% interest in Barstool Sports. In his tweet, Carlson gloated, "Penn National plummets 20% after weak earnings and allegations against Dave Portnoy."

60.     Perhaps most indicative of Defendants' malicious intent, in the days following the First Story's publication, Insider employees began contacting Barstool Sports' advertisers, informing the advertisers of the false allegations against Portnoy, and inquiring whether those advertisers would continue to advertise with Barstool Sports. For example, on or around November 6, 2021, Insider correspondent Patrick Coffee emailed a Barstool Sports advertiser, stating "I would like to ask whether leadership was aware of this recent story about [Barstool

Sports'] founder and, if so, whether there have been any discussions regarding those partnerships and/or ad placements."  Defendants' conduct was intended to shame Barstool Sports' advertisers for working with Mr. Portnoy and his company and encourage them to stop doing business with Mr. Portnoy.



61.       To a large degree, Defendants succeeded.  Due to Defendants' deliberate interference with Barstool Sports' business relationships, Barstool Sports has lost no less than $12,000,000 in advertiser revenue since the publication of the defamatory First Story.

### Insider Publishes a Second False and Defamatory Hit Piece

62.       To make matters worse, on January 18, 2022, Defendants Black and Licea again emailed Mr. Portnoy informing him that Insider was planning to run an additional defamatory story. In that email, Black and Licea requested that Mr. Portnoy provide a comment for their Second Story. Insider's comment request email contained an additional twenty-eight bullet points of false and entirely unsubstantiated allegations. In their email, Black and Licea informed

7199-2

Mr. Portnoy that Insider was ready to publish the Second Story, and they demanded that he respond within 48 hours to the new maelstrom of false allegations contained therein.

63.     In response to the comment request email, on January 19, 2022, counsel for Mr. Portnoy transmitted a legal letter to Insider, putting Insider on notice of the provably false allegations contained in the proposed Second Story, providing Insider with documentary evidence directly contradicting the malicious allegations contained therein, and demanding that Insider refrain from publishing the Second Story. Defendants published the Second Story anyway.

64.     On February 2, 2022, Defendants published their second defamatory hit piece on Businessinsider.com, titled *Three More Women Say Barstool Sports Founder Dave Portnoy Filmed Them Without Asking During Sex* ([https://www.businessinsider.com/dave-portnoy-new-women-sexual-misconduct-allegations-filming-sex-without-permission](https://www.businessinsider.com/dave-portnoy-new-women-sexual-misconduct-allegations-filming-sex-without-permission)).[3] For search engine optimization and "clickbait" purposes, the Second Story's URL included the words and phrases "portnoy," "new women," "sexual misconduct," "filming," "sex," and "without permission." Further, the Second Story, like the First Story, was published behind a paywall, requiring readers to sign up for Insider's paid subscription service to access it.[4]

### "Kayla"

65.     The thrust of the Second Story pertains to a fabricated account of Mr. Portnoy's alleged encounter with a woman referred to as "Kayla." In short, the Second Story falsely

---

[3] A true and correct copy of the Second Story is attached hereto as "Exhibit B."

[4] Perhaps no longer a coincidence, the date Insider published the Second Story occurred *the day before* Penn National Gaming's next earnings announcement.

7199-2

accuses Mr. Portnoy of sexual assault and forcible rape. Defendants' narrative of events is

preposterous, and, critically, belied by the evidence in Defendants' possession.

66.        The Second Story alleges that Kayla first messaged Mr. Portnoy on Instagram in

the summer of 2017, and that Kayla eventually took an Uber to Mr. Portnoy's house to visit him.

67.        Defendants further allege that Kayla and Mr. Portnoy had violent sex and that "it

was just way too much." Kayla further alleges that Mr. Portnoy filmed her without permission.

68.        However, despite Mr. Portnoy's alleged violent and non-consensual conduct,

Kayla was eager to see Mr. Portnoy again.

69.        About one month later, Kayla again visited Mr. Portnoy at his home in New York.

Defendants went on to report that "the sex during her second encounter was far rougher than she

had anticipated or would have agreed to had she been asked." Kayla further admitted that "Yes,

it was technically consensual sex, but that was not the sex I consented to."

70.        Defendants also falsely reported that Mr. Portnoy attempted to force Kayla to

have anal sex during this encounter, and that Kayla had injured her rib from rough sex.

71.        At a minimum, the Second Story implies that Kayla's encounter with Mr. Portnoy

was not consensual and was so impermissibly violent as to constitute sexual assault.

