UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID PORTNOY,

        Plaintiff,

   v.

INSIDER, INC., HENRY BLODGET, NICHOLAS
CARLSON, JULIA BLACK, and MELKORKA
LICEA,

          Defendants.

Case No. 1:22-cv-10197
[Leave to file excess pages
granted 4/7/22 (ECF   22)]

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT .................................................................................................................. 8

    I.      PORTNOY'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ........ 9

          A.      Portnoy's Claim is Not Based on any "Provably False" Statements .......... 9

                  1.      Portnoy Cannot Meet His Burden of Pleading Material Falsity ............................................................................................ 10

                  2.      The Women's Characterizations of their Encounters are Non-Actionable Opinion ............................................................ 12

                  3.      The Articles do not imply that Portnoy committed crimes .......... 15

          B.      Portnoy Fails to Plausibly Plead Actual Malice ...................................... 17

    II.      PORTNOY'S PRIVACY CLAIM FAILS ........................................................... 21

CONCLUSION .............................................................................................................. 23

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013) ...................................................................................11

*Amrak Prods, Inc.. v. Morton*,
410 F.3d 69 (1st Cir. 2005) ..................................................................................16

*Ayyadurai v. Floor64, Inc.*,
270 F. Supp. 3d 343 (D. Mass. 2017) .......................................................... *passim*

*Bah v. Apple Inc.*,
2021 WL 4416104 (D. Mass. Sept. 27, 2021), *appeal docketed*, No. 21-1868
(1st Cir. Nov. 1, 2021) ...........................................................................................18

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ................................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................9, 18

*Blankenship v. Napolitano*,
451 F. Supp. 3d 596 (S.D.W. Va. 2020) ...............................................................21

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ...........................................................................................9, 18

*Brown v. Hearst Corp.*,
862 F. Supp. 622 (D. Mass. 1994), *aff'd*, 54 F.3d 21 (1st Cir. 1995) ....................23

*BYD Co. v. Vice Media LLC*,
2022 WL 598973 (2d Cir. Mar. 1, 2022) ..............................................................19

*Coleman v. Grand*,
523 F. Supp. 3d 244 (E.D.N.Y. Feb. 26, 2021), *appeal docketed*, No. 21-800
(2d Cir. Mar. 26, 2021) ...............................................................................14, 16, 23

*D.A.R.E Am. v. Rolling Stone Magazine*,
101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001) .........................21

*Diaz v. Gazmey Santiago*,
2020 WL 1042041 (D.P.R. Mar. 3, 2020) .....................................................18, 20

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013) ..................................................................................19

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989)............................................................................................22

*Franchini v. Bangor Publ'g Co.*,
    2020 WL 1879012 (D. Me. Apr. 15, 2020) ......................................................20

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)............................................................................................17

*Gray v. St. Martin's Press, Inc.*,
    221 F.3d 243 (1st Cir. 2000)..............................................................................15

*Greisen v. Hanken*,
    925 F.3d 1097 (9th Cir. 2019) ...........................................................................22

*Harte-Hanks Comm'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989).....................................................................................18, 20

*Lemelson v. Bloomberg L.P.*,
    903 F.3d 19 (1st Cir. 2018)................................................................................20

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
    127 F.3d 122 (1st Cir. 1997)..............................................................................12

*Loeb v. Globe Newspaper Co.*,
    489 F. Supp. 481 (D. Mass. 1980) ....................................................................18

*Martin v. Mooney*,
    448 F. Supp. 3d 72 (D.N.H. 2020)....................................................................11

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)..........................................................................................10

*Mateo v. Univ. Sys. of N.H.*,
    2019 WL 199890 (D. Mass. Jan. 14, 2019) ......................................................17

*McKee v. Cosby*,
    236 F. Supp. 3d 427 (D. Mass. 2017), *aff'd*, 874 F.3d 54 (1st Cir. 2017)........11, 16

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ...........................................................................20

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..............................................................................17, 18, 21

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
    418 U.S. 264 (1974)..........................................................................................10

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986)..................................................................................................10

*Piccone v. Bartels*,
   785 F.3d 766 (1st Cir. 2015) ......................................................................................13

*Riley v. Harr*,
   292 F.3d 282 (1st Cir. 2002).................................................................................13, 22

*Rivera v. Centro Medico de Turabo, Inc.*,
   575 F.3d 10 (1st Cir. 2009) .........................................................................................7

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ...........................................................................9, 18, 19

*Shay v. Walters*,
   702 F.3d 76 (1st Cir. 2012) ......................................................................................18

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ...................................................................................................22

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ...................................................................................................21

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ...................................................................................21

*Thibault v. Spino*,
   431 F. Supp. 3d 1 (D. Conn. 2019) ............................................................................22

*Veilleux v. NBC*,
   206 F.3d 92 (1st Cir. 2000) ................................................................................10, 12

*Worrell-Payne v. Gannett Co.*,
   49 F. App'x 105 (9th Cir. 2002) ................................................................................19

*Yohe v. Nugent*,
   321 F.3d 35 (1st Cir. 2003) ..............................................................................10, 13

**State Cases**

*Bonome v. Kaysen*,
   2004 WL 1194731 (Mass. Super. Ct. Mar. 3, 2004) ...........................................22, 23

*Driscoll v. Bd. of Trs.*,
   70 Mass. App. Ct. 285 (2007).....................................................................................14

*Dulgarian v. Stone*,
   420 Mass. 843 (1995) .................................................................................................13

*Foley v. Lowell Sun Publ'g Co.*,
    404 Mass. 9 (1989) ..................................................................................................16

*Peckham v. Bos. Herald, Inc.*,
    48 Mass. App. Ct. 282 (1999)................................................................................23

*Scholz v. Boston Herald, Inc.*,
    2013 WL 5531637 (Mass. Sup. Ct. 2013) .............................................................14

*Scholz v. Delp*,
    473 Mass. 242 (Mass. Sup. Ct. 2015) ...................................................................14

**State Statutes**

Mass. Gen. Laws 272 § 105(b) ......................................................................................17

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................................18

**Constitutional Provisions**

First Amendment ............................................................................................ ..*passim*

## INTRODUCTION

A provable false statement of fact is the core element of every defamation claim. *Ayyadurai v. Floor64, Inc.,* 270 F. Supp. 3d 343, 358 (D. Mass. 2017) ("[D]efamatory statements are not punishable unless they are capable of being proved true or false.") (citation omitted).  Yet, here, Plaintiff David Portnoy ("Portnoy") cannot meet this basic requirement.  Rather, he brings this defamation action based on depictions of sex he had with young women, claiming they suggest the sex was "impermissibly violent" and "nonconsensual."  But he does not challenge a mountain of foundational facts included in the two articles published by Defendant Insider, Inc. ("Insider") that inform the conclusions and views expressed by his sexual partners.  Instead, his Complaint targets the subjective views and reactions young women had in highly complex sexual situations where the power dynamics put them in a distinct disadvantage.  At bottom, Portnoy's Complaint challenges statements that he cannot prove to be false.  And the law is not the arbiter of the inherently subjective and differing perspectives of Portnoy and his sexual partners.

Specifically, Portnoy admits having "aggressive sex" with these women, even admitting that one woman had her rib fractured and more than one was choked.  And he does not dispute that the women were just out of high school or in college, when he was a middle-aged, multimillionaire CEO of Barstools Sports, or a "God," as one woman called him.  Nor does he dispute that the Articles report that the young women understood that they consented to have sex with him, but later came to realize it was too much, went too far, and they did not know what to do.  He does not even dispute that he routinely videotaped his young sex partners, and shared copies of the videos with other women, including at least one video showing him choking a woman so violently she looked like she could not breathe and a photograph showing a woman covered in red welts on her body.  And most importantly, Portnoy *admits* that he is "never ever going to be able to prove [his] version of events" because he cannot know "what's going on in [these young women's] brain[s]."

Because Portnoy cannot prove that any material fact is false, he claims that the Articles say or imply facts that they do not.  For instance, Portnoy ignores that over and over the women acknowledge the sex was consensual, if ultimately unwanted, and he disregards that the Articles

make it clear that his videotaping of the sex was entirely out in the open.  And the Articles give full voice to Portnoy's side of the various stories, not only including his denials that anything was nonconsensual, but even linking to the letters that Portnoy's lawyers sent to Insider and one woman, challenging the woman's credibility.  In short, Portnoy's defamation claim fails because he has not alleged any provably false statements of fact.  *See* Point I(A).

The Complaint independently fails because Portnoy (a public figure) has not alleged facts that would support a finding that any defendant published the challenged statements knowing them to be false or with serious doubts as to their truth. Instead, his Complaint rests on conclusory allegations that do little to push the bar past the bare recitation of the actual malice legal standard and, again, is based on the misrepresentation that the articles did not include details that help readers understand why he believes these encounters were fully consensual.  *See* Point I(B).

Finally, Portnoy's tag-along privacy claim fails because women have a right to disclose their own social-media communications to document events in their personal lives that relate to a matter of deep public interest:  the real-world consequences of the sexual behavior engaged in by an influential media executive who has built a half-a-billion dollar media brand, in part, on his objectification of women.  The law is clear that no privacy claim can be stated in the context of reporting on issues of such utmost public concern.  *See* Point II.

## FACTUAL BACKGROUND

*The Parties*.  Plaintiff David Portnoy is the founder and "Chief of Content" of Barstool Sports, an online media company with blogs, video, podcasts, and other often-bawdy content covering sports, celebrities, and pop culture.  (Compl. ¶ 9; *see* barstoolsports.com).  Defendant Insider, Inc. is an online media company that publishes Insider, a global online news publication. Defendant Henry Blodget is its CEO, and Defendant Nicholas Carlson its global editor-in-chief. Defendants Julia Black and Melkorka Licea are feature staff writers.

*The First Article*. Drawing on over seven months of reporting, Insider published the first article at issue on November 4, 2021, *"'I was literally screaming in pain': women say they met Barstool Sports founder Dave Portnoy for sex and it turned violent and humiliating*."  Compl.

Ex. A ("First Article"); Compl. ¶¶ 18, 20.  Insider's reporter indicated when she first contacted Portnoy that she wanted to cover the "full gamut" of Portnoy and his business, which is just what the First Article does, delving into his influence and brash persona, his proclivity for pushing boundaries in life and business, and his openness about his sexual exploits.

The Article opens with a sexually explicit text exchange between a "20-year-old college student" ("Madison") and Portnoy, then a "43-year-old multimillionaire."  Ex. A at 2.  As described—and not disputed—Portnoy pressed Madison to tell him about her sexual fantasies. When she revealed hers to be the "common" rape fantasy, Portnoy responded:  "You and I are going to get along so well."  *Id.*  Shortly thereafter, Portnoy bought her a first-class plane ticket to visit him at his $2.2 million Nantucket home.  *Id.*  The Article then briefly recounts that a sexual encounter ensued, as Portnoy admits.  Compl. ¶ 43.  Madison said "she first became uncomfortable when Portnoy pulled out his phone and started filming her—without asking permission—as she performed oral sex on him."  Ex. A at 3.  Madison explained that she did not feel comfortable expressing her discomfort:  "I never said anything.  I was scared.  He was just so mean."  *Id.* Ultimately, and not denied, Madison observed:  "I felt like I was just a human sex doll."  *Id.*

The First Article then pulls back and provides the historical context to how Portnoy founded Barstool, growing it into a "half-a-billion-dollar digital-media empire of sports gambling, crude humor, and barely clothed women."  Ex. A at 7.  As the Article notes, Portnoy (who identifies himself to his followers as "El Presidente") "makes no secret of the fact that he likes to have sex with young women, and to push the boundaries of what is socially acceptable."  *Id.* at 4. Indeed, the Article reports—and Portnoy does not dispute—that he had been the subject of three leaked sex tapes depicting aggressive, kinky sex, with one video showing him "violently chok[ing] a woman using a collar and a leash."  *Id.* at 4.  Nor does he dispute that an official Barstool documentary "features Portnoy forcefully digitally penetrating a sex doll while donning a tuxedo." *Id.* at 4-5.  Portnoy's response: "I used to sling it."  Nor does he challenge that he once defended a man acquitted of raping a 24-year-old, arguing that she "kind of deserve[s] it" for wearing "skinny jeans," and similarly defended Harvey Weinstein's "casting-couch" bargain of sex in exchange for

3

a starring role.  *Id.* at 8.  Portnoy also does not dispute that his "community of Stoolies" (a term for Barstool fans) "have waged harassment campaigns . . . include[ing] death threats, doxing, online harassment, and targeting of people's families, friends, and workplaces."  *Id.*at 10.

With this foundation of undisputed facts, the Article turns to "Allison's" experience, a young woman and recent high school graduate who was summering on Nantucket, where Portnoy was seen as "a God and a king."  Ex. A at 13.  She recounts how she went to Portnoy's estate, and ultimately had sex with him (which he admits).  Compl. ¶ 31.  She describes that he repeatedly spit in her mouth, observing "he was really aggressive and I didn't know what to do . . . I was kind of scared and I didn't want to disappoint him."  Ex. A at 14.  When her friend picked her up, she observed that Allison "was clearly almost in shock," and her mother noted "she basically couldn't talk the next day."  *Id.*  Despite this, the Article reports that "Allison does not describe what happened to her as sexual assault but said she was still deeply disturbed by the experience. 'I just felt very preyed on.'"  *Id.* at 15.  None of these quotes are disputed by Portnoy.  Compl. ¶¶ 26-38.

Shortly after Allison's encounter, photos of her with Portnoy and of her leaving his Nantucket home were screenshot from private Snapchat accounts and spread widely around the Island.  Ex. A at 15.  As Allison explained: "she felt stressed and overwhelmed with Portnoy and the subsequent attention it got."  *Id.*  Three days later "Allison was suicidal and was hospitalized" and her mother reported to the Nantucket police that Portnoy was seeing young girls.  *Id.*  While her mother wanted her to pursue legal action, the Article states that Allison refused to do so.  *Id.*

Prior to publication, Insider reached out to Portnoy for comment on "specific allegations and details" that it planned to publish.  As the First Article reports, Portnoy's attorney responded that the accusations "embody half-truths, are highly misleading, lack appropriate context, and appear to have been provided to you by individuals whose motivations and trustworthiness should at least have been fully vetted."  Ex. A at 6.  The attorney asked for more time to respond, but after Insider provided two additional days, no further comment was received.  *Id.*

***The Second Article***.  After the First Article was published, more women came forward to Insider with similar stories.  Following three months of additional reporting, Insider published the

second article at issue on February 2, 2022, "*3 more women say Barstool Sports founder Dave Portnoy filmed them without asking during sex.*"  Compl. Ex. B (the "Second Article").  The same day, Insider also published an Editor's Note explaining that its articles about Portnoy were "in the public interest and newsworthy," because, among other things, "[w]hen a rich, famous, and powerful person uses their power in a way that is harmful to other people, it is newsworthy."[1]

The Second Article recounts additional sexual encounters women described as "frightening and humiliating."  Ex. B at 2.  In total, three more women "told Insider that Portnoy filmed them during sex without asking for permission" and—as Portnoy does not deny—four women "told Insider that Portnoy has sent them at least 19 unsolicited videos of what appears to be him having sex with other women."  *Id.*  Notably, Portnoy does not challenge that two of the videos viewed by Insider show women who "appear to have difficulty breathing as they are being choked;" nor that Insider received another photo which depicts a woman's body covered in red marks accompanied by Portnoy's boast that he was responsible for the injuries.  *Id.*  Portnoy also does not deny that yet another woman told Insider that she had rough, but "consensual" sex with him, during which she "saw the iPhone filming only when Portnoy yanked her hair back and repositioned his camera to capture her face in the moment."  *Id.* at 16.

The Second Article then describes "Kayla's" experiences with Portnoy.  Kayla was 21 and living with her parents in Connecticut when she reached out to Portnoy, then 40 years old.  After exchanging "flirtatious messages" for several weeks, she travelled to his home in New York City, where he admits they had sex.  Ex. B at 6; Compl. ¶ 72.  She recounts that it was "definitely exciting" because he was "so famous," but she was also nervous "because he was so much older than me."  Ex. B at 5.  The sex "was more aggressive than Kayla anticipated" and—as Portnoy does not deny—he "began choking her so hard she couldn't breathe and . . . she became frightened."  *Id.* at 6.  Portnoy also filmed Kayla openly with his iPhone, which she found "odd

---

[1] The Complaint challenges a version of this quote, but does not attach the Editor's Note. Compl. ¶ 85 (g).  Nicholas Carlson, "*Editor's Note on Insider's Dave Portnoy articles*," INSIDER (Feb. 2, 2022) *available at* https://www.businessinsider.com/why-insider-published-its-dave-portnoy-articles-2022-2.

and creepy." *Id.*  Nonetheless, the Article makes clear that Kayla was still "willing to see Portnoy again." *Id.* at 6-7.  While Kayla now regrets her decision, she recognizes that "maybe I was being naive and hoping that something would be different." *Id.* at 7.

Kayla describes her second sexual encounter with Portnoy as "technically consensual sex, but [] not the sex I consented to." Ex. B at 7.  As she told Insider, the second encounter "was far rougher than she had anticipated or would have agreed to had she been asked." *Id.*  Describing the events—not denied by Portnoy—she notes that Portnoy "slapped her across the face 'full force,'" and then they had "very painful" sex on a living room rug causing a three inch rug burn (documented in a photo included in the Article). *Id.* at 8.  This was followed by sex in the bedroom, where Portnoy "gripped her rib cage so tightly that . . . one of her ribs broke." *Id.* at 9.  At one point, Portnoy placed his iPhone on the pillow in front of her, but Kayla "felt too intimidated to ask him to stop recording." *Id.*  The Article makes clear that she did not speak up when he hit her, noting: "if he can hit me that hard, I was like 'I don't want to make you mad.'" *Id.* at 7.  She decided it was "just better to go along with it all" since he was twice her age and she felt trapped. *Id.*  Ultimately, however, when he tried anal sex, she refused, with the Article expressly reporting that Portnoy "listened to her and 'gave up.'" *Id.* at 9.

The Article in great detail also explains Portnoy's response to Insider's reported allegations. Ex. B at 3-4.  Even before telling Kayla's story, the Article reports that when it sought comment from Portnoy before publication, Portnoy responded by publishing a four-page letter from his lawyer on Twitter. *Id.*  As the Article observes, Portnoy's lawyer "doesn't deny that any of the alleged encounters took place," but emphasized that all of his sexual encounters "have been entirely consensual." *Id.* at 3.  The letter acknowledged Kayla's rib injury but discounted it since she later "joked" about it.  The Article also reports that his lawyer said Portnoy "never filmed any sexual encounter surreptitiously or without the full knowledge and participation of his partners." *Id.*  As the Article reports, linking to the letter, Portnoy's lawyer also wrote directly to Kayla and demanded that she renounce the statements she made to Insider. *Id.* at 3-4.  The Article includes Kayla's response:  "I know what I went through . . . I'm just very determined to speak up and share

my story and hopefully encourage other women to feel confident to speak up." *Id.* at 4.

By way of further denial, Portnoy and his lawyers underscored that Kayla continued to communicate "flirtatiously" with Portnoy after the two encounters, but that fact was made clear in the Second Article, while also reporting that Portnoy sent her at least three sexually explicit videos depicting him having similarly aggressive sex with other women. Ex. B at 13.  It also reports Kayla's explanation: she often sent "short replies meant to end the conversation quickly" because "she still felt intimated by Portnoy and the fact that he possessed videos of the two of them having sex." *Id.*  She was then scared to speak publicly:  "if you go against him, it never turns out well. He's basically built his brand around that . . . ." *Id.* at 12.

The Second Article provides full voice to Portnoy's response to the First Article as well, explaining that after publication he held a press conference and posted it on social media. *Id.* at 14.  In that video, Portnoy admitted to having sex with both women in the First Article "but vehemently denied their characterization" of the events and again emphasized that he had "never done anything that's remotely not consensual." *Id.*[2]  The Article reports that Portnoy and his lawyer contended the women (one supposedly "unstable") were not credible because they exchanged sexual messages with him after their liaisons. *Id.* at 15.  Insider contextualized this with an expert perspective: according to a forensic psychologist who specializes in sexualized violence, after trauma, people often remain in contact because "[b]y trying to contact the person who hurt you, you're trying to undo in your own mind what really happened." *Id.* at 15-16.

***This Action and Portnoy's Responses to the Articles***.  Prior to the publication of the Second Article, as specifically referenced in his Complaint, on November 11, 2021, Portnoy published a nearly hour-long press-conference-style YouTube video titled "Dave Portnoy Exposes Business Insider Hit Piece" ("Press Conference").  In the Press Conference, Portnoy at great length attacks the credibility of the women's stories (much of which was addressed in the Second Article),

---

[2] As set forth more fully in Defendants' concurrently filed Request for Judicial Notice ("RJN"), in evaluating a motion to dismiss, the court may consider facts and documents that are "part of or incorporated into the complaint," *i.e.*, "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009).

but admits that he is "never ever going to be able to prove [his] version of events" because he cannot know "what's going on in [their] brain[s]." *Id.* at 26:46-26:51; 29:56-29:58.

Portnoy followed his public statements by filing this action on February 7, 2022, asserting one count of Defamation and one count of Invasion of Privacy. At its core, the Defamation claim alleges that the Articles falsely imply that the events depicted were "not consensual" and "so impermissibly violent as to constitute a sexual assault." Compl. ¶¶ 27, 71. The Complaint alleges that the "gist and sting" of the Articles is that Portnoy "is a rapist, an abuser of women, and a person who secretly records women having sex without their consent." *Id.* ¶ 85. It then specifically challenges 16 statements from the Articles and Editor's Note (together, the "Statements."). *Id.*[3] The Statements can generally be broken down into three categories: First, the Complaint challenges a number of Statements where the women describe the sex as turning "violent" or "humiliating," that it was "rougher" than "anticipated," and noting that it took a "toll on their mental health," with one women becoming "suicidal." *Id.* ¶¶ 85(a),(d), (f), (g), (j), (l), (n), and (p). Second, several Statements challenge the Article's reporting that Portnoy filmed the sexual encounters openly but "without advance permission." *Id.* ¶¶ 85(b), (c), (k), (m), and (o). Third, the Complaint challenges Kayla's depiction of his attempt to have anal sex with her, but stopped when she clearly refused. *Id.* ¶¶ 85 (e), (h), and (i).

The Invasion of Privacy claim alleges that by "releasing and publishing Mr. Portnoy's highly personal text messages and social media messages" Insider committed an unreasonable and serious violation of the Massachusetts' privacy statute and his common law right to privacy.

## ARGUMENT

Portnoy has brought two claims, one for defamation based on facts he has not adequately pleaded are false, and one for invasion of privacy, based on facts that are indisputably newsworthy. Early screening of a plaintiff's complaint is especially important in cases like this that implicate First Amendment protections, particularly when, as here, the lawsuit is a transparent attempt to

---

[3] A chart itemizing the Statements, including the context in which they appear, is annexed hereto as Exhibit 1.

chill Insider's contribution to the growing debate on the boundaries of acceptable and healthy sexual relationships in the context of an extreme imbalance of power between the participants. To embark on discovery, "a plaintiff must *first* produce a complaint that passes the plausibility test— a test that helps keep defendants from wasting time and money in discovery on 'largely groundless' claims." *Schatz v. Republican State Leadership Comm*., 669 F.3d 50, 56 (1st Cir. 2012) (emphasis in original) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). A plaintiff must establish that their claims are "plausible," which, of course, is "something more than merely possible." *Id.* at 55. Here, Portnoy's Complaint is far from plausible, and it should be dismissed.

## I.   PORTNOY'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW

To establish a defamation claim, a plaintiff must satisfy four basic elements: 1) a "defamatory" statement of fact that harms the plaintiff's reputation; 2) which was published to a third party; 3) that is provably false; and 4) that is defamatory *per se*, or which caused special damages that the plaintiff pleads specifically. *Ayyadurai*, 270 F. Supp. 3d at 355–56 (internal citations omitted). Where, as here, the plaintiff is a public figure, the plaintiff also must prove constitutional malice, *i.e.*, "that the defendant realized that his statement was false or that he subjectively entertained serious doubts as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984). Here, Plaintiff's claim is not based on any provably false statements— indeed, he concedes that the gist of the reporting is substantially true and takes aim solely at the constitutionally protected opinions expressed in the Articles. If that were not enough, and it is, his claim independently fails because he has not adequately pleaded that the Defendants acted with actual malice.

### A.   Portnoy's Claim is Not Based on any "Provably False" Statements

As this Court explained in *Ayyadurai v. Floor64, Inc*., "the Supreme Court—reading the First Amendment (made binding on the states through the Fourteenth)—has hedged about defamation suits with lots of safeguards designed to protect a vigorous market in ideas and opinions." 270 F. Supp. 3d at 356 (citations and internal quotations omitted). Not only does a plaintiff bear "the burden of showing that the communications at issue are false," *id.* (citing

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986)), but "subjective statements and statements of opinion are protected under the First Amendment as long as they do not present or imply the existence of facts which are capable of being proven true or false." *Id.* (citations, internal quotations, and alterations omitted).   But here, Portnoy has not alleged that any of the underlying facts in the Articles are false, and instead he expressly takes aim at constitutionally protected opinions.   For this reason alone, the Complaint should be dismissed.

### 1.      Portnoy Cannot Meet His Burden of Pleading Material Falsity

Primarily, Portnoy's defamation claim is doomed because he has not met his burden of establishing that any of the facts set forth in the Articles are materially false.   The "sine qua non of recovery for defamation" is the "existence of falsehood."   *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 283 (1974).   Where, as here, the speech involves a matter of public concern, the "plaintiff must shoulder the burden" of proving falsity.   *Veilleux v. NBC*, 206 F.3d 92, 108 (1st Cir. 2000) (citing *Philadelphia Newspapers, Inc.*, 475 U.S. at 776). To survive a motion to dismiss, "a complaint . . . must not only allege that the statements are false, but also provide 'factual underpinning[s] to support that claim.'"   *Ayyadurai*, 270 F. Supp. 3d at 358 (citation omitted).   Further, the law of defamation "overlooks minor inaccuracies and concentrates upon substantial truth," *Veilleux*, 206 F.3d at 108 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991)).   Therefore, it is Portnoy's burden to prove that the allegedly defamatory statements at issue are "materially false."   *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003).   He cannot do so if "the substance, the gist, the sting, of the libelous charge [is] justified."   *Masson*, 501 U.S. at 517 (citation omitted).

Here, Portnoy repeatedly makes the threadbare claim that the women's accounts of sex with him are "entirely fabricated" or "pure fiction" (Compl. ¶ 25), but then contradicts his own core allegation of falsity by ***explicitly admitting*** that he had sex with the young women who spoke with Insider, that the sex was so rough he was happy to hold the "title for most aggressive sex," and that he videotapes his sexual encounters.   Compl. ¶¶ 33, 43, 72, 75, 83.   Because false facts cannot also be true facts, Portnoy's pleading leaves Defendants and the Court guessing as to what,

if anything, Portnoy claims is actually "false"—an uncertainty that eviscerates his libel claim. *See McKee v. Cosby*, 236 F. Supp. 3d 427, 450 (D. Mass. 2017) (statement is "not actionable" if the plaintiff does not—or cannot—deny the facts), *aff'd*, 874 F.3d 54 (1st Cir. 2017).[4]

At bottom, Portnoy's Complaint focuses on three substantive depictions, but he has not, and cannot, plead that any of these events as depicted in the Articles are *materially* false:

***Consensual sex turned rougher than women anticipated*:** Portnoy concedes that he likes "aggressive" sex. Press Conference at 8:38 ("you can say Dave likes aggressive sex. I mean, yeah, everyone's seen it."). And he does not deny he spit in Madison's and Allison's mouths and choked them. *Cf.* Compl. ¶¶ 26, 41. The Complaint concedes that Kayla received a three-inch rug burn to the point it left blood on the carpet, and that she even told him her rib was injured during aggressive sex and that he "still hold[s] my title for most aggressive sex." *Id.* ¶ 75. Nor does Portnoy deny choking Kayla or slapping her on her face and buttocks. *Cf.* Compl. ¶¶ 65-77. He does not deny there are videos of him that "show women who appear to have difficulty breathing as they are being choked," nor a photo of a "woman's body covered in red marks with an accompanying message boasting that he was responsible for the injuries." *Cf.* Compl. Ex. B at 2, 16-17, *with* Compl. ¶¶ 64-77.

***Portnoy filmed openly, but without permission*:** The Complaint does not deny he filmed Madison and Kayla during sex without asking first. *Cf.* Compl. ¶¶ 39-52,75. Portnoy only alleges that he did not "surreptitious[ly]" or "secretly" videotape the women, when the Articles make it abundantly clear that the filming was entirely in the open—even noting that Kayla had sex with him again *after* she realized he filmed their first encounter. Compl. ¶¶ 5(ii), 75, 83; Ex. B at 6.

***Portnoy attempted to have anal sex without asking first*:** The Complaint's focus on Kayla's claim that Portnoy tried to have anal sex with her is particularly misguided. The Article

---

[4] Further, such threadbare allegations must be disregarded. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013) ("When allegations, though disguised as factual, are so threadbare that they omit any meaningful factual content" they will be treated "as what they are: naked conclusions."); *Martin v. Mooney*, 448 F. Supp. 3d 72, 85 (D.N.H. 2020) (dismissing libel claim claiming description of termination was false where the Complaint "includes no assertions about [plaintiff's] professionalism or the reason for his termination"); *McKee*, 874 F.3d at 63 (affirming dismissal of claim where plaintiff alleged falsity of characterization, but not underlying facts).

makes it clear that Portnoy did *not* force Kayla to have anal sex after she refused.  Ex. B at 9.  Indeed, this incident is the only time that the Articles detail any woman actually voicing a refusal to engage in a sexual act—and Portnoy respected that line.

Thus, far from pleading falsity, Portnoy concedes that the facts in the Article are substantially accurate.  To the extent the Complaint pleads any specific facts in an attempt to show falsity, it relies on the time-worn contention that women must be lying if they engaged in sexual banter before and after the sexual encounters at issue.  *E.g.*, Compl. ¶¶ 31, 36, 40, 48.  But the Articles fully *disclosed* these facts.  The Articles explain that Madison told Portnoy before they met that she had a "rape fantasy" where she did not "have any control of what's going on," that he received "flirtatious messages from Allison after the two had sex but before she was hospitalized," and that Portnoy received "messages of a sexual nature [from Kayla] two years after their last sexual encounter."  Ex. A at 2, 13; Ex. B at 14-15.  Thus, the Articles do, in fact, include the very information that Portnoy claims somehow renders the depictions of the events false.  For this reason, Portnoy has not adequately pleaded that any of the allegedly defamatory Statements are materially false, and his Complaint should be dismissed.

### 2.    The Women's Characterizations of their Encounters are Non-Actionable Opinion

Rather than focusing on the *facts* set forth in the Articles, Portnoy objects to the women's descriptions of sex with him as "rough," and "violent," leaving them feeling "uncomfortable," "humiliate[ed]," or "frighten[ed]," and Insider's editorial opinion that their stories are newsworthy because they involve a powerful person using power in a "way that is harmful."  Compl. ¶¶ 85(a), (b), (d), (g).  But, as this Court explained in *Ayyadurai*, "[d]efamatory statements are not punishable unless they are capable of being proved true or false." 270 F. Supp. 3d at 358 (citation omitted).  Thus, statements cannot support liability if they are "highly subjective and susceptible of numerous interpretations." *Veilleux*, 206 F.3d at 115 (citing *Levinsky's, Inc. v. Wal-Mart Stores,*

*Inc.*, 127 F.3d 122, 129-30 (1st Cir. 1997)).[5]  Likewise, conclusions "based on disclosed or assumed nondefamatory facts" also are not actionable "no matter how unjustified or unreasonable the opinion may be or how derogatory it is." *Yohe*, 321 F.3d at 42 (quoting *Dulgarian v. Stone*, 420 Mass. 843, 850 (1995)); *see also Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.") (citations omitted).

These principles informed this Court's dismissal of a libel claim over statements that a scientist and entrepreneur was a "liar" and a "fake" when he claimed to have invented e-mail. *Ayyadurai*, 270 F. Supp. 3d at 349.  In dismissing the claim, this Court reasoned that "by its nature, the question of who invented e-mail is not subject to one, and only one, 'true' answer.  The answer depends upon how 'e-mail' itself is defined" as well as "how one defines 'fake.'"  *Id.* at 358-59.  "Because both terms, in this context, are imprecise, the statements are not actionable."  *Id.* at 359.  Separately, the statements were protected opinion because the articles "provide all of the relevant facts on which defendants rely in reaching the conclusion that plaintiff's claim is false," including the history of the electronic messaging system the plaintiff invented.  *Id.* at 360.

Under both theories, it is clear that Portnoy's actual issues with the Articles are based on constitutionally protected opinions.  Specifically, the thrust of Portnoy's Complaint is his contention that the women described sex that was "impermissibly violent," or that they later found the experiences "humiliating" or "rougher than she anticipated."  But, as in *Ayyadurai*, the question of what is "impermissibly" violent or "humiliating" is too imprecise to support liability.  That alone is enough to support dismissal here.  And the fact that the women never protested during their sexual encounters with Portnoy yet, nevertheless, felt that he crossed a line is precisely the type of "person[al] motivation" that "can never been known for sure."  *Ayyadurai*, 270 F. Supp.

[5]"Whether a statement is a verifiable fact . . . can be decided by the court as a matter of law."  *Piccone v. Bartels*, 785 F.3d 766, 772 (1st Cir. 2015).

3d at 365.[6]

More than that, and as in *Ayyadurai*, the Articles lay out all of the factual support for the conclusion that the sexual encounters with Portnoy were "harmful" or more aggressive than these women had anticipated. The Articles note that the young women originally reached out to Portnoy and some continued communicating with him long after their sexual encounters with him, all the women knew they were going to his place in order to have sex with him, some had been on the receiving end of "graphic videos of other women [Portnoy] slept with" before they too chose to sleep with him, and one even told Portnoy before she met him that she had a "rape fantasy" where she had no control. Indeed, Kayla admits that her first sexual experience with him was startling and creepy because he filmed her and choked her so "hard she couldn't breathe"—yet, she *still* chose to have another sexual encounter with him. These disclosures provide the hallmark for protected opinion. Readers are left to determine for themselves if the women's opinions about their encounters are justified—or even if Portnoy himself is justified in believing, as he clearly does, that these experiences were fully consensual.

On this point, the case of *Coleman v. Grand*, 523 F. Supp. 3d 244, 263 (E.D.N.Y. Feb. 26, 2021), *appeal docketed*, No. 21-800 (2d Cir. Mar. 26, 2021), is instructive. There, an aspiring musician wrote a letter referring to "sexual harassment," an "abusive dynamic," and being a "victim" in a relationship with the plaintiff, a prominent musician. The plaintiff alleged the letter accused him of "criminal, non-consensual sex," but the court dismissed the libel claims on summary judgment, holding that "[e]ven if she had alleged criminal conduct, and even though allegations of sexual harassment can be actionable, [the] letter remains protected opinion" because it "is a personal narrative" in which supporting facts are disclosed. *Id.*; *see also Driscoll v. Bd. of Trs.*, 70 Mass. App. Ct. 285, 296-97 (2007) (dismissing libel claim based on letter explaining that

---

[6] This principle applies fully to the statement that Allison "who has had depression, said she was suicidal after the two had sex," Compl. ¶ 85(n); *see also id.* ¶ 27. *See also Scholz v. Boston Herald, Inc.*, 2013 WL 5531637, at *1 (Mass. Sup. Ct. 2013) (impossible to disprove motivation behind suicidality because someone else's mental state "could never be objectively proven"); *Scholz v. Delp*, 473 Mass. 242, 251 (Mass. Sup. Ct. 2015) (statements referencing "suicide" were non-actionable opinion because they are not capable of being proved true or false). Moreover, Insider made clear that it was not just Portnoy's conduct that distressed Allison, but the toxic results of its exposure on social media "and the subsequent attention it got" on Snapchat.

boys were expelled because they participated in a "pressurized" sexual encounter with 5 boys and 1 girl because the "statements regarding whether there was pressure or coercion are opinions clearly based on disclosed nondefamatory facts.").

Here, the clearest sting that emerges from this nuanced reporting is that these young women clearly initially consented to sex, but Portnoy pushed farther and rougher than what they wanted, although the women never felt comfortable actually voicing their displeasure, and they ultimately found the experience "frightening" and "humiliating." *E.g.*, Compl. Ex. B at 2; *cf.* Compl. ¶¶ 85(b), (d), (e), (f), (h), (j), (m).  The women claim they never told Portnoy to stop because in the moment, they did not know what to do—"he's so much older, he's famous" and they were in their late teens and early 20s, alone in the home of a media mogul.[7]

This dynamic plumbs the most difficult line-drawing problems in contemporary conversations about sex.  There is immense room for disagreement about the extent to which "affirmative," "explicit," or "continuing" consent should be *de rigueur*—and what, if anything, these concepts mean in practice.  Whether Portnoy should have explicitly asked before dialing up the roughness of sex, and whether he should have been more sensitive to his partners' reactions to his conduct, is something about which readers may disagree.  But neither the fully disclosed underlying facts (which Portnoy does not deny), nor the source's subjective expression of their reactions are actionable.

### 3. The Articles do not imply that Portnoy committed crimes

As none of the actual statements in the Articles are actionable, Portnoy's remaining claims of falsity rely on alleged implications that the Articles imputed crimes, but this reading is not borne out by what Insider actually wrote.  In evaluating implied defamatory meaning, the publication "must be interpreted reasonably," leading a "reasonable reader" to conclude that it conveys the

---

[7] For this same reason, the statement from the Editor's Note, that "[w]hen a rich, famous, and powerful person uses their power in a way that is harmful to other people, it is newsworthy," is not actionable.  Compl. ¶ 85(g).  This is plainly Mr. Carlson's opinion based on the facts disclosed in the Articles.  *See Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 249 (1st Cir. 2000) (subjective judgment that expresses a "vague and subjective *characterization* of what happened" is not actionable).

alleged implication.  *Amrak Prods, Inc.. v. Morton*, 410 F.3d 69, 72-73 (1st Cir. 2005).[8] "At bottom, any implication supporting a defamation claim must derive primarily from the specific language used (or the 'gist' derived from that language)."  *McKee*, 236 F. Supp. 3d at 443. "Context matters in assessing such claims: 'The court [must] examine the statement in its totality in the context in which it was uttered or published'" and "'must consider all the words used, not merely a particular phrase or sentence.'"  *Amrak Prods.*, 410 F.3d at 72-73 (citation omitted). When the Articles are reasonably read in full context, Portnoy's implication claim fails.

**The Articles do not charge Portnoy with rape or sexual assault.**  Portnoy contends that the Articles portray the sex as "impliedly non-consensual," Compl. ¶ 25, or somehow "so impermissibly violent as to constitute a sexual assault," *id.* ¶ 27*; see also id.* ¶¶ 85-86.  But the Articles expressly state the sex was not criminal.  Insider noted that "Allison *does not describe what happened to her as sexual assault* but says she was still deeply disturbed by the experience." Compl. Ex. A at 15 (emphasis added).  In describing sex that was "more aggressive than Kayla anticipated," and "way too much," Insider prominently featured her admission that it was "*technically consensual sex*" that she "*[went] along with*," Compl. Ex. B at 7 (emphasis added). That Portnoy "gave up" trying to have anal sex with her after she said no (*id.* at 9; *cf.* Compl. ¶ 70) signals that Portnoy did not rape her.  *See Coleman*, 523 F. Supp. 3d at 263 (letter did not imply rape where it "recounts only instances in which Coleman tried to convince her to have sex but gave up after she refused—not instances in which he persisted despite her refusal").  Indeed, Portnoy concedes this, acknowledging that Insider "never said" he raped anyone, and "they never said it wasn't consensual."  Press Conf. at 33:04-33:08.

**Insider did not accuse Portnoy of "surreptitious recording."**  Criminal surreptitious recording requires "intent to *secretly* conduct or hide such activity, when the other person . . . would have a reasonable expectation of privacy in not being so photographed . . . *and* without that

---

[8] Courts are to interpret headlines "in light of the entire context of the publication – *i.e.*, the entire text of the article – to survive dismissal." Portnoy's claim regarding supposedly "standalone" headlines (Compl. ¶5.i) must be considered in the context of the publication as a whole.  *Id.*; *see also Foley v. Lowell Sun Publ'g Co.*, 404 Mass. 9, 11, (1989).

person's knowledge and consent."  Mass. Gen. Laws 272 § 105(b) (emphasis added).  While the accounts Insider published characterized instances of filming as without "asking," without "advance permission," or even "without consent," (Compl. ¶¶ 85(c), (k), (o)), in each instance it is disclosed that Portnoy did not hide the filming and the women saw they were being filmed. Compl. Ex. A at 3; Ex. B at 6, 9.   Insider thus made clear that Portnoy did not film "surreptitiously," and that his conduct was not criminal.  Moreover, Insider published Portnoy's claim—however conclusory—that he "did not film without advance permission," (Compl. Ex. B at 3), allowing readers to assess the situation for themselves.

> **The police report is described truthfully.**   Portnoy claims the First Article "falsely suggested that he was under criminal investigation for sexual assault,"  Compl. ¶ 28, but, again, Insider said no such thing.  Insider wrote only that "after finding Portnoy's messages, Allison's mother called the Nantucket Police Department," and "told the police, 'go put somebody outside his door because you're going to see every day there's some young girl being dropped off.'" Compl. Ex. A at 15.  The Complaint concedes, as it must, that Allison's mother made this claim. Compl. ¶ 28.  But the Article makes clear that no legal action, let alone a criminal charge, was pursued against Portnoy.  Compl. Ex. A at 15.[9]  The Articles simply do not imply any criminality and Portnoy's Complaint must be fully dismissed with prejudice.

### B.      Portnoy Fails to Plausibly Plead Actual Malice

Portnoy's libel claim fails for the independent reason that—as an admitted "celebrity" and "one of Massachusetts's most well-known entrepreneurs and media personalities" (Compl. ¶ 3)— Portnoy is a public figure who must plausibly plead actual malice, and he has failed to do so.

To ensure "breathing space" for "freedoms of expression," the Supreme Court has long required public officials and public figures who sue for libel to prove "actual malice."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (emphasis added); *Gertz v. Robert Welch, Inc.,* 418

---

[9] Because Insider accurately described the police report, Portnoy's claim fails even if he disputes the validity of Allison's mother's underlying grievance.  *See, e.g., Mateo v. Univ. Sys. of N.H.*, 2019 WL 199890, at *7 (D. Mass. Jan. 14, 2019).

U.S. 323, 333-34 (1974).  This heavy burden requires a public figure like Portnoy to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."  *Bose Corp.*, 466 U.S. at 511 n.30.  This exacting standard far exceeds negligence.  *Schatz*, 669 F.3d at 56; *see also Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient.").

Pleading actual malice is an onerous task.  In *Schatz*, the First Circuit clarified that "to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred – even in a world with *Twombly* and *Iqbal*."  669 F.3d at 58.  And "in determining whether allegations cross the plausibility threshold, an inquiring court need not give weight to bare conclusions, unembellished by pertinent facts."  *Shay v. Walters*, 702 F.3d 76, 82-83 (1st Cir. 2012).  Given this high bar, courts within the First Circuit regularly dismiss defamation claims where plaintiff's "allegations concerning defendants' mental state [were] conclusory . . . or unrelated to [defendants'] subjective belief."  *Bah v. Apple Inc.*, 2021 WL 4416104, at *3 (D. Mass. Sept. 27, 2021), *appeal docketed*, No. 21-1868 (1st Cir. Nov. 1, 2021); *Diaz v. Gazmey Santiago*, 2020 WL 1042041, at *6 (D.P.R. Mar. 3, 2020) ("[L]egal conclusions recapitulating the actual malice standard  . . . [are] insufficient to survive scrutiny under Fed. R. Civ. P. 12(b)(6).").  Portnoy's conclusory incantations of the legal standard for actual malice (Compl. ¶¶ 6, 17) fail to clear this bar, because they fail to provide any plausible, factual basis to infer that any defendant had serious doubts that the material facts about Portnoy were false.

Preliminarily, Portnoy's pleading with respect to actual malice is flawed in that he does not "bring home" his actual malice allegations as to each specific Defendant.  "[T]he state of mind required for actual malice would have to be brought home to the persons in the (publisher's) organization having responsibility for publication."  *Loeb v. Globe Newspaper Co.*, 489 F. Supp. 481, 485 (D. Mass. 1980) (quoting *Sullivan*, 376 U.S. at 287).  That means "[w]hen there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a particular statement, and

it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013); *see also BYD Co. v. Vice Media LLC*, 2022 WL 598973 at *3 fn.5 (2d Cir. Mar. 1, 2022). Here, Portnoy named multiple defendants, but fails to "bring home" his allegations of actual malice to any of them specifically. Rather, he vaguely lumps them together as the "Defendants" and claims they all acted with actual malice. But this general allegation is insufficient—there is no clear indication that any defendant had any knowledge of falsity. As just one example, there is not a single fact in the Complaint that could support a finding that Henry Blodget, the CEO of Insider had serious doubts about the challenged Statements or that he even played any role in the publication of these Articles. Compl. ¶¶ 4, 11. For this reason alone, Plaintiff's pleading falls far short.

Even putting this threshold failure aside, the core of the Complaint's actual malice allegation boils down to the same allegations that fail to plead falsity: Portnoy insists Insider should have blindly credited his version of events, and refused to believe the multiple women who relayed strikingly similar accounts of aggressive sex because he allegedly possesses "overwhelming," "exculpatory evidence" disproving how they felt about their sexual encounters. (Compl. ¶¶ 6-7, 29, 49, 63, 76, 83). Portnoy's argument mischaracterizes his communications as "exculpatory,"—when they actually affirm that he did have sex with these women and it was rough enough that he ended up "joking" with one that he fractured her rib and was happy to hold the title of "most aggressive sex." In any event, Insider had no obligation to further report, or rely upon, Portnoy's self-serving materials. *Schatz*, 669 F.3d at 58 ("That his complaint also alleged that the [defendants] passed on doing 'additional' legwork to verify the truth behind its statements does not change things."); *see also Worrell-Payne v. Gannett Co.*, 49 F. App'x 105, 108 (9th Cir. 2002) (defendants 'knowledge that plaintiff made "statements [] in her own defense at a press conference" and distributed packet of "corrective information" did not support a finding of actual malice). Here, like *Schatz*, there is no evidence that Insider purposefully avoided discovery of the truth or engaged in anything but diligent journalism. To the contrary, Portnoy admits that Insider investigated the First Article for seven months, tried to interview Portnoy, sought his comment,

included his denials and hyperlinked to Portnoy's and his lawyer's responses, and went back to its sources to corroborate the authenticity of the additional messages. This is "conduct [that] tends to undercut any inference of actual malice." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

Nor can the complaint establish actual malice by pointing to things that Insider never published. The conclusory claims that "Portnoy has never sexually assaulted anyone, and Defendants are well-aware of this fact," (Compl. ¶ 6), is yet more misdirection, given that Insider did not accuse Portnoy of sexual assault. *See* Point I(A)(3), above. Likewise, the allegation that Insider published the police report despite knowing it "contained no allegations of rape" (Compl. ¶ 29) is a red herring, since Insider never stated or implied that it did. *See* Point I(A)(3), above.

The Complaint's remaining allegations of actual malice sound a familiar chorus of claims that courts have repeatedly and readily rejected:

- Claimed motives to increase "viewership," "subscriptions," revenue, or attention (Compl. ¶¶ 1, 3, 5, 21) are unavailing because " [i]f a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases . . . would be little more than empty vessels." *Harte-Hanks Commc'ns*, 491 U.S. at 667.

- Insider never sought to publish a "calculated smear campaign," (Compl. ¶ 4), or "preconceived and biased agenda," (Compl. ¶ 5(iii)), or "angle" (Compl. ¶ 19),—but even if allegations of "a preconceived and biased agenda" are taken as true, they would not plead actual malice because allegations that a publisher exhibited malice, animosity, or ill-will are insufficient to plead actual malice. *See, e.g.*, *Diaz*, 2020 WL 1042041, at *7 (explaining that "despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication") (internal citations and quotations omitted); *Franchini v. Bangor Publ'g Co.*, 2020 WL 1879012, at *4 (D. Me. Apr. 15, 2020) ("a bare assertion of bias . . . has little purchase in the actual malice assessment").

- Insider made clear that several of its sources harbored negative feelings towards Portnoy. *See* Point I(A). But alleged reliance on sources with "bias" (Compl. ¶ 5(iv)) does not plausibly

allege actual malice, particularly here, where Insider spoke with multiple women with similar accounts and reviewed photos and videos that further corroborated their accounts. *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968) (reliance on a single source locked in a fierce struggle with officials closely allied to plaintiff did not permit an inference of actual malice when the publisher had "verified other aspects" of the source's information and had other indicia of the source's credibility); *Tavoulareas v. Piro*, 817 F.2d 762, 792-93 (D.C. Cir. 1987) ("evidence of personal animus . . . not indicative of the defendants' actual malice in view of their independent corroboration").

- The quoted messages in the Complaint merely display journalistic requests for comment—not any attempt to "shame" advertisers. (Compl. ¶ 60). But even accepting as true the allegation that Insider communicated with Barstool's advertisers to "encourage them to stop doing business with Mr. Portnoy" in light of the troubling accounts Insider published (*id.*), a publisher's purported desire for social impact "lends no support" to allegation of actual malice. *D.A.R.E Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1286 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001).

- Refusals to retract or correct a story (Compl. ¶ 4) have no bearing on actual malice because malice must exist "at the time of the publication." *Sullivan*, 376 U.S. at 286; *see also Blankenship v. Napolitano*, 451 F. Supp. 3d 596, 619 (S.D.W. Va. 2020) ("None of these allegations are relevant to the issue of actual malice because actual malice is based on a defendant's subjective state of mind at the time the challenged statement was published . . . .").

In short, Portnoy has not come close to meeting his burden of pleading actual malice, and the Complaint can be dismissed on this independent ground.

## II.    PORTNOY'S PRIVACY CLAIM FAILS

Portnoy's privacy claim targets Insider's publication of what he calls "highly personal text messages and social media messages," (Compl. ¶ 93), exchanged with the women who spoke to Insider—which Insider obtained voluntarily from those women. This sparse tag-along claim, however, runs headlong into black-letter constitutional protections for speech on matters of public

concern—which have long been held to include private communications and facts that, as here, relate to important social issues.

As the Supreme Court has explained, such speech "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (citation omitted).  Consequently, the Court repeatedly has rejected the application of state privacy laws to truthful publications on matters of public concern.  *E.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 536 (1989) (statute barring publication of names of victims of sex offenses could not be applied to a "news article [that] concerned 'a matter of public significance'") (citation omitted); *Bartnicki v. Vopper*, 532 U.S. 514, 533-34 (2001) (media defendant not held liable for broadcasting private conversation about labor dispute that a third party illegally recorded, because it would "impose[] sanctions on the publication of truthful information of public concern").

For publication-based privacy claims, courts evaluate the issue of public concern[10] by looking to the publication as a whole.  *Florida Star*, 491 U.S. at 536-37.  Accordingly, the First Circuit has held that "[e]ven if the private fact is not itself newsworthy, its publication is still protected if it has substantial relevance to, or any substantial nexus with a newsworthy topic." *Riley v. Harr*, 292 F.3d 282, 298 (1st Cir. 2002) (citation omitted); *see also Thibault v. Spino*, 431 F. Supp. 3d 1, 10 (D. Conn. 2019) (Facebook post criticizing an elected official's parenting is matter of public concern, reasoning that childhood "[b]ullying is a subject of public interest").

Applying these principles, the court in *Bonome v. Kaysen* held that a book publisher had a First Amendment right to publish "graphic" details regarding several sexual encounters between an author who wrote about her undiagnosed genital pain and her private-figure boyfriend.  2004 WL 1194731, at *5-6 (Mass. Super. Ct. Mar. 3, 2004).  In determining whether these details of an "intensely intimate and personal nature" related to a matter of public interest, the court began by noting that, in light of the constitutional interests at play, "courts have been generous to publishers

---

[10] "Whether speech is on a matter of public concern is a question of law, determined by the court."  *Greisen v. Hanken*, 925 F.3d 1097, 1109 (9th Cir. 2019).

in determining that private information relates to issues of legitimate public concern." *Id.* at \*6. Thus, the court held that details of the couple's private sexual relationship were relevant to the memoir's exploration of "when undesired physical intimacy crosses the line into non-consensual sexual relations in the context of her condition." *Id. See also Peckham v. Bos. Herald, Inc.*, 48 Mass. App. Ct. 282, 289 (1999) (affirming dismissal of privacy claim where personal details of a prominent businessman's extramarital affair were related to the several broader topics of public interest, including "workplace liaison between an employee and her superior").

Here, the limited quotations from text messages relate to a matter of urgent public interest: how Portnoy's attitude and conduct towards women relate to his management of an influential and lucrative online media organization and its many followers. The messages are included only because they illustrate and substantiate the Article's reporting about Portnoy's troubling behavior towards much younger women — an issue explicitly and repeatedly linked to the casual misogyny that infuses the half-a-billion dollar media organization where he is Head of Content. Compl. Ex. A at 7, 17; Compl. Ex B at 14. Indeed, Insider's reporting is part of "the broader social context" of the #MeToo movement, which courts recognize has encouraged men and women to "opine on complex topics like the role of sex" and "add [their] narrative to industry-wide talks." *Coleman*, 523 F. Supp. 3d at 264. As the court emphasized in *Bonome*: "there is an additional interest in this case: [the woman]'s right to disclose her own intimate affairs," 2004 WL 1194731, at \*6. For this reason, Plaintiff's privacy claim easily fails.[11]

## CONCLUSION

The Complaint aims to chill Insider's addition to the important and public discussion about "the boundaries of what is considered socially acceptable" sexual encounters from a media mogul who has made this exact "image . . . the core of [his] brand." Because Insider's reporting is fully

---

[11] The privacy claim fails for the additional reason that this type of information about Portnoy "was in the public domain and was no longer private information." *Brown v. Hearst Corp.*, 862 F. Supp. 622, 631 (D. Mass. 1994), *aff'd*, 54 F.3d 21 (1st Cir. 1995). Portnoy does not deny that, before Insider's publication, sex videos of him were publicly disclosed depicting similar sexual conduct, including a video of him choking a woman with a leash and collar, circulated so widely that the stock price of Barstool Sports' parent company plummeted. Compl. Ex. A at 4.

protected speech, the Complaint must be dismissed with prejudice.

Dated:  April 11, 2022

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

/s/ *Elizabeth A. McNamara*

Elizabeth A. McNamara (admitted *pro hac vice*)
Rachel F. Strom (BBO #666319)
Brendan N. Charney (admitted *pro hac vice*)
Lindsey B. Cherner (admitted *pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
rachelstrom@dwt.com
brendancharney@dwt.com
lindseycherner@dwt.com

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that on Wednesday, April 6, 2022, Elizabeth A. McNamara, counsel for Defendants, conferred with Howard Cooper, counsel for the Plaintiff, in a good faith attempt to narrow or resolve the issues addressed in this motion.

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara

Dated:  April 11, 2022