IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID PORTNOY,

                    Plaintiff,

INSIDER, INC., at al.

                    Defendants.

Civil Action No. 1:22-cv-10197-FDS

LEAVE TO FILE GRANTED
MAY 19, 2022 (ECF No. 33)

ORAL ARGUMENT REQUESTED

**<u>DAVID PORTNOY'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... iii

I. INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND ................................................................................3

      A.      The First Story ............................................................................................3

              i.      "Allison" ....................................................................................4

              ii.      "Madison" ..................................................................................7

      B.      Insider's Promotional Campaign .................................................................9

      C.      The Second Story .......................................................................................12

              i.      "Kayla" .....................................................................................13

      D.      The Editor's Note .......................................................................................15

III. ARGUMENT .......................................................................................................16

      A. The Articles Are Actionable Under Clear Massachusetts Law Where
      They Falsely Accuse Mr. Portnoy of Non-Consensual Sex Through Implication,
      Innuendo and Express Statements, and Make Other Defamatory Statements
      of Provably False Facts ......................................................................................16

              i.      Applicable Law – Defamatory Statement of Fact.........................16

              ii.      The Articles Falsely Accuse Mr. Portnoy of Engaging
                        in Non-Consensual Sex Through a Combination of
                        Implication, Innuendo, and Express Statements ...........................18

             iii.      The "Facts" Upon Which the "Opinions" Are Premised
                        Are Incomplete and in Many Cases False, Rendering the
                        Exception for Defamatory Opinions Based on Disclosed
                        Facts Inapplicable...........................................................................20

      B. The Complaint Pleads Sufficient Facts to Allege
      Defendants Acted with Actual Malice in Publishing the Articles..................24

              i.      Applicable Law – the Actual Malice Standard ..............................25

i

ii.    Defendants Willfully Ignored Evidence That
       Casts Serious Doubt on the Credibility of Their
       Sources and the Veracity of Their Allegations ............................................26

iii.   Defendants' Publication of Mr. Portnoy's Denials
       and Perfunctory and Sanitized Reference to His
       Exculpatory Evidence Does Not Negate the Plausible
       Inference of Actual Malice .............................................................................28

iv.    The Complaint Need Not "Bring Home" the Allegations
       of Actual Malice to the Individual Defendants Without
       the Benefit of Discovery ..................................................................................29

C. The Complaint Adequately Pleads a Cause of Action for Invasion of Privacy
   Because Mr. Portnoy's Consensual Sex Life Is Not Newsworthy .................................30

IV. CONCLUSION..........................................................................................................................30

# **TABLE OF AUTHORITIES**

## **Cases**

*Bose Corp. v. Consumers Union of U.S., Inc.*,
692 F.2d 189 (1st Cir. 1982)...................................................................................25, 26, 28

*Brown v. Hearst Corp.*,
54 F.3d 21 (1st Cir. 1995)...................................................................................................19

*Carwile v. Richmond Newspapers*,
82 S.E.2d 588 (Va. 1954)....................................................................................................19

*Celle v. Filipino Reporters Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)................................................................................................28

*Dempsey v. Time Inc.*,
252 N.Y.S.2d 186 (N.Y. Sup. Ct. July 22, 1964) ...............................................................29

*Depp v. Heard*,
No. CL-2019-2911, 2020 WL 8772348 (Va. Cir. Mar. 27, 2020)......................................20

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (1st Cir. 2013)...............................................................................................29

*Freeman v. Town of Hudson*,
714 F.3d 29 (1st Cir. 2013)...................................................................................................3

*Fudge v. Penthouse Int'l, Ltd.*,
840 F.2d 1012 (1st Cir. 1988)..............................................................................................20

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985)................................................................................................3

*Harte-Hanks Comms., Inc. v. Connaughton*,
491 U.S. 657 (1989).................................................................................................25, 26, 27

*Helprin v. Harcourt, Inc.*,
277 F. Supp. 2d 327 (S.D.N.Y. 2003)....................................................................................3

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ........................................................................................25, 28

*Lemelson v. Bloomberg L.P.*,
903 F.3d 19 (1st Cir. 2018)...................................................................................................28

*Levesque v. Doocy*,
560 F.3d 82 (1st Cir. 2009).............................................................................25

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997)...................................................................17, 20

*Loeb v. Globe Newspaper Co.*,
489 F. Supp. 481 (D. Mass. 1980)...................................................................29

*Lyons v. Globe Newspaper Co.*,
415 Mass. 258 (1993)........................................................................................21

*McKee v. Cosby*,
236 F. Supp. 3d 427 (D. Mass. 2017)...............................................................21

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990)...........................................................................17, 18, 21

*Murphy v. Boston Herald, Inc.*,
449 Mass. 42 (2007)..........................................................................................28

*Peckham v. Boston Herald, Inc.*,
48 Mass. App. Ct. 282 (1999)...........................................................................30

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992).............................................................................17

*Piccone v. Bartels*,
785 F.3d 766 (1st Cir. 2015)....................................................................17, 18, 21

*Reilly v. Associated Press*,
59 Mass. App. Ct. 764 (2003)....................................................................19, 20

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002).............................................................................17

*Ruivo v. Wells Fargo Bank, N.A.*,
766 F.3d 87 (1st Cir. 2014)...............................................................................20

*Schatz v. Republican State Leadership Comm.*,
669 F.2d 50 (1st Cir. 2012)....................................................................27, 28

*Scholz v. Delp*,
473 Mass. 242 (2015)........................................................................................18

*Shafir v. Steele*,
431 Mass. 365 (2000) ..............................................................................................19

*Smartmatic USA Corp. v. Fox Corp.*,
No. 151136/2021 (N.Y. Sup. Ct. March 8, 2002)........................................................29

*St. Amant v. Thompson*,
390 U.S. 727 (1968)...................................................................................24, 25, 26

*Stanton v. Metro Corp.*,
438 F.3d 119 (1st Cir. 2006)...........................................................................16, 20

## **<u>Statutes</u>**

G.L. c. 214, § 1B......................................................................................................30

## I.     INTRODUCTION

Defendants, in their articles, both expressly and through innuendo, defamed Mr. Portnoy by falsely accusing him of engaging in non-consensual sex with unidentified women.  This unsupported claim and other statements in Defendants' articles constitute provably false statements of fact, despite Defendants' meritless effort to couch them solely in terms of subjective views or opinions to try to escape liability.  Defendants cannot avoid liability for defamation on the basis that their reports represented opinions based on disclosed, non-defamatory facts, where Defendants failed to fully disclose the relevant facts known to them and where the facts they did disclose were, in many cases, themselves false and defamatory.

In addition, the Complaint more than adequately pleads actual malice.  The Complaint sets forth a more than plausible basis that Defendants purposefully avoided facts which called into serious doubt the credibility of the anonymous sources, whose claims formed the sole basis for Defendants' defamatory allegations.  Indeed, as Defendants *concede* in their Motion to Dismiss, and as a review of the articles makes clear, Defendants went to great lengths in an attempt to *avoid* expressly accusing Mr. Portnoy of criminal sexual assault in the articles.  Defendants went to such lengths because they *knew* their anonymous sources lacked credibility and because they *knew* they lacked a factual basis to make and support such an accusation.  But they made the accusation anyway through innuendo.  Not only does Defendants' use of innuendo to brand Mr. Portnoy a rapist fail to insulate them from liability for defamation, but it also constitutes clear and convincing evidence of Defendants' actual malice in publishing the articles.  Defendants, in their articles, recounted versions of events which they knew were false or recklessly ignored contrary evidence demonstrating the falsity of their published claims.  Among other things, Defendants selectively and incompletely published text messages that support their pre-conceived and biased version of

the story while ignoring and omitting from their articles exculpatory text messages and those that established Defendants' anonymous sources had ulterior motives for falsely accusing Mr. Portnoy of wrongdoing.   Defendants then failed to retract or correct the defamatory articles and doubled down on their reporting by republishing their accusations of non-consensual sex against Mr. Portnoy, even *after* he presented clear evidence demonstrating that the women who accused him of assault were lying.

Defendants' assertion in their Motion to Dismiss that their articles do not accuse Mr. Portnoy of engaging in non-consensual sex is not only at odds with the text of the articles themselves (and the meaning that the Complaint plausibly alleges a reasonable reader would ascribe to that text), but also and more tellingly, would render the stories non-newsworthy.  A story that Mr. Portnoy likes to engage in rough but consensual sex, with willing sex partners, who sought him out and explicitly initiated sex, would not sell subscriptions to Defendants' website.  Rather, what made the stories newsworthy, and provided Defendants with a platform to promote their paid subscription service, and a basis to pressure Barstool Sports' advertisers to discontinue their relationships with Barstool, is precisely what made the stories actionable:  the false and defamatory allegation that Mr. Portnoy is a sexual predator and a rapist.  Without this false allegation at its center, there would be no story.  This is precisely why Defendants were willing to purposefully ignore the facts in favor of a knowingly false and defamatory portrayal of Mr. Portnoy.

For these reasons, and the reasons explained more fully below, the Court should deny Defendants' Motion to Dismiss and allow this case to proceed to discovery.

## II.     FACTUAL BACKGROUND[1]

### A.  <u>The First Story</u>

On November 4, 2021, Defendant Insider published an article on its website Businessinsider.com, written by Defendant Julia Black, titled "*I was literally screaming in pain*": *Young women say they met Barstool Sports founder for sex and it turned violent and humiliating.* Complaint ("Compl.") ¶ 21; Compl.  Ex. A at p. 1 (hereinafter, the "First Story").  For search engine optimization and "clickbait" purposes, the First Story's URL included the words "portnoy," "choking," "violent," "sex," and "stoolies" (collectively, the "URL Tags").  Compl. ¶ 21.  Further, although many Insider articles are available to the public for free, the First Story was published behind a paywall, requiring readers to sign up for Insider's paid subscription service to access it. *Id.*  This revenue generating scheme was all part of Defendants' nefarious plan.  *Id.*  The individual Defendants publicly tweeted about the claims made in the story and as a result, numerous other media outlets picked up on the story, thereby exacerbating the damage caused to Mr. Portnoy.

---

[1] Accompanying their Motion to Dismiss, Defendants have filed a separate "Request for Judicial Notice" (ECF No. 28) in which they ask the Court to take judicial notice of, and consider as part of the record in support of their Motion to Dismiss, certain documents not attached to the Complaint.  Those documents are: 1) a copy of an "Editor's Note" published by Defendant Carlson on February 2, 2022, which is attached as Exhibit 2 to the Declaration of Rachel Strom ("Strom Decl."); 2) a DVD containing a copy of a YouTube "Press Conference" published by Mr. Portnoy in response to the First Story (Strom Decl. Ex. 3); 3) a transcription that Defendants' counsel prepared of that video Press Conference (Strom Decl. Ex. 4); and 4) a copy of the Nantucket Police Department's report (the "Police Report") referenced in the articles and in the Complaint (Strom Decl. Ex. 5).  While Mr. Portnoy does not object to the Court considering the Editor's Note, which contains the defamatory statements over which Mr. Portnoy is suing Defendants, or the Police Report, which is a public record, he does object to the Court taking judicial notice of the content of the "Press Conference," which is an hour-long YouTube video to which the Complaint makes only passing reference, *see* Compl. ¶ 51.  None of the "narrow exceptions" to the general rule against considering extrinsic materials on a Rule 12(b)(6) motion apply to this video.  *See Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (holding that "passing reference" to certain depositions in the complaint "does not amount to sufficient reference" such that court may properly consider content of depositions in deciding Rule 12(b)(6) motion); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) (holding that even "limited quotation does not constitute incorporation by reference"), *quoted with approval in Freeman*, 714 F.3d at 36.  *See also Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003) (to be considered incorporated by reference, a complaint must make a "clear, definite and substantial reference to the documents.").

The First Story was the product of at least eight months of "reporting": in April 2021, Defendant Black sent an email to Mr. Portnoy requesting an interview for a purported upcoming "profile" in *Business Insider*. *Id.* ¶ 18. In her email, Black falsely proclaimed, "There's no particular angle here – I'd like to cover the full gamut, from building a media empire to becoming the face of the meme stock movement." *Id.* Mr. Portnoy declined the interview about these subjects, which have been extensively reported on in the past. *Id.* He thereafter learned, upon receiving unsolicited messages from both friends and strangers, that Black had reached out to them for comment on an article she was writing about how Mr. Portnoy is a sexual predator. *Id.* ¶ 19.

The First Story purports to recount sexual encounters between Mr. Portnoy and two women, identified by the pseudonyms "Madison," and "Allison," that Defendants expressly reported were "violent" and "humiliating" and implied were non-consensual. *Id.* ¶ 24.

### i. "Allison"

Defendants dedicate a significant portion of the defamatory First Story to an entirely fabricated account of Mr. Portnoy's alleged encounter with a woman referred to in the First Story by the pseudonym "Allison." *Id.* ¶ 25. In short, Defendants falsely reported that after a violent and impliedly non-consensual sexual encounter with Mr. Portnoy, Allison suffered from severe depression and suicidal thoughts, which allegedly resulted in her seeking treatment at the hospital. *Id.* As Defendants were well-aware prior to the First Story's publication, Allison's account is pure fiction. *Id.*

According to the First Story, in July 2020, Allison messaged Mr. Portnoy on social media, notifying him that she was in Nantucket and "would love to see him." *Id.* ¶ 26; Compl. Ex A at p. 13. Allison met Portnoy at his home, where they spent the day by the pool. Compl. ¶ 26; Compl.

Ex A at p. 14.  According to Defendants, Portnoy and Allison then began having violent sex, with the implication that the encounter was not consensual:

> "He leaned in and started kissing me and *I didn't know what to do at that point*…And we went upstairs and he was really aggressive and *I didn't know what to do and we had sex and he kicked me out*."… She said Portnoy choked her. "He kept spitting in my mouth, which was really gross … I was kind of scared. I didn't want to disappoint him."

*Id.*  (emphasis supplied).

Defendants implied that Allison's encounter with Mr. Portnoy was not consensual and was so impermissibly violent as to constitute a sexual assault.  Compl. ¶ 27.  Defendants went on to state that Allison was so distressed by the events that she could barely talk the next day.  *Id.*; Compl. Ex. A at p. 14.  They further reported that Allison was hospitalized and became suicidal due to the allegedly violent sexual encounter.  Compl. ¶ 27; Compl. Ex. A at p. 15.  Moreover, Defendants published that Allison's mother reported Mr. Portnoy to the Nantucket Police Department and, as a result, Defendants falsely suggested that Mr. Portnoy was under criminal investigation for sexual assault.  Compl. ¶ 28, Compl. Ex. A at p. 15.  The First Story also states that Allison's "mother wanted to pursue some sort of legal action against Portnoy, but Allison refused" because she "knew he would drag [her] through the mud."  Compl. Ex. A at p. 15.  Defendants falsely implied that there was a basis to pursue criminal charges against Mr. Portnoy despite knowing that claim to be false.

The allegations concerning Allison are false and belied by documentary evidence in Defendants' possession.  Compl. ¶ 29.  Indeed, Defendants had all of Allison's written communications with Mr. Portnoy prior to and after her alleged encounter with him.  *Id.*  Further, Defendants were in possession of the so-called "Police Report" filed by Allison's mother, which, critically, contained no allegations of rape, sexual assault, or any other crime for that matter, but

5

instead documented an utterly ridiculous call to the police by Allison's mother in which she suggested that the Nantucket Police "should keep an eye on David Portnoy when he is on the island because he shouldn't be dating 18 years [sic] old girls." Strom Decl. Ex. 5. Even a cursory review of the Police Report and Allison's subsequent communications with Mr. Portnoy reveal that her story was entirely fabricated. *Id.* Defendants published it anyway.

The truth stands in stark contrast to the version of events published by Defendants. The day before she visited Mr. Portnoy, Allison begged him to let her come to his house: "I'm on island with all my friends and really want to see you…would do anything…Let's hang tonight." Compl. ¶ 30. When Mr. Portnoy stated he was unavailable, Allison stated, "Noooo it's your last week [in Nantucket]." *Id.* The following day, Allison messaged Mr. Portnoy again and stated that she wanted to have sex with him: "What u doin today…*can we bang*[?]"



Allison and Mr. Portnoy made plans to see each other that day. *Id.* ¶ 32. Just prior to arriving at Mr. Portnoy's house, he texted her, "Don't be [nervous]. It'll be fun. *And if you don't wanna do anything, we won't*." *Id.* After spending time at the pool, Mr. Portnoy and Allison had consensual sex in his home. *Id.* ¶ 33.

Critically, *after* Allison was allegedly in the hospital and suicidal due to her encounter with Mr. Portnoy, she continued to contact him via text message and Instagram. *Id.* ¶ 34. None of her messages indicated that she was in any distress. *Id.* In fact, Allison sought to continue her relationship with Mr. Portnoy. *Id.* On August 1, 2020, Allison replied to Mr. Portnoy's Instagram

story in which he announced he was leaving Nantucket to spend the summer in the Hamptons.  *Id.* ¶ 35.  Allison stated, "Aww bye ☹ Nantucket is better."  *Id.*  After Mr. Portnoy responded to her unsolicited message, Allison replied, "I'm in shock that ur still dming [direct messaging] me rn [right now]…like whats up Dave Portnoy?"  *Id.*  The next day, on August 2, 2020, Allison messaged Mr. Portnoy again, stating, "If you ever want to text me my number is [redacted]."  *Id.*

As is clear by the evidence in Defendants' possession, *after* Allison was purportedly hospitalized due to Mr. Portnoy's alleged conduct, she repeatedly contacted Mr. Portnoy in hopes of seeing him again, gave Portnoy her phone number, and encouraged him to continue a relationship.  *Id.* ¶ 36.  Defendants were in possession of these messages prior to the First Story's publication, yet Defendants included Allison's false allegations in the First Story anyway and made the calculated decision to omit these exculpatory communications from their reporting.  *Id.*

### ii.  "Madison"

In addition to Allison, the First Story also purported to describe an alleged encounter between Mr. Portnoy and a second woman, referred to by the pseudonym "Madison," which, by the Defendants' description, amounted to a forcible sexual assault.  Compl. ¶ 39; Compl. Ex. A at pp. 2-4.  Defendants reported that Madison traveled to visit Mr. Portnoy at his home in Nantucket. Compl. ¶ 40.  Prior to visiting Mr. Portnoy, Madison messaged Portnoy for several weeks, wherein she described to Mr. Portnoy her "rape" fantasy.  *Id.*  Defendants went on to report an entirely fabricated series of events, namely, that Mr. Portnoy choked and raped Madison:

> "It was so rough I felt like I was being raped…It hurt and I was literally screaming in pain"… She recalled crying and shouting, "Too much! Too much!" and "It hurts!"… "*I kept trying to get away and he was like, 'stop running away from me. Stop running away from me.*'"

Compl. ¶ 41; Compl. Ex. A at p. 4 (emphasis supplied). After the purported assault, Defendants reported that Madison slept on Mr. Portnoy's couch for two additional nights rather than immediately flying back home. Compl. ¶ 42; Compl. Ex. A at p. 4.

The allegations concerning Madison are provably false. Compl. ¶ 43. In reality, Mr. Portnoy and Madison engaged in consensual sex, and Defendants were fully aware of that fact. *Id.* Indeed, prior to publishing the First Story, which selectively quotes from Madison's text and social media correspondence with Mr. Portnoy, Defendants were or should have been in possession of *all* of Madison's communications with Mr. Portnoy, as well as all of Madison's social media posts. *Id.*; Compl. Ex. A at 3.[2]

The posts on one of Madison's Instagram accounts unambiguously contradict Defendants' false report. Compl. ¶ 44. On July 19, 2020, Madison uploaded a picture of her and Mr. Portnoy playing scrabble together. *Id.* ¶ 45. The photograph depicts Madison and Mr. Portnoy together in Nantucket during the weekend of the alleged sexual assault. *Id.* In the post, Madison gloated, "Me beating Dave Portnoy in scrabble." *Id.* On July 20, 2020, after the sexual encounter, which Defendants depicted as a violent and forcible rape, Madison then posted a video revealing her true motivations with Mr. Portnoy. *Id.* at ¶ 46. In the caption to the video, Madison wrote, complete with seven "flying money" emoji:

> Portnoy was a dick and lame and grumpy. He gets a 2/10 from me. If he ever truly pisses me off I have lots of content to expose him with. I am going to stick to athletes. 💸 💸 💸 💸 💸 💸 💸.

*Id.* at ¶ 46. Later, Madison posted a picture of Mr. Portnoy with Donald Trump. In the caption to the photograph, Madison wrote, "Ok. Not my proudest fuck." *Id.* ¶ 47. Notably, in the days

---

[2] It is beyond dispute that as of November 11, 2021, when Mr. Portnoy publicly disclosed those communications (while taking steps to conceal his accuser's identity), Defendants refused to retract, correct, update, or in any way modify their defamatory First Story, and indeed, they doubled down and republished the false assault accusations via their February 2, 2022 "Editor's Note." Compl. ¶¶ 43, 80; Strom Decl. Ex. 2.

following the First Story's publication, Madison sought to take advantage of her newly-found notoriety by setting up an OnlyFans account, an online platform whereby the general public can pay Madison for personalized content (photos, videos, and live streams) via a monthly subscription membership, and more recently, has started performing in hardcore pornography. *Id.* ¶ 48.  She identified herself on Instagram as the girl from the Insider article about Mr. Portnoy.  Today, Madison uses her various social media accounts to advertise the fact that she makes hardcore pornographic content for sale online.  Despite that Defendants had access to Madison's social media posts and should have been fully aware of the problems with her false and sensationalistic account of events, Defendants published the defamatory First Story anyway. *Id.* ¶ 49.

On November 11, 2021, after taking steps to protect the anonymity of the two women who purportedly accused Mr. Portnoy of sexual assault, Mr. Portnoy published redacted versions of Madison's exculpatory Instagram posts. *Id.* at ¶ 50.  Despite having access to this information, Defendants failed and refused to retract, correct, update, or in any way modify their defamatory First Story. *Id.*  Critically, Mr. Portnoy provided Defendants with the true facts and documentation concerning Allison and Madison, including through Mr. Portnoy's various press conferences (which Insider admits it viewed), but Insider ignored the information because of its preconceived agenda to harm Mr. Portnoy's reputation.  *Id.*  In particular, Insider was made aware that critical text messages were available to them, but Insider did not include reference to them in its articles. *Id.*  Where Insider did include information from Mr. Portnoy, Insider made a transparent effort to minimize its import.  *Id.*

### B.  Insider's Promotional Campaign

As if Defendants' nefarious intent was not already apparent through their actions prior to the publication of the First Story, just minutes after Insider published it, Defendant Black tweeted

to her thousands of Twitter followers, soliciting more unsubstantiated "tips" regarding Mr. Portnoy's private life. Compl. ¶ 53. Insider made it clear that it intended to double-down on its defamatory allegations by planning to publish a follow-up story concerning Mr. Portnoy. *Id.* To ensure that her tweet reached the widest audience possible, Black "pinned" it to her Twitter profile, ensuring that her message remained at the top of her feed for all to see. *Id.* Through February 1, 2022, Black's tweet remained "pinned" to the top of her Twitter page. *Id.*

Seemingly aware that those who live in glass houses should not throw stones, prior to the publication of the First Story, Black took steps to protect herself from online scrutiny and conceal evidence of her bias and motivation to publish false accusations directed at Mr. Portnoy. *Id.* at ¶ 54. Prior to the First Story's publication, Black's public Twitter profile contained 4,151 tweets. *Id.* Just prior to publication, however, Black deleted nearly all her prior tweets, leaving only 132 tweets visible to the public. *Id.*

Simultaneously, Insider unleashed its Twitter army of executives, editors (including Defendant Carlson), reporters, and employees, shamelessly tweeting and re-tweeting the First Story in a blatant attempt to drum up buzz, and, notably, to attract new paid subscribers. *Id.* ¶ 55. Indeed, the hit piece served as the launch for Defendants' new promotion on premium subscriptions. On the day of the First Story's publication, Insider circulated its "68% off" subscription promotion, encouraging the public to sign up using Insider's libelous hit piece as bait. *Id.* at ¶ 56. For example, Insider's Senior Politics Reporter, Grace Panetta tweeted a screenshot of the promotion, along with the message "heads-up that [I]nsider is currently offering a huge discount on annual Premium subscriptions, so you can currently pay just $4/month to read incredible journalism like [Defendant Black's] investigation into Dave Portnoy!" *Id.*

Concurrently, Insider launched promoted paid advertisements for its subscription service, using Mr. Portnoy's photograph in conjunction with a new defamatory headline, "Dave Portney [sic], Barstool Sports founder, accused of allegations involving sexual violence and humiliation." *Id.* at ¶ 57. Having been publicly questioned regarding Insider's true motives in publishing the first hit piece as a vehicle to generate new subscribers, Defendant Licea immediately took to Twitter to defend Insider's decision to run a promotion at Portnoy's expense: "Broken record here, but the reason big important stories like these are behind a paywall is because people spend months working their asses off and need to make a living. Anyways, subscribe to Insider." *Id.* at ¶ 58. The next day, on November 5, 2021, Defendant Carlson tweeted a story from Insider concerning Penn National Gaming, which owns a 36% interest in Barstool Sports. In his tweet, Carlson gloated, "Penn National plummets 20% after weak earnings and allegations against Dave Portnoy." *Id.* at ¶ 59.

Perhaps most indicative of Defendants' malicious intent, in the days following the First Story's publication, Insider employees began contacting Barstool Sports' advertisers, informing them of the false allegations against Mr. Portnoy, and inquiring whether those advertisers would continue to work with Barstool Sports, in an effort to create another story. *Id.* at ¶ 59. For example, on or around November 6, 2021, Insider correspondent Patrick Coffee emailed a Barstool Sports advertiser, stating "I would like to ask whether leadership was aware of this recent story about [Barstool Sports's] founder and, if so, whether there have been any discussions regarding those partnerships and/or ad placements." *Id.* Defendants' conduct was intended to shame Barstool Sports' advertisers for working with Mr. Portnoy and his company and encourage them to stop doing business with Mr. Portnoy while at the same time creating another story for Insider to publish and promote. *Id.*

### C.  **The Second Story**

To make matters worse, on January 18, 2022, Defendants Black and Licea again emailed Mr. Portnoy informing him that Insider was planning to run an additional defamatory story (the "Second Story").  Compl. ¶ 62.  In that email, Black and Licea requested that Mr. Portnoy provide a comment for their Second Story, and respond to an additional twenty-eight bullet points of false and entirely unsubstantiated allegations.  *Id.*  In their email, Defendants Black and Licea informed Mr. Portnoy that Insider was ready to publish the Second Story, and they demanded that he respond within 48 hours to the new maelstrom of false allegations contained therein.  *Id.*

In response to the comment request email, on January 19, 2022, counsel for Mr. Portnoy sent a letter to Insider, putting Defendants on notice of the provably false allegations contained in the proposed Second Story, providing Insider with documentary evidence directly contradicting the malicious allegations contained therein, and demanding that Insider retract the claims in First Story and refrain from publishing the Second Story.  *Id.* At ¶ 63.  Defendants refused to make any changes to the First Story and published the Second Story anyway.  *Id.*

On February 2, 2022, Defendants published their second defamatory hit piece on Businessinsider.com, titled *Three More Women Say Barstool Sports Founder Dave Portnoy Filmed Them Without Asking During Sex*.  *See* Compl. Ex. B.  For search engine optimization and "clickbait" purposes, the Second Story's the URL Tags included the words and phrases "portnoy," "new women," "sexual misconduct," "filming," "sex," and "without permission."  *Id.* ¶ 64. Further, the Second Story, like the First Story, was published behind a paywall, requiring readers to sign up for Insider's paid subscription service to access it.  *Id.*

i. **"Kayla"**

The thrust of the Second Story pertains to a fabricated account of Mr. Portnoy's alleged encounter with a woman referred to by the pseudonym "Kayla."  Compl. ¶ 65; Compl. Ex. B at pp. 2-12.  In short, the Second Story falsely accuses Mr. Portnoy of sexual assault and forcible rape.  *Id.*  Defendants' narrative of events is preposterous, and, critically, belied by the evidence in Defendants' possession.

The Second Story alleges that Kayla first messaged Mr. Portnoy on Instagram in the summer of 2017, and that Kayla eventually took an Uber to Mr. Portnoy's house to visit him.  Compl. ¶ 66; Compl. Ex. B at pp. 4-6.  Defendants allege that Kayla and Mr. Portnoy had violent sex and that "it was just way too much," and, further, that Mr. Portnoy filmed her without permission.  Compl. ¶ 67; Compl. Ex. B at 6.  However, despite Mr. Portnoy's allegedly violent and non-consensual conduct, Kayla was eager to see Mr. Portnoy again.  Compl. ¶ 68.

About one month later, Kayla again visited Mr. Portnoy in New York.  Compl. ¶ 69; Compl. Ex. B at 7.  Defendants reported that "the sex during [Kayla's] second encounter was far rougher than she had anticipated or would have agreed to had she been asked."  Kayla further admitted that "Yes, it was technically consensual sex, but that was *not the sex I consented to*."  *Id.* (emphasis supplied).  Defendants also falsely reported that Mr. Portnoy attempted to force Kayla to have anal sex during this encounter, and that Kayla had injured her rib from rough sex.  Compl. ¶ 70; Compl. Ex. B at p. 9.  At a minimum, the Second Story implies that Kayla's encounter with Mr. Portnoy was not consensual and was so impermissibly violent as to constitute sexual assault.  Compl. ¶ 71.

Defendants' allegations concerning Kayla, as published in the Second Story, are provably false.  *Id.* at ¶ 72.  In reality, Mr. Portnoy and Kayla engaged in consensual sex, and Defendants

were fully aware of that fact. *Id.* Indeed, in text messages initiated by Kayla that post-date the alleged violent sexual encounters between Kayla and Mr. Portnoy, Kayla repeatedly referred to those past interactions in only positive terms. *Id.* In March 2019, after describing a "really good" albeit "scary aggressive" sexual encounter she supposedly had with another male celebrity who, according to Kayla, would "pin [her] down, choke [her] a little, slap [her] around a little, [and] bite [her]," Kayla teased Mr. Portnoy about his sexual prowess and suggested they get together again. *Id.* Several months later, in another unsolicited message, Kayla informed Mr. Portnoy that he would "100% get laid" if he helped her find a home for a certain rescue animal. *Id.* at ¶ 73. And while the Second Story claims that it took Kayla "months to process what had happened to her," a full *two years* after the alleged non-consensual sexual encounter, Kayla again messaged Mr. Portnoy, "*Miss that dick.*" *Id.* at ¶ 74. At no time during her extensive text message exchange with Mr. Portnoy did Kayla ever complain about him being violent, abusive, or recording her without her permission – allegations that Mr. Portnoy unequivocally denies. *Id.* at ¶ 75. In fact, Kayla joked about how she injured her rib during one of their sexual encounters and boasted to Mr. Portnoy that he "still holds [her] title for most aggressive sex… 😊." *Id.*

Again, Mr. Portnoy's counsel provided Defendants with the facts and documentation concerning Kayla, but they ignored that information because they had a preconceived agenda to write a second negative article about Mr. Portnoy. *Id.* at ¶ 76. In particular, Defendants were made aware that critical text messages were available to them, but they did not even request copies of them from Mr. Portnoy or his attorneys. *Id.* Where Insider did include information from Mr. Portnoy, Insider made an affirmative effort in its presentation to minimize its import. *Id.* Despite that prior to the Second Story's publication Defendants were provided with Kayla's post-dated communications with Mr. Portnoy and were fully aware of the problems with her sensationalistic

14

and fabricated account of events, and the fact that Defendants' in-house counsel promised to "be in touch…to give Mr. Portnoy ample time to comment," Defendants published the defamatory Second Story anyway.  *Id.* at ¶ 77.

As with the First Story, Insider again ran a promotional campaign for their subscription service in connection with the release of the Second Story behind a paywall.  *Id.* at ¶ 78.  And again, Insider's Twitter army of executives, editors, and reporters advertised and promoted the Second Story, seeking further subscription revenue.  *Id.*  Defendant Black again tweeted to her thousands of followers seeking further dirt into Portnoy's private life: "If you would like to share any information connected to this story, you can reach us securely at juliablackjourno@protonmail.com and melkorkalicea@protonmail.com."  *Id.* at ¶ 70.

### D.  **The Editor's Note**

Anticipating the backlash from the outlandish allegations contained in the Second Story, Defendant Carlson published an Editor's Note on Insider's website, titled *Why Insider Published Its Dave Portnoy Articles*.  Compl. ¶ 80; *see* Strom Decl. Ex. 2.  In the Editor's Note, Carlson further defamed Mr. Portnoy, stating that he took "a sexual encounter that began consensually and turn[ed] it violent without first asking [his] sexual partner for permission."  Strom Decl. Ex. 2.  He also reaffirmed and republished the defamatory accusations of the First Story, which, in his words, were that three young women "met [Mr. Portnoy] for sex that began consensually but during the course of the encounters turned violent and humiliating in a manner they wouldn't have agree to if he'd asked."  *Id.*  Carlson then pinned his article to the top of his Twitter account.  Compl. ¶ 80.

III.     **ARGUMENT**

A.     **The Articles Are Actionable Under Clear Massachusetts Law Where They Falsely Accuse Mr. Portnoy of Non-Consensual Sex Through Implication, Innuendo and Express Statements, and Make Other Defamatory Statements of Provably False Facts.**

Defendants' principal argument in seeking dismissal of Mr. Portnoy's claim for defamation is that their articles include only opinions, rather than defamatory facts which are capable of being proven true or false.  This argument fails for at least three reasons.  First, there is no doubt that Defendants deliberately attempted, through the use of artful phrasing, to disguise the defamatory accusations in their articles in a misguided attempt to avoid liability for their actions.  But the law recognizes that defamation can occur by innuendo as well as by explicit assertion.  All that matters is whether a reasonable reader may interpret a given statement as making a factual assertion.

Here, as the Complaint alleges, Defendants' articles are filled with innuendo which a reasonable reader would interpret as conveying a plainly defamatory meaning, i.e., that Mr. Portnoy is a rapist and abuser of women, who films women having sex without their consent. Second, the articles contain multiple direct and expressly false and defamatory statements, detailed below, which are alone sufficient to give rise to liability for defamation.  Finally, insofar as the stories purport to contain "opinions" regarding Mr. Portnoy, it is well settled that couching factual assertions in terms of subjective views or beliefs does not relieve a publisher of liability for defamation when the supposed "opinions" imply the existence of facts which are capable of being proven true or false.

i.     **Applicable Law – Defamatory Statement of Fact**

At the motion to dismiss stage, this Court is "not called upon to determine the ultimate issue of whether the article is defamatory, but to answer the threshold question of whether the communication is reasonably susceptible of a defamatory meaning."  *Stanton v. Metro Corp.*, 438

F.3d 119, 124 (1st Cir. 2006) (internal citations omitted).  "If the answer to this question is 'yes,' then the ultimate issue of whether the article is defamatory is not the court's to decide: where the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Id.* (internal citations omitted).

As Defendants acknowledge, merely labeling an assertion as an "opinion" does not automatically render it immune from liability for defamation.  Statements of pure opinion are constitutionally protected because "they are not susceptible of being proved true or false." *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015).  The Supreme Court, however, has "rejected the proposition that the First Amendment creates a blanket exception to state defamation law for 'statements which are categorized as "opinion" as opposed to "fact."'"  *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (quoting *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 17 (1990)).  A statement "couched as an opinion" may be actionable if it "presents or implies the existence of facts which are capable of being proven true or false." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997) (citing *Milkovich*, 497 U.S. at 18–19).

As the Supreme Court has observed, "[it] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words, 'I think.'" *Milkovich*, 497 U.S. at 19.  Naturally, "the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, "Jones is a liar."' *Id.*  Thus, "the relevant question is not whether challenged language may be described as an opinion, but whether it *reasonably would be understood* to declare or imply provable assertions of [defamatory] fact." *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992) (emphasis supplied); *see Riley*, 292 F.3d at 289 ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those

facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").  The inquiry requires examining "the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation." *Piccone*, 785 F.3d at 772.  Other factors to be considered include the specific language used and whether the statement is verifiable.  *Milkovich*, 497 U.S. at 9. "Whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion, and a question of fact if the statement reasonably can be understood both ways." *Scholz v. Delp*, 473 Mass. 242, 250 (2015) (internal quotation marks omitted).

### ii.    The Articles Falsely Accuse Mr. Portnoy of Engaging in Non-Consensual Sex Through a Combination of Implication, Innuendo, and Express Statements.

Defendants go to great lengths to misdirect the Court's attention to the more ambiguous and subjective assertions in the two articles, and ignore the multiple instances in which the articles (and the Editor's Note) expressly state or strongly imply that Mr. Portnoy engaged in non-consensual sex and non-consensual recording.  This includes, without limitation, the assertion in the Second Story that sex with four of the women "started consensually but then turned violent and frightening beyond what they would have agreed to had they been asked," Compl. Ex. B at p. 16; the claim by Kayla that the sex with Mr. Portnoy was "not the sex [she] consented to," *id.* at p. 7; the assertion in the Editor's Note that Mr. Portnoy took "a sexual encounter that began consensually and turn[ed] it violent without first asking [his] sexual partner for permission," Strom Decl. Ex. 2 at p. 2; and the claim by Madison that she was shouting "too much! Too much!" and "kept trying to get away" from Mr. Portnoy while he yelled at her "stop running away from me[,] [s]top running away from me" and "just went harder," Compl. Ex. A at p. 4.  The Second Story

also explicitly accuses Mr. Portnoy of attempting to "have anal sex [with Kayla] without her permission," including that he "tried to force it in."  Compl. Ex. B at 9.

The unavoidable import of these assertions is that Mr. Portnoy engaged in sexual contact that turned non-consensual, i.e., rape, and that, at least in the case of Madison, he persisted in having sex with a woman even after she told him to stop and tried to physically distance herself from him.  Defendants also stated unequivocally in the Editor's Note that Mr. Portnoy unlawfully filmed encounters with Allison and Madison "without their consent."  Strom. Decl. Ex. 2 at p. 1. There can be no question that these statements accuse Mr. Portnoy of crimes and as such are defamatory *per se*, *see, e.g., Shafir v. Steele*, 431 Mass. 365, 373 (2000), and they advance factual assertions that are capable of being proven true or false – i.e., Mr. Portnoy either did or did not engage in unlawful conduct – and therefore are actionable defamations.

To the extent any of these statements leave room for interpretation – and most do not – that is no bar to liability for defamation.  The law does not require express assertions to give rise to defamation liability.  "[D]efamation can occur by innuendo as well as by explicit assertion[.]" *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 774 (2003) (quoting *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995)).  Put another way, "[i]n order to render words defamatory and actionable, it is not necessary that the defamatory charge be in direct terms but it may be indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory."  *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954).  Applying that principal, the court in the *Depp v. Heard* defamation suit held, in denying a motion to dismiss, that statements by Ms. Heard in an op-ed that she "spoke up against sexual violence," that she was "a public figure representing domestic abuse" and that she had the "rare vantage point of seeing, in real time, how institutions protect men accused of abuse," were all actionable defamations

insofar as they implied that Mr. Depp had abused her even though she attempted to avoid saying so or even mentioning him.  *Depp v. Heard*, No. CL-2019-2911, 2020 WL 8772348, at *3 (Va. Cir. Mar. 27, 2020).  So too here, the statements accusing Mr. Portnoy, in various terms, of engaging in non-consensual sex, are more than susceptible of defamatory meaning to be actionable.  Indeed, numerous publication which picked up on Defendants' stories reported that they accused Mr. Portnoy of sexual assault.[3]

"The existence of defamatory innuendo is a question of fact for [the] jury[.]"  *Reilly,* 59 Mass. App. Ct. at 774.  At this pleading stage, however, the Court is required to construe all well-pleaded facts of the Complaint in the light most favorable to the Plaintiff, accepting their truth and drawing all reasonable inferences in the Plaintiff's favor.  *See, e.g., Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 90 (1st Cir. 2014).  Although, in this defamation case, the Court may also consider the content of the defamatory publications themselves, *see Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988), it may not resolve competing inferences in favor of the Defendants.  Here, upon reviewing Defendants' articles, the Court should conclude that the Complaint plausibly alleges that a reasonable reader would understand them to convey a defamatory meaning of and concerning Mr. Portnoy, which is all that is required at this stage.  *See Stanton*, 438 F.3d at 129.

      **iii.**    **The "Facts" Upon Which the "Opinions" Are Premised Are Incomplete and in Many Cases False, Rendering the Exception for Defamatory Opinions Based on Disclosed Facts Inapplicable.**

Insofar as certain of the defamatory assertions contained within the articles are presented as subjective views or expressions of belief or otherwise couched as "opinions," Defendants are not relieved of liability because those statements, however expressed, "present[] or impl[y] the

---

[3]  *See, e.g.,* "Dave Portnoy Hit With 3 New Sexual Assault Allegations," available at: https://www.hotnewhiphop.com/dave-portnoy-hit-with-3-new-sexual-assault-allegations-news.147169.html.

existence of facts which are capable of being proven true or false." *Levinsky's, Inc.*, 127 F.3d at 127; *see Milkovich*, 497 U.S. at 18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). Defendants here attempt to avail themselves of the rule that a publisher is protected from defamation liability if he or she "communicates the non-defamatory facts that undergird his [or her] opinion." *Piccone*, 785 F.3d at 771. *See also Lyons v. Globe Newspaper Co*., 415 Mass. 258, 267 (1993) ("Our cases protect expressions of opinion based on disclosed information because we trust that the recipient of such opinions will reject ideas which he or she finds unwarranted by the disclosed information."). Critically, however, to successfully invoke this doctrine, it is necessary that a publication *fully disclose* the facts underlying an opinion, and that the facts disclosed are true (or otherwise non-defamatory). Even where a publisher discloses the facts underpinning its opinion, the opinion remains actionable if those facts are "incorrect or incomplete, or if his assessment of them is erroneous." *Milkovich*, 497 U.S. at 18-19. The relevant inquiry is whether "a fact-finder could conclude the [publication at issue] did not fully disclose the non-defamatory factual bases underlying the opinions expressed." *McKee v. Cosby*, 236 F. Supp. 3d 427, 442 (D. Mass. 2017).

Here, any suggestion in the articles that Mr. Portnoy engaged in non-consensual sex, or recorded women during sex without their consent, is not entitled to immunity from defamation liability because the purported "facts" relied upon in the articles for such assertions are not true, and because the articles necessarily imply that the authors are in possession of non-defamatory facts supporting such conclusions, when in reality, the undisclosed facts in their possession prove just the opposite. Thus, contrary to Defendants' contention in their Motion to Dismiss, readers lack an adequate basis to "determine for themselves if the women's opinions about their encounters are justified[.]" Mot. at 14.

Take "Allison" for example.  The First Story reports Allison's description of her sexual encounter with Mr. Portnoy in terms that imply the sex took her by surprise and was not consensual.  As reported by Defendants, Mr. Portnoy "leaned in and started kissing me and *I didn't know what to do at that point*…. And we went upstairs and he was really aggressive and *I didn't know what to do and we had sex* and he kicked me out."  Compl. Ex. A at p. 14 (emphasis supplied). In reality however, as Defendants knew, but failed to report, it was *Allison* who had aggressively pursued Mr. Portnoy after he initially rejected her overtures, and she only received an invitation to his home after she messaged him, unsolicited, "What u doin today….*can we bang*[?]"  Compl. ¶ 31.  This critical text message exchange, which Defendants were aware of prior to publication, is mentioned *nowhere* in the First Story.  It is *impossible* for a reasonable reader of the First Story to properly evaluate the veracity of Allison's claims of surprise and her professed inability to react to Mr. Portnoy's sexual advances when deprived of the critical information that Allison's visit to Portnoy's home was predicated on her own unsolicited and express offer to have sex with him.

Further, a reasonable reader of the First Story lacks the ability to evaluate the credibility of Allison's claim that she felt "preyed on," was "deeply disturbed," and suffered "emotional distress" to the point of being suicidal as a result of her encounter with Mr. Portnoy, without being told that Allison continued to contact Mr. Portnoy on an unsolicited basis, and engage in flirtatious banter with him including providing him her phone number so he could text message her, after allegedly being traumatized at his hands.  Compl. ¶¶ 35-36.  Defendants' readers were not provided any of this information and therefore had no ability to evaluate the validity of the "opinions" being expressed in the First Story.

Likewise, Defendants published an account of Madison's encounter with Mr. Portnoy which was incomplete, inaccurate, and based on alleged facts which are provably false.  Madison's

claim that during sex with Mr. Portnoy, she was "crying and shouting, 'Too much! Too much!'" and attempting to "get away" from Mr. Portnoy while he yelled "stop running away from me…[s]top running away from me[,]" and "just went harder," amounts to a claim of forcible rape. Despite the Defendants having access to Madison's text messages and social media posts (selective examples of which they published in the First Story), Defendants in the First Story failed to include Madison's own contemporaneous statements regarding her encounter with Mr. Portnoy, which she published on her social media, including that, due to his perceived support of President Trump, he was "not [her] proudest fuck," that he was "a dick and lame and grumpy," that he gets a "2/10" from her, that "if he ever truly pisses [her] off [she has] lots of content to expose him with[,]" and that she is "going to stick to athletes. 🪙 🪙 🪙 🪙 🪙 🪙 🪙."[4]  Compl. ¶ 46.  Again, as with Allison, Defendants withheld from their readers this critical information which called into serious doubt Madison's account of her encounter with Mr. Portnoy and her motivation for accusing Mr. Portnoy of wrongdoing, and deprived the readers of the ability to make an informed judgment about the validity of Madison's claims in the First Story.

Finally, as with the others, Defendants telling of Kayla's encounter is not immune from defamation liability because the facts upon which it relies are incomplete and in multiple instances outright false.  The Second Story reports, without an ounce of scrutiny, Kayla's claim that she was choked to the point of not being able to breathe and filmed without her permission during her first sexual encounter with Mr. Portnoy, even though, as Defendants knew (and reported), Kayla willingly returned to Mr. Portnoy's apartment for a second sexual encounter.  Defendants further reported that Mr. Portnoy attempted to forcibly anally rape Kayla, that the sex Kayla had with Mr.

---

[4] The symbol "🪙" is an emoji depicting a banded stack of cash with feather wings.  According to Emojipedia, it is used to "represent losing, transferring, or earning money, but commonly used for wealth, money, and success more generally, often with a flourish or sense of flair."  *See* https://emojipedia.org/money-with-wings/.

Portnoy during the second encounter was "even more violent" and "*not the sex [she] consented to,*" but that she submitted to it because she was in Portnoy's apartment, and he was "twice [her] age" and "famous."  Compl. Ex. B at pp. 7-9.

Critically, despite having been specifically put on notice of the availability of numerous, after-the-fact text message exchanges between Kayla and Mr. Portnoy, in which she told him, among other things, that she "*miss[ed] that dick,*" expressed interest in having sex with him again, and discussed in only positive terms her sexual encounters with both Portnoy and a male celebrity athlete, who, according to Kayla, would "pin [her] down, choke [her] a little, slap [her] around a little, [and] bite [her]," Defendants still published Kayla's false accusations, and presented Mr. Portnoy's exculpatory evidence as allegations made by his lawyer, as opposed to undisputed facts. If fairly presented, these messages would, to a reasonable reader, have called into serious doubt the veracity of Kayla's version of the story which Defendants published.  But instead, Defendants merely reported that Mr. Portnoy's lawyer had made certain claims about the existence of these messages, thereby substantially minimizing their impact.

**B.  The Complaint Pleads Sufficient Facts to Allege Defendants Acted with Actual Malice in Publishing the Articles.**

Mr. Portnoy does not dispute that as a public figure, he is required to plead Defendants acted with actual malice in defaming him, that is, they published the defamatory allegations at issue knowing they were false or with reckless disregard, i.e., entertaining serious doubts, as to their truth.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  That standard is amply met here where the Complaint alleges that there were obvious reasons to doubt the veracity of Defendant's anonymous sources, which Defendants were either aware of, or purposefully avoided learning, because the true facts completely undermined the purported newsworthiness and shock value of their hit piece against Mr. Portnoy.  Indeed, the lengths to which Defendants concede they went in

an attempt to avoid expressly accusing Mr. Portnoy of being a rapist (in a misguided attempt to avoid defamation liability), while conveying precisely that message to their readers through implication and innuendo, is alone powerful evidence of the doubts they in fact subjectively harbored regarding the credibility of their chosen sources and the falsity of such an allegation.

Defendants' contention that the Complaint fails to adequately allege actual malice rests principally on the strawman argument that their articles only accuse Mr. Portnoy of engaging in aggressive sex, which cannot be false (much less knowingly so) because, they claim, Mr. Portnoy has admitted liking aggressive sex.   But of course, the defamatory sting of Defendants' publications is not that Mr. Portnoy enjoys aggressive, albeit consensual sex, but that he preyed on the young women who are the sources for the articles, engaged in non-consensual sex with them, and unlawfully recorded them without their permission.  Defendants acted with actual malice with respect to these latter false and defamatory assertions.

### i.   Applicable Law - the Actual Malice Standard

"Because direct evidence of actual malice is rare, it may be proved through inference and circumstantial evidence." *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009) (citing *Bose Corp. v. Consumers Union of U.S., Inc*., 692 F.2d 189, 196 (1st Cir. 1982); *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).  "Recklessness amounting to actual malice may be found where a publisher fabricates an account, makes inherently improbable allegations . . . or deliberately ignores evidence that calls into question his published statements." *Id.* (citing *Connaughton*, 491 U.S. at 684-85; *St. Amant*, 390 U.S. at 732); *see also Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (finding actual malice where the investigation was "grossly inadequate" and the neutrality of the source was dubious); *Bose Corp.*, 692 F.2d at 196 (noting that a court should consider the thoroughness and methodology of a publisher's preparation and the expertise of its authors).  An "accumulation" of "evidence of negligence,

motive, and intent" can also support a finding of actual malice.  *Bose Corp.*, 692 F.2d at 196.
"Although failure to investigate will not alone support a finding of actual malice, the purposeful
avoidance of the truth is in a different category."  *Connaughton*, 491 U.S. at 692 (internal citation
omitted).  Critically, "[i]n a case such as this involving the reporting of a third party's allegations,
'recklessness may be found where there are obvious reasons to doubt the veracity of the informant
or the accuracy of his reports.'"  *Id.* at 688 (quoting *St. Amant*, 390 U.S. at 732).

>     ii.    **Defendants Willfully Ignored Evidence That Casts Serious Doubt on
>            the Credibility of Their Sources and the Veracity of Their
>            Allegations.**

Defendants accused Mr. Portnoy, expressly and through innuendo and implication, of
preying on and sexually assaulting multiple young women.  They reported, as fact, that three young
women "met [Mr. Portnoy] for sex that began consensually but during the course of the encounters
turned violent and humiliating in a manner they wouldn't have agree to if he'd asked."  Compl.
¶ 80; Strom Decl. Ex. 2 at p. 1.  Defendants did so in the face of substantial evidence, which was
available to them and which they deliberately ignored, demonstrating that Mr. Portnoy's sexual
encounters with the women interviewed for the articles were consensual.  Again, it must be
emphasized here that the thesis of Defendants' stories is not that Mr. Portnoy is someone who
enjoys rough but consensual sex.  Such a story would not have been newsworthy and would not
have provided Defendants with a platform to promote their paid subscription service, as they did,
or a basis to pressure Barstool Sports' advertisers to discontinue their relationships with Barstool
and Mr. Portnoy, as they also did.  Compl. ¶¶ 56-58, 60.  The sting and gist of Defendants' stories
was that Mr. Portnoy is a sexual predator and rapist, and that he engaged in non-consensual sex
with and unlawfully recorded the women featured in the two stories.  Because the Complaint
adequately pleads facts from which it can reasonably be inferred that Defendants made these
assertions either knowing they were false or entertaining serious doubts as to their truth,

Defendants' Motion to Dismiss must be denied.  *See Schatz v. Republican State Leadership Comm.*, 669 F.2d 50, 58 (1st Cir. 2012).

Here, the Complaint plausibly alleges that, in an attempt to cash in on the climate of fear and "cancel culture" permeating the media, Defendants executed on a pre-conceived plan to portray Mr. Portnoy as a sexual predator who engaged in non-consensual sex and illegal recording of unsuspecting young women, while deliberately ignoring evidence that undermined the credibility of their sources and cast serious doubt on the veracity of their claims.  For example, Defendants completely ignored that Allison's reported encounter with Mr. Portnoy was precipitated by her text to Portnoy asking, "can we bang[?]," that Mr. Portnoy promised they would not do anything she was not comfortable doing, and that she continued to contact Mr. Portnoy *after* allegedly being hospitalized as a result of her encounter with him, including voluntarily providing her telephone number so he could message her.  Defendants also deliberately ignored evidence that Madison was  falsely accusing Mr. Portnoy of sexual assault based upon an ulterior motive i.e., monetizing her claims and "exposing" Mr. Portnoy because he was "a dick and lame and grumpy," and, given his perceived support of President Trump, "not [her] proudest fuck[.]"  Last but not least, Defendants ignored that years after allegedly being assaulted by him, Kayla told Mr. Portnoy that she "miss[ed] that dick," expressed interest in having sex with him again, and discussed how much she had enjoyed what she described as "scary aggressive" sex with another male celebrity who would "pin [her] down, choke [her] a little, slap [her] around a little, [and] bite [her]."

This type of purposeful avoidance of contrary evidence, particularly in the context of reporting on third party, anonymous allegations, has repeatedly been held to constitute actual malice.  *See Connaughton*, 491 U.S. at 688 ("[i]n a case such as this involving the reporting of a

third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of h[er] reports." [internal citation omitted]); *Celle v. Filipino Reporters Enters. Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (finding actual malice where the defendants relied on a single person who had a known bias against the plaintiff and whose account had internal inconsistencies); *Hunt*, 720 F.2d at 645-46 (defendant had reason to question the neutrality of sources and the entire premise of the story was inherently improbable); *Murphy v. Boston Herald, Inc*., 449 Mass. 42, 59-60 (2007) (affirming jury verdict finding actual malice in part based upon evidence that reporter relied on sources with known biases against plaintiff). Here, the purposeful avoidance of exculpatory evidence with regard to three separate sources is more than a sufficient factual basis "from which malice might reasonably be inferred." *Schatz*, 669 F.3d at 58.

In making the actual malice inquiry, the Court may also take into account Defendants' profit motive to recklessly disregard the truth here. While profit motive may not be sufficient by itself to support an inference of actual malice, it is certainly a factor that a court may consider in assessing the totality of the evidence. *Bose Corp*., 692 F.2d at 196; *see also Murphy*, 449 Mass. at 63 (intention to create "media frenzy" through inclusion of a false quote considered evidence of actual malice). Here, when combined with Defendants' purposeful avoidance of the truth, Defendants' motive to falsely accuse Mr. Portnoy of non-consensual sex to maximize interest in the stories and drive traffic to their website, at a very minimum, "nudge[s] his actual malice claim across the line from conceivable to plausible." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (internal citations omitted).

> iii. **Defendants' Publication of Mr. Portnoy's Denials and Perfunctory and Sanitized Reference to His Exculpatory Evidence Does Not Negate the Plausible Inference of Actual Malice.**

Defendants further argue that they cannot be charged with actual malice where, in the Second Story, they published a general denial from Mr. Portnoy and hyperlinked to his response, through his lawyers, to the allegations contained in that story.  The purpose of Mr. Portnoy directing Defendants to the existence of this exculpatory information was to demonstrate that Defendants' sources lack credibility and their stories are contradicted by their own words and actions, such that publishing in the face of this information would amount to actual malice.  Merely publishing a denial to a knowingly false accusation does not absolve Defendants of liability.  *See Smartmatic USA Corp. v. Fox Corp*., No. 151136/2021 (N.Y. Sup. Ct. Mar. 8, 2002) (explaining that defendant "Fox News cannot escape liability merely because the Fox anchor defendants occasionally mentioned that [plaintiff] denied their representations."); *Dempsey v Time Inc.*, 252 N.Y.S.2d 186 (N.Y. Sup. Ct. July 22, 1964) ("the suggestion that a libel be excused because a denial made by the subject thereof is also published, is patently absurd.").

### iv.   The Complaint Need Not "Bring Home" the Allegations of Actual Malice to the Individual Defendants Without the Benefit of Discovery.

The cases Defendants rely on for the proposition that allegations of actual malice must be "brought home" to each individual defendant, *Loeb v. Globe Newspaper Co.*, 489 F. Supp. 481, 485 (D. Mass. 1980), and *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (1s Cir. 2013), were both summary judgment cases.  Obviously, without the benefit of discovery, it is impossible for Mr. Portnoy to know the precise role each of the individual defendants played in the publication of the defamatory articles.  However, at this early pleading stage, it is enough that, as the Complaint alleges, Ms. Black and Ms. Licea reported the defamatory articles, and Mr. Carlson edited them (as well as authored the independently defamatory Editor's Note).  And Mr. Blodget made the decision to publish them behind a pay wall and use the stories to promote his website and brand.

**C.  The Complaint Adequately Pleads a Cause of Action for Invasion of Privacy Because Mr. Portnoy's Consensual Sex Life Is Not Newsworthy.**

Defendants' challenge to Mr. Portnoy's claim for invasion of privacy under Massachusetts law, G.L. c. 214, § 1B, is premised exclusively on the argument that the subject matter of Defendants' stories is newsworthy (i.e., a "matter of public concern"), and therefore, Defendants' publication of Mr. Portnoy's private messages is protected by the First Amendment.  The problem with this argument is that the newsworthiness of the articles derives only from the knowingly false assertion that Portnoy is a sexual predator and a rapist.  The private text messages cited in the articles do not, as Defendants contend, "relate to a matter of public interest: how Portnoy's attitude towards women relate to his management of an influential and lucrative online media organization." Mot. at 23.  Nor is there any validity to Defendants' attempt to tie their "reporting" to the "MeToo" movement.  To the contrary, the women who were interviewed for Defendants' articles did not work for Barstool Sports, or have any type of hierarchical relationship with Mr. Portnoy which was susceptible to exploitation.  All of them contacted Mr. Portnoy via social media and, without pretense, expressed a desire to meet him for sex.  His consensual interactions with these women were not matters of public concern, and therefore, it was a violation of G.L. c. 214, § 1B for Defendants to publish private messages concerning Mr. Portnoy's sexual relationships, notwithstanding his status as a public figure.  *See Peckham v. Boston Herald, Inc.*, 48 Mass. App. Ct. 282, 287 (1999) (recognizing that "[t]he extent of the authority to make public private facts is not, however, unlimited. There may be some intimate details of her life, such as sexual relations, which even [a famous] actress is entitled to keep to herself.").

## IV.   CONCLUSION

For the foregoing reasons, Mr. Portnoy respectfully requests that the Court deny Defendants' Motion to Dismiss.

DAVID PORTNOY,

By his attorneys,


/s/ *Howard M. Cooper*
Howard M. Cooper (BBO #543842)
hcooper@toddweld.com
Christian G. Kiely (BBO #684308)
ckiely@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626

Andrew B. Brettler (*pro hac vice*)
abrettler@lavelysinger.com
Jake A. Camara (*pro hac vice*)
jcamara@lavelysinger.com
Lavely & Singer PC
2049 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 556-3501

Dated:  May 26, 2022


## CERTIFICATE OF SERVICE

I, Christian G. Kiely, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


/s/ *Christian G. Kiely*
Christian G. Kiely

Dated:  May 26, 2022