UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID PORTNOY,

    Plaintiff,

v.

INSIDER, INC., HENRY BLODGET, NICHOLAS CARLSON, JULIA BLACK, and MELKORKA LICEA,

    Defendants.

Case No. 1:22-cv-10197
[Leave to file granted 6/3/22 (ECF 37)]

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

    I.      THE FACTS UPON WHICH THE FULLY PROTECTED OPINIONS
            ARE DRAWN ARE UNDISPUTED AND DISCLOSED ..................................... 2

            A.      The Key Facts in the Articles are Undisputed ............................................ 2

            B.      The "Omitted" Key Facts were in Fact Disclosed ...................................... 3

            C.      Portnoy's Strained Implications are Unreasonable .................................... 7

    II.     PORTNOY CONCEDES HE CANNOT PLEAD ACTUAL MALICE ................ 9

    III.    THE PRIVACY CLAIM FAILS AS THE ARTICLES ARE
            NEWSWORTHY ................................................................................................ 12

CONCLUSION ............................................................................................................................ 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Archdiocese of Milwaukee Supporting Fund v. Investors Fin. Servs. Corp.*,
  No. 05-11627-RCL, 2007 WL 9797807 (D. Mass. July 31, 2007) ............................................3

*Ayyadurai v. Floor64, Inc.*,
  270 F. Supp. 3d 343 (D. Mass. 2017) ..............................................................................1, 3, 4

*Bonome v. Kaysen*,
  No. 032767, 2004 WL 1194731 (Mass. Super. Ct. Mar. 3, 2004)...........................................12

*BYD Co. v. VICE Media LLC*,
  531 F. Supp. 3d 810 (S.D.N.Y. 2021)....................................................................................12

*BYD Co. v. VICE Media LLC*,
  No. 21-1097, 2022 WL598973 (2d Cir. Mar. 1, 2022), *pet. for cert. docketed*,
  No. 21-1518 (U.S. June 2, 2022) ..........................................................................................11

*Coleman v. Grand*,
  523 F. Supp. 3d 244 (E.D.N.Y. 2021), *appeal docketed*, No. 21-800
  (2d Cir. Mar. 26, 2021) .........................................................................................................12

*Depp v. Heard*,
  104 Va. Cir. 377 (2020) ..........................................................................................................9

*Foley v. Lowell Sun Publ'g Co.*,
  404 Mass. 9 (1989) .............................................................................................................8, 9

*Green v. Cosby*
  138 F. Supp. 3d 114 (D. Mass. 2015) ......................................................................................4

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657 (1989)........................................................................................................10, 11

*Herring Networks, Inc. v. Maddow*,
  445 F. Supp. 3d 1042 (S.D. Cal. 2020), *aff'd*, 8 F.4th 1148 (9th Cir. 2021) .............................4

*Lemelson v. Bloomberg L.P.*,
  903 F.3d 19 (1st Cir. 2018)....................................................................................................10

*McCafferty v. Newsweek Media Grp., Ltd.*,
  955 F.3d 352 (3d Cir. 2020)...................................................................................................11

*McDougal v. Fox News Network, LLC*,
  489 F. Supp. 3d 174 (S.D.N.Y. 2020)....................................................................................12

*McKee v. Cosby*,
   236 F. Supp. 3d 427 (D. Mass 2017) ...................................................................................... 4

*New Times, Inc. v. Isaacks*,
   146 S.W.3d 144 (Tex. 2004) .................................................................................................. 9

*New York v. Weinstein*,
   No. 2020-00590, 2022 WL 1788228 (N.Y. App. Div. 2022) .................................................. 7

*Piccone v. Bartels*,
   785 F.3d 766 (1st Cir. 2015), *aff'd*, 874 F.3d 54 (1st Cir. 2017) ............................................. 4

*Robinson v. Spencer Stuart, Inc.*,
   No. 13-10278-RWZ, 2015 WL 12732421 (D. Mass. Feb. 24, 2015) ..................................... 11

*Turner v. Wells*,
   198 F. Supp. 3d 1355 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254 (11th Cir. 2018) ......................... 4

**PRELIMINARY STATEMENT**

In Opposition to Defendants' Motion to Dismiss (the "Opp."), Portnoy all but abandons his challenge to the specific statements outlined in his Complaint and instead now rests his claim on his contention that Insider through "artful phrasing" falsely implied he engaged in "non-consensual" and "impermissibly violent" sex. Opp. at 5, 16. But the conclusions he challenges – that his young sex partners felt "humiliated," or that the sex turned more "violent and frightening" than expected – are subjective reactions that, in the words of Portnoy, he could never prove false since he cannot know "what's going on in [these young women's] brain[s]." And while Portnoy includes broad-brush claims that the women's stories are "pure fiction," he not only fails to identify *any* false facts that formed the foundation to the women's conclusions, he affirmatively admits or does not dispute their core elements. As this Court has made clear in *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 358 (D. Mass. 2017), generalized platitudes, without providing the "factual underpinning[s] to support that claim," are insufficient to plead a defamation claim. This failure to grapple with his burden to plead falsity is alone sufficient to dismiss Portnoy's defamation claim.

In lieu of pleading falsity, Portnoy first argues that the opinions in the Articles are actionable because Insider did not disclose contradictory and relevant facts: e.g., that the women wanted to have sex with him or continued to have contact with him after the violent encounters. But these "exculpatory" facts that Portnoy mentions were *all*, in fact, disclosed in the Articles. Next, Portnoy manufactures a defamatory implication that the Articles accuse him of rape – in fact, the Articles made it clear that none of the women were accusing him of sexual assault. In the words of one woman, after acknowledging the encounter was consensual: "I just felt very preyed on." If that were not enough, and it is, Portnoy then essentially concedes he cannot plead actual malice and instead inverts the actual malice standard by weaponizing Defendants' diligent and careful reporting, suggesting that Insider "went to great lengths in an attempt to *avoid* expressly

1

accusing Mr. Portnoy of criminal sexual assault in the articles." Opp. at 1. In short, Portnoy's defamation claim fails for multiple and independent reasons and should be dismissed.

Finally, in his tag-along privacy claim, Portnoy makes the astounding (and contradictory) argument that, by failing to accuse him of rape, the Articles are not newsworthy. But newsworthiness is hardly the narrow construct Portnoy envisions.

Stripped of these smokescreens, one thing becomes clear: Portnoy simply does not believe that the young women he had sex with have any right to regret their encounters or feel humiliated by them. For these reasons and more, Defendants' Motion to Dismiss should be granted in full.

## ARGUMENT

### I. THE FACTS UPON WHICH THE FULLY PROTECTED OPINIONS ARE DRAWN ARE UNDISPUTED AND DISCLOSED

Portnoy's opposition confirms that he is taking aim at the subjective reflections his young sexual partners came to following their admittedly consensual sexual encounters with Portnoy: specifically, that the sex became more "rough" and "violent" than they expected, leaving them feeling "uncomfortable," "humiliate[ed]," "frighten[ed]," or like "a human sex doll." Yet, Portnoy does not challenge the foundational facts for these views and, recognizing that the challenged statements are "presented as subjective views of expressions of belief," Portnoy instead argues the opinions are nonetheless actionable because they rely on incomplete, or false facts. Opp. at 20. The Articles establish that Portnoy is simply wrong.

#### A. The Key Facts in the Articles are Undisputed

Portnoy does not meet his burden of pleading that any of the underlying facts in the Articles are materially false. To be sure, Portnoy argues that "the purported facts" that support "any suggestion in the articles that Mr. Portnoy engaged in non-consensual sex, or recorded women during sex without their consent . . . are not true" or "in multiple instances outright false." Opp.

2

at 21, 23.  But, Portnoy ignores this Court's determination in *Ayyadurai* that conclusory claims such as these are insufficient for this Complaint to proceed to discovery.  270 F. Supp. 3d at 358.  Portnoy must instead plead that the factual underpinnings are false – which he has not done.

As Defendants established on this motion – and Portnoy does not dispute – based on the Complaint, the Articles, and the linked material incorporated by reference in the Articles,[1] Portnoy had conceded over and over that he did have sex with each of the young women quoted in the Articles, that he was happy to hold the "title for most aggressive sex," and that he routinely and openly videotapes his sexual encounters and shares those videos with other women.  *See* MTD at 9-12.  Portnoy does not dispute videos showing him choking a woman to the point she could not breathe or causing red welts on another woman's body. MTD at 3, 11.  Nor does he dispute that he choked the women in the Articles or spit in their mouths, that he fractured Kayla's rib and later joked about it, that Kayla lost flesh on her back (leaving blood on the carpet), or that he videotaped the women without asking first.  *See* MTD at 11-14; Ex. B at 8, 11.

Portnoy fails to plausibly assert that *any* of the foundational facts that inform the women's views and conclusions surrounding their sexual experiences with Portnoy are false.  He fails to carry his burden of pleading falsity, and his defamation claim must be dismissed.

### B.     The "Omitted" Key Facts were in Fact Disclosed

What is now abundantly clear is that Portnoy does not dispute the facts here – rather, he is trying to silence the views of the young women who believed their encounters with him were

---

[1] Portnoy "objects" in a footnote to the Court taking judicial notice of his November 11, 2021 Press Conference, but he failed to oppose Defendants' Request for Judicial Notice (Dkt. 28). For this reason, this Court can consider the Conference. *See Archdiocese of Milwaukee Supporting Fund v. Investors Fin. Servs. Corp.*, No. 05-11627-RCL, 2007 WL 9797807, at *1 (D. Mass. July 31, 2007) (treating RJN as unopposed where other party "submitted no opposition").  Further, and contrary to Portnoy's footnoted objection that the Complaint makes only a "passing reference" to the Conference, the Complaint over and over relies on it to show that Defendants were allegedly on notice of his "exculpatory evidence."  *See* Compl. ¶¶ 7, 43, 51, 87; Opp. at 9, 28-29.  The Press Conference is also expressly referenced and linked to in the Second Article, which was appended as an exhibit to the Complaint.  *See also* Ex. B at 14.  It is part of the publications at issue and incorporated by reference in the Complaint.  Portnoy's "objection" should be overruled.

"rough," "violent," "uncomfortable," "humiliating," or "frightening." MTD at 12.[2] Portnoy rejects the women's fully protected opinions because he claims the Articles omitted all the facts. Opp. at 21, 23. But, as this Court explained in *Ayyadurai*, the actual inquiry is whether the Defendants disclosed the *relevant* facts on which the opinions are based, not whether they disclosed *every* possible fact.[3] 270 F. Supp. 3d at 364 ("statements at issue here are accompanied by full disclosures of the non-defamatory facts on which they rely" and "no reasonable reader would believe [the] statements were based on any other additional and undisclosed information"). *See also Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1052 (S.D. Cal. 2020) ("*Milkovich* does not require the author to include every possible fact before giving an opinion."), *aff'd*, 8 F.4th 1148 (9th Cir. 2021); *Turner v. Wells*, 198 F. Supp. 3d 1355, 1369 (S.D. Fla. 2016) (rejecting argument that defendant failed to disclose four particular facts), *aff'd*, 879 F.3d 1254 (11th Cir. 2018). A review of the Articles makes it abundantly clear that the Articles do, in fact, disclose the information Portnoy claims is missing. MTD at 12.

*First*, contrary to Portnoy's arguments, Defendants *did* disclose the fact that the women initiated sexual contact with him. Indeed, the First Article made this evident in its title: "Young women say they met Barstool Sports founder Dave Portnoy *for sex*." Ex. A at 1 (emphasis added). Ignoring this, Portnoy argues that "Defendants knew, but failed to report, it was *Allison* who had

---

[2] In addition to trying to silence the women, Portnoy attempts to retaliate against the Defendants (a pattern he is known for). Ex. A at 11-12. Indeed, Portnoy has since publicly threatened Defendants with physical harm, telling them they "had to pay the price" for their reporting and that he was "coming for [their] fucking throats" after they filed their Motion to Dismiss the Complaint. *See* Portnoy - Saint Barthélemy Tweet dated April 16, 2022, *accessible here* https://twitter.com/stoolpresidente/status/1515451722252095496?s=10&t=_gHsmSmXyco1XiQiHOS47w.

[3] Oddly, Portnoy relies on *McKee v. Cosby* but ignores that it stands for the proposition that if the relevant underlying facts are revealed, as here, "defamation cannot arise." 236 F. Supp. 3d 427, 438 (D. Mass 2017) (quoting *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015), *aff'd*, 874 F.3d 54 (1st Cir. 2017)). Instead, Portnoy attributes to *McKee* another quote, which is actually from the distinguishable facts in *Green v. Cosby*, 138 F. Supp. 3d 114 (D. Mass. 2015), where the court observed that the article at issue referenced additional, undisclosed "documentary evidence" that "could be read to imply the existence of undisclosed evidence clearing Defendant of misconduct." *McKee*, 236 F. Supp. 3d at 441-42. Here, Portnoy does not identify any referenced (but undisclosed) documentary evidence undercutting the women's perspectives. Instead, all the facts are plainly revealed.

aggressively pursued Mr. Portnoy." Opp. at 22 (emphasis in original). But the Article is clear that Allison "baited him," at her friends' urging, and she went to his home after he rejected her first proposal to bring friends ("when we fuck? That seems weird"). Ex. A at 14. A reader did not need to know that she also wrote "can we bang?" to fully understand Allison went to Portnoy's house understanding they would have sex. And Portnoy flew Madison to Nantucket only after he "sent her graphic videos of other women he slept with" and she revealed her "rape fantasy," where [she didn't] have any control of what [was] going on," to which Portnoy responded: "You and I are going to get along so well." Ex. A at 2. Simply put, the Articles made it crystal clear that each woman met Portnoy fully expecting to have sex with him.

*Second*, Portnoy claims that the women's accounts should not be credited because some, like Allison, "continued to contact Mr. Portnoy on an unsolicited basis, and engage[d] in flirtatious banter with him . . . after allegedly being traumatized at his hands," or Kayla, who "willingly returned" for a second sexual encounter with Portnoy and had "after-the-fact" sexual messages with Portnoy. Opp. at 22-24. Portnoy appears to have not read the Articles. Defendants specifically reported that Portnoy "showed flirtatious messages from Allison after the two had sex but before she was hospitalized." Ex. B at 14. And the Second Article disclosed in detail that Kayla not only went back to have sex with Portnoy after an already aggressive first encounter, but also later replied "to a sexually explicit video Portnoy had sent" by stating "fucking hot . . . miss that dick" even after their second encounter. *Id.* at 13. The Article includes Kayla's explanation for her continued communications, along with a psychologist's explanation for why women "often remain in touch" with men after a harmful encounter.[4] Thus, the Articles are clear that some of

---

[4] Portnoy twice uses a message Kayla sent about a sexual encounter she had with another male celebrity that involved aggressive sex as somehow establishing that her views of her experience with Portnoy should not be credited. Opp. at 14, 24. But he ignores that Kayla explains in the Article that the other encounter was "the complete opposite of my experience with Dave" in that it was "respectful" and she "never felt scared." Ex. B at 13.

5

the women continued communication with Portnoy after their encounters – and readers can decide for themselves if that means they must have enjoyed their experiences with him.

*Third*, Portnoy stresses the Articles should have reported that Madison was biased against him "due to his perceived support of President Trump," and that Portnoy was "not [her] proudest fuck," describing him as "lame and grumpy." Opp. at 23. But, again, the Second Article *did* disclose this, noting that "Portnoy went on to show anti-Trump tweets from Madison as proof she had an 'agenda'. . ." It even linked to Portnoy's Press Conference which disclosed Madison's contemporaneous statements regarding her sexual encounter. Ex. B at 14. And the First Article disclosed that she found him to be "nothing like his charismatic online persona" describing him as "not funny at all," and "a boring, grumpy old man." Ex. A at 3. Thus, it is not clear exactly what Portnoy believes is missing.

What is increasingly clear is that Portnoy simply cannot believe that these young women would go to the house of a media mogul more than twice their age for sex, communicate with him later, and still believe that their experiences with him were too aggressive or humiliating. But Insider explained this in the Articles by quoting an expert specializing in sexual trauma and psychology: "[Y]ou're trying to undo in your own mind what really happened and make it into something else that actually it wasn't because it feels better." Ex. B at 15-16. Kayla also spoke for herself on this issue: "It makes me scared knowing that he has those videos on his phone" *Id.* at 13. The women were also fearful Portnoy would retaliate. As Allison explained: "I knew he would drag me through the mud." Ex. A at 15.

Tellingly, Portnoy's argument here is the same that Harvey Weinstein used in trying to defend himself: by showing that his relationships with women "included episodes of consensual sex, some of which occurred after the alleged assaults, and behavior . . . in the days and even years after the charged episodes, that to jurors could seem incongruent with what would be expected

6

from a victim of a sex crime." *New York v. Weinstein*, No. 2020-00590, 2022 WL 1788228, at *1 (N.Y. App. Div. 2022). There, the trial court permitted expert testimony from Dr. Barbara Ziv, a forensic psychiatrist on rape trauma syndrome, who testified that victims of sexual assault "sometimes remain in contact with their perpetrator" and tend to "engage in behavior vis-á-vis their assailants that is counter-intuitive to what outside observers would expect." *Id.* at *1, *12.

Here, the Articles do *not* paint Portnoy in the same light as Weinstein. The Articles never say Portnoy raped anyone, but it is telling that Portnoy (like Weinstein) does not understand that women can and often do continue to communicate (or even have sex with) men that they felt were too aggressive or violent. While Portnoy wants to sweep away the extreme imbalance of power between a middle-aged multi-millionaire and young women just out of high school or in college, articles like the ones at issue here help explain how this imbalance of power may have been a key factor in understanding the young women's reactions during and after the sexual encounters. At bottom, because the Articles do clearly disclose that these women intended to have sex with him, knew he filmed other women during sex, communicated with him after their experiences – and in one instance, went to have another sexual encounter with him – there are simply no relevant undisclosed facts here. The statements at issue are protected opinion; Portnoy's claim must fail.

### C.     Portnoy's Strained Implications are Unreasonable

Perhaps aware of these deficiencies, Portnoy is left to argue that "Defendants' articles are filled with innuendo which a reasonable reader would interpret as conveying a plainly defamatory meaning, i.e., that Mr. Portnoy is a rapist and abuser of women, who films women having sex without their consent." Opp. at 16. But this reading is not supported by what Insider actually reported. And Portnoy expressly admits at his Press Conference that the Articles never accused him of rape and that he will never be able to prove his version of events, which is perhaps why his lawyers "object" to its use. Press Conf. at 33:04-33:08 ("They never said I raped her, they never

7

said it wasn't consensual."); *id*. at 26:44-26:51 ("This is a he said, she said. I am never ever going to be able to prove that my version of events is what happened.").

Portnoy is correct. His new ready-for-litigation readings of the Articles cannot save his defamation claim. While "[t]he existence of defamatory innuendo is a question of fact for [the] jury," (Opp. at 20), the threshold inquiry, "whether the statement is reasonably susceptible of a defamatory meaning . . . is a question of law for the court." *Foley v. Lowell Sun Publ'g Co.*, 404 Mass. 9, 11-12 (1989). And here, the "implication" Plaintiff ascribes to the Articles is not reasonable as a matter of law. Rather, the sum effect of the format, tone, and context, including the linked denial letter and Press Conference, is unmistakably clear that the young women are expressing their perspectives of their sexual encounters, which Portnoy admits occurred, were aggressive, and openly filmed. In hindsight, the young women felt their experiences were "rougher than anticipated" and they "didn't know what to do" – yet the Articles disclose that the sex was consensual. Ex. B at 7; Ex. A at 15. And while Portnoy highlights that Madison said she "*felt*" like she was being raped and that she shouted it was "Too much!" and "It hurts!," (Opp. at 23), Madison never accuses Portnoy of actual rape, nor does Portnoy deny the facts that informed Madison's reactions (e.g., Portnoy "just went harder" and she felt like "a human sex doll"). Ex. A at 2-4. In the context of Madison's disclosed "rape fantasy," contingent on her feeling "comfortable," the events depicted are clear that Madison believed that the violence went too far because it was "so painful." Ex. A at 2-3. That was Madison's personal perspective that is impossible to objectively verify; the classic non-actionable opinion—not a factual implication that she was actually raped. Ex. A at 3.

Underscoring how far Plaintiff strains the plain reading of the Articles to advance these "implications," Portnoy resorts to cherry-picking quotes from the Articles – sometimes only using a portion of a sentence and omitting the part that hurts his claim. Thus, in stressing that the Article

8

includes Kayla's quote "that the sex with Portnoy was 'not the sex [she] consented to,'" (Opp. at 18, 24), Portnoy omits the sentence opening: "***Yes, it was technically consensual sex***." Ex. B at 7 (emphasis added). He claims the Article implies that he tried to force Kayla to have anal sex, but omits that the Article makes clear that "he listened to her" and they did not have anal sex. *Id*. at 9. He also ignores the Articles' statements that Madison and Kayla admit they saw that Portnoy was filming them with his iPhone. Ex. A at 3; Ex. B at 6.[5]

But Portnoy's omissions do not end with the language in the Article. Portnoy also ignores all of the case law in this Circuit undermining his claim (*see* MTD at 15-17), relying instead on a single out-of-state case, *Depp v. Heard*. Yet, the implication at issue in *Depp* was whether Amber Heard was referencing her famous ex-husband Johnny Depp's alleged abuse when she talked about how she became the public face of domestic abuse. 104 Va. Cir. 377, at *4 (2020). Thus, the *Depp* case has no bearing on the fully disclosed facts and protected opinions at issue here. At bottom, Portnoy has not and cannot plead that any of the actual factual statements in the Articles are materially false – and for this reason, his defamation claim must fail.

## II.    PORTNOY CONCEDES HE CANNOT PLEAD ACTUAL MALICE

Portnoy's Opposition fails for another independent reason: He has not adequately pled plausible facts to support actual malice. Plaintiff argues: "the Complaint alleges that there were obvious reasons to doubt the veracity of Defendant's [sic] anonymous sources, which Defendants were either aware of, or purposefully avoided learning, because the true facts completely

---

[5] Nor is there any validity to Portnoy's argument that because an obscure publication called "hotnewhiphop.com," reported that women "accused Mr. Portnoy of sexual assault," this means the Articles implied Portnoy is a rapist. Opp. at 20. It is well established that what a reader or publication says about another article is not defining of what the article actually says, or in this case, implies. *See e.g.*, *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004) ("The appropriate inquiry is objective, not subjective. Thus, the question is not whether some actual readers were misled, as they inevitably will be, but whether the hypothetical reasonable reader could be.").

undermined the purported newsworthiness and shock value of their hit piece." Opp. at 24. But this is nonsense.

Portnoy admits that all of the "sources" for the Article were real, that he did have sex with them, and he does not deny that Insider accurately reported what these women told them. Portnoy admits that the Defendants investigated the Articles for months, sought and included his extensive comments, as well as his arguments on why the women should not be considered credible, and went back to their sources to discuss all of the "evidence" that Portnoy presented them with. The Articles make clear that Insider not only spoke with the women involved, but with friends who had contemporaneous insights, and reviewed photographs and medical records, as well as the police report filed by Allison's mother. This diligent reporting undermines any claim that Defendants acted with actual malice. *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (affirming motion to dismiss because "before publishing its story, Bloomberg reached out repeatedly to . . . Lemelson [] to otherwise solicit his comment, and then published his denial of the claim . . .[,] conduct [that] tends to undercut any inference of actual malice"). In the face of this, Portnoy makes four equally baseless arguments.

*First*, Portnoy attempts to weaponize Defendants' diligent reporting by claiming that their careful language – never actually accusing him of rape – somehow shows that they not only implied that a sexual assault occurred (they did not) but that they knew this was false (and that is why they were so careful). Opp. at 24-25. This Orwellian approach to the clear language of the Articles finds no support in the law and, notably, Portnoy does not cite any law in support.

*Second*, despite conceding, as he must, that profit is not "sufficient by itself to support an inference of actual malice," (Opp. at 28), Portnoy nonetheless argues that it should carry great weight here. In doing so, Portnoy ignores the long line of cases explaining that profit has little, if any, effect on actual malice. *See Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667

(1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases . . . would be little more than empty vessels."); *see also Robinson v. Spencer Stuart, Inc.*, No. 13-10278-RWZ, 2015 WL 12732421, at *4 (D. Mass. Feb. 24, 2015) ("[T]he desire for profit . . . falls short); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020) ("*Newsweek*'s desire to increase its profits and sluggish sales does not make out actual malice either.") (citation and internal quotation marks omitted). Portnoy's conclusory claim that because the Articles were behind a paywall Defendants had actual malice cannot substitute for sufficiently pleading actual malice.

*Third*, Portnoy claims Defendants "deliberately ignore[d] evidence that undermined the credibility of their sources and cast doubt on the veracity of their claims." Opp. at 27. But as Defendants explained above, Insider *did* disclose the facts and denials that Portnoy claims they deliberately ignored. *See* I.B. What Portnoy is really attacking under the guise of actual malice is Insider's alleged "transparent effort to minimize" his evidence. Opp. at 9. But Insider hardly "minimized" his "evidence"; they cited it extensively throughout, even linked to his full lawyer denial letter and Press Conference, along with including his multiple denials in the body of the Articles.[6] Ex. A at 6; Ex. B at 3-4, 12-15. Here, unlike in *Harte-Hanks*, where "the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events," (491 U.S. at 683), Portnoy never pointed to any additional witnesses or evidence that Insider ignored.

*Fourth*, Portnoy's Opposition concedes that his Complaint does not "bring home" actual malice to each Defendant, but incorrectly claims he had no obligation to do so before discovery. Opp. at 29. Portnoy ignores contrary case law cited by the Defendants, such as the Second

---

[6] Because none of the cases cited by Portnoy address willfully ignoring evidence at the pleading stage they are, therefore, readily distinguishable. Opp. at 27-28.

11

Circuit's recent opinion in *BYD Co. v. VICE Media LLC*, No. 21-1097, 2022 WL598973 (2d Cir. Mar. 1, 2022), *pet. for cert. docketed*, No. 21-1518 (U.S. June 2, 2022), which affirmed dismissal of a complaint where, *inter alia*, the plaintiff failed to "make any allegations about specific individuals at [the publication] to whom such knowledge could be imputed." *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 823 (S.D.N.Y. 2021). The court held: "[e]ven at this juncture, the allegations [of actual malice] [we]re insufficient" to survive a motion to dismiss. *Id. See also McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020) (granting motion to dismiss where Plaintiff failed to plausibly plead actual malice: "it is instead Plaintiff's obligation[] to 'bring home' an existing connection"). Because Portnoy admits he did not meet this burden, (Opp. at 29), his defamation claim should be dismissed.

### III.    THE PRIVACY CLAIM FAILS AS THE ARTICLES ARE NEWSWORTHY

In trying to save his privacy claim, Portnoy argues, unpersuasively, "that the newsworthiness of the articles derives only from the knowingly false assertion that Portnoy is a sexual predator and a rapist." Opp. at 30. But as explained in *Coleman v. Grand*, a case Portnoy – again – ignores, "sexual impropriety and power dynamics in the music industry, as in others, [are] indisputably an issue of public interest." 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021), *appeal docketed*, No. 21-800 (2d Cir. Mar. 26, 2021). And in *Bonome v. Kaysen*, a Massachusetts case Portnoy also does not distinguish, a couple's private sexual relationship was relevant to the discussion of "undesired physical intimacy cross[ing] the line into non-consensual sexual relations." No. 032767, 2004 WL 1194731, at *5-6 (Mass. Super. Ct. Mar. 3, 2004). It does not matter that the Articles do not accuse Portnoy of rape. As *Coleman* and *Bonome* make clear, physical intimacy and power dynamics are newsworthy even when involving consenting adult partners, particularly when there is a wealth, power, and age disparity, and as here, is tied to discussions of sexual relations toeing the line into unwanted encounters.

12

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in their opening brief, Defendants respectfully request that this Court dismiss the Complaint with prejudice[7] and for any such other relief as this Court deems just and proper.

Dated:  June 17, 2022

                Respectfully submitted,

                DAVIS WRIGHT TREMAINE LLP

                */s/ Elizabeth A. McNamara*
                Elizabeth A. McNamara (admitted *pro hac vice*)
                Rachel F. Strom (BBO #666319)
                Brendan N. Charney (admitted *pro hac vice*)
                Lindsey B. Cherner (admitted *pro hac vice*)
                1251 Avenue of the Americas, 21st Floor
                New York, NY 10020
                Telephone: (212) 489-8230
                lizmcnamara@dwt.com
                rachelstrom@dwt.com
                brendancharney@dwt.com
                lindseycherner@dwt.com

---

[7] Portnoy's Opposition does not include a request to amend the Complaint.  Should this Court conclude that his claims have not been adequately alleged, and because he cannot adequately meet his burden of proof, Defendants respectfully request that this Court deny any request to do so now.

13

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that on April 6, 2022 Elizabeth A. McNamara, counsel for Defendants, conferred with Howard Cooper, counsel for the Plaintiff, in a good faith attempt to narrow the issues in dispute.

/s/ <i>Elizabeth A. McNamara</i><br>Elizabeth A. McNamara

Dated:  June 17, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara

Dated:  June 17, 2022