72.        The allegations concerning Kayla are provably false. In reality, Mr. Portnoy and

Kayla engaged in consensual sex, and Defendants were fully aware of that fact. Indeed, in

messages that post-date the alleged violent sexual encounters between Kayla and Mr. Portnoy,

Kayla repeatedly referred to those past interactions in only positive terms. In March 2019, after

describing a "really good" albeit "scary aggressive" sexual encounter she supposedly had with

another male celebrity who, according to Kayla, would "pin [her] down, choke [her] a little, slap

[her] around a little, [and] bite [her]," Kayla teased Mr. Portnoy about his sexual prowess and suggested they get together again.

73.      Several months later, in an unsolicited message, Kayla informed Mr. Portnoy that he would "100% get laid" if he helped her find a home for a certain rescue animal.

74.      And while the Second Story claims that it took Kayla "months to process what had happened to her," **two years** after the alleged non-consensual sexual encounter, Kayla again messaged Mr. Portnoy, "Miss that dick."



75.      At no time during her extensive text message exchange with Mr. Portnoy did Kayla ever complain about him being violent, abusive, or recording her without her permission – allegations that Mr. Portnoy unequivocally denies. In fact, Kayla joked about how she injured her rib during one of their sexual encounters and boasted to Mr. Portnoy that he "still holds [her] title for most aggressive sex… 😊."



76.     Again, Mr. Portnoy's counsel provided Defendants with the true facts and documentation concerning Kayla, but Insider ignored the information because of their preconceived agenda. In particular, Insider was made aware that critical text messages were available to them, but Insider again did not even request copies of them from Mr. Portnoy or his attorneys. Where Insider did include information from Mr. Portnoy, Insider made an affirmative effort in its presentation to minimize its import.

77.     Despite the fact that prior to the Second Story's publication Defendants were provided with Kayla's post-dated communications with Mr. Portnoy and were fully aware of the problems with her sensationalistic account of events, and the fact that Defendants' in-house counsel promised to "be in touch…to give Mr. Portnoy ample time to comment," Defendants published the defamatory Second Story anyway.

**Insider Runs Its Second Promotional Campaign**

78.     Insider again ran a promotional campaign for their subscription service in connection with the release of the Second Story behind a paywall. Again, Insider's Twitter army

of executives, editors, and reporters advertised and promoted the article, seeking further

subscription revenue.

79.      Defendant Black again tweeted to her thousands of followers seeking further dirt

into Portnoy's private life: "*If you would like to share any information connected to this story,*

*you can reach us securely at juliablackjourno@protonmail.com and*

*melkorkalicea@protonmail.com.*"

80.      Anticipating the backlash from the outlandish allegations contained in the Second

Story, Defendant Carlson published an Editor's Note on Insider's website, titled *Why Insider*

*Published Its Dave Portnoy Articles* (https://www.businessinsider.com/why-insider-published-

its-dave-portnoy-articles-2022-2). In that article, Carlson further defamed Mr. Portnoy, stating

that he took "a sexual encounter that began consensually and turn[ed] it violent without first

asking [his] sexual partner for permission." Carlson further described Portnoy as "a rich, famous,

and powerful person [who] uses [his] power in a way that is harmful to other people." Carlson

then pinned his article to the top of his Twitter account.

81.      An Insider representative then gave an interview to *Variety*, in which Insider

welcomed a lawsuit and claimed that such lawsuits are "the cost of doing business"

(https://variety.com/2022/digital/news/barstool-sports-dave-portnoy-sex-video-lawsuit-insider-

1235171273/).

82.      The effects on Mr. Portnoy's reputation have been pervasive and continuing. As a

result of Defendants' defamatory statements and use, Mr. Portnoy has suffered significant and

irreparable damage to his reputation and profession, as well as embarrassment and humiliation.

83.       To any reasonable reader of the Insider stories, the clear and essential gist and

sting of Defendants' overall publications is that Mr. Portnoy is a rapist, an abuser of women, and

a person who secretly records women having sex without their consent. Yet, Defendants intentionally ignored and/or intentionally buried in their Stories actually provided and/or readily available and known evidence establishing precisely to the contrary. Simply put, Defendants slanted material facts in their published Stories pursuant to their pre-conceived agenda to harm Mr. Portnoy. In doing so, Defendants ignored, for example, and without limitation, that the sex which took place was fully consensual as reflected in text messages of the women themselves, that the women themselves either enjoyed and/or never protested their encounters, as reflected in their text messages, and that all recordings were done openly and notoriously with the full knowledge of the women who voiced no objection whatsoever.

## COUNT 1 – DEFAMATION

84.     Plaintiff realleges and incorporates herein by reference each of the prior paragraphs.

85.     Defendants published their false and defamatory First Story and Second Story (together, the "Stories") of and concerning Mr. Portnoy with a knowing and reckless disregard of the truth and thereby caused and continue to cause Mr. Portnoy damages. The clear and essential gist and sting of Defendants' overall publications is that Mr. Portnoy is a rapist, an abuser of women, and a person who secretly records women having sex without their consent. Mr. Portnoy sues here based upon the overall knowing, slanted, false and defamatory sting of the publications in their entirety, as well as over specific statements set forth in the publications which are too numerous to allege here in their entirety.  Without limitation, these statements include the following:

(a) "'I was literally screaming in pain': Young women say they met Barstool Sports founder Dave Portnoy for sex and it turned violent and humiliating."

(b) "Five women have now told Insider that Portnoy filmed them during sex without seeking permission. Four of them said the sex that was recorded started consensually but then turned violent and frightening beyond what they would have agreed to had they been asked."

(c) "Three more women say Barstool Sports Founder Dave Portnoy filmed them without asking during sex."

(d) "The sex during her second encounter was far rougher than she had anticipated or would have agreed to had she been asked."

(e) "He attempted to have anal sex without her permission."

(f) Mr. Portnoy took "a sexual encounter that began consensually and turn[ed] it violent without first asking [his] sexual partner for permission."

(g) Portnoy is "a rich, famous, and powerful person [who] uses [his] power in a way that is harmful to other people."

(h) "He didn't ask — he just like, tried to force it in."

(i) "She told him 'no' three or four times because she 'knew it would have been excruciating.'"

(j) "That was not the sex [she] consented to."

(k) "These women told Insider the experiences with Portnoy turned frightening and humiliating and had taken a toll on their mental health. Two of the women also said Portnoy filmed their encounters without their consent."

(l) "I kept trying to get away and he was like, 'Stop running away from me. Stop running away from me.'"

(m) "She first became uncomfortable when Portnoy pulled out his phone and started filming her — without asking permission — as she performed oral sex on him."

(n) "Another, who has had depression, said she was suicidal after the two had sex."

(o) "She was both choked and filmed without advance permission."

(p) "Three of these women said they had sex with Portnoy, now 44, and that the encounters turned into frightening and humiliating experiences that have taken a toll on their mental health. Two, including Madison, said Portnoy both choked and filmed them without advance permission."

86.     The Stories are defamatory *per se*, in that the Stories falsely accuse Mr. Portnoy of having committed a crime or crimes, including sexual assault and unlawful recording.

87.     Defendants compounded their wrongdoing by continuing to publish and promote their defamatory Stories, and by failing and/or refusing to retract or update the Stories even after they were notified that the clickbait, headlines, ledes, and substance of the Stories were false, unsupported by documentary evidence, and defamatory.

88.     In so doing, Defendants' false and defamatory statements subjected Mr. Portnoy to ridicule and scorn, sabotaging his reputation. The consequences of the false allegations in the headline of the Stories and the Stories themselves have been harmful to Mr. Portnoy and his work.

89.     As a result, Defendants are liable in damages to Mr. Portnoy.

## COUNT 2 – INVASION OF PRIVACY (G.L. c. 214, § 1B)

90.      Plaintiff realleges and incorporates herein by reference each of the prior paragraphs.

91.      Massachusetts G.L. c. 214 §1B guarantees Mr. Portnoy the right to be free from unreasonable, substantial, or serious interference with his privacy.

92.      Mr. Portnoy's rights to privacy include a right to be let alone and a right to be free from the public disclosure of private facts and information without his consent.

93.      Defendants' releasing and publishing of Mr. Portnoy's highly personal text messages and social media messages amounted to an unreasonable, substantial, and serious interference with and invasion of Mr. Portnoy's privacy in violation of G.L. c. 214 §1B and of his common law rights to privacy.

94.      As a result of Defendants' invasion of Mr. Portnoy's privacy, Portnoy was humiliated, felt invaded and ashamed, and suffered a violation of his privacy, dignity, and personal integrity. As a result of the Defendants' invasion of Mr. Portnoy's privacy, Mr. Portnoy has suffered harm, injury, and damages.

WHEREFORE, the plaintiff, David Portnoy, respectfully requests that the Court grant him the following relief:

1.      after trial, enter judgment on Counts I and II in his favor and award him damages in the amount assessed by the jury on each Count, including fees, costs, and interest; and

2.      grant such other further relief as the Court deems just and proper.

7199-2

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,
For Plaintiff, David Portnoy,
By his attorneys,

Dated:  February 7, 2022

/s/ *Howard M. Cooper*
Howard M. Cooper (BBO #543842)
hcooper@toddweld.com
Christian G. Kiely (BBO #684308)
ckiely@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626

-and-

Andrew B. Brettler (*pro hac vice* application
forthcoming)
abrettler@lavelysinger.com
Jake A. Camara (*pro hac vice* application
forthcoming)
jcamara@lavelysinger.com
Lavely & Singer PC
2049 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 556-3501

7199-2