# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| DAVID PORTNOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 22-10197-FDS |
| | ) | |
| INSIDER, INC., HENRY BLODGET, | ) | |
| NICHOLAS CARLSON, JULIA BLACK, | ) | |
| and MELKORKA LICEA, | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

This case arises out of two allegedly defamatory articles that detail purported sexual encounters between plaintiff David Portnoy and several anonymous young women. According to the complaint, defendant Insider, Inc., published two articles about Portnoy in order to destroy his reputation and increase Insider's viewership and subscription revenue. Portnoy filed suit against Insider and certain of its executives and employees, contending that the articles defamed him under Massachusetts law and constituted an invasion of his privacy under Mass. Gen. Laws ch. 214, § 1B. Jurisdiction is based on diversity of citizenship.

Defendants collectively have moved to dismiss both claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion to dismiss will be granted.

I.      **Background**

       A.      **Factual Background**

The following facts are drawn from the complaint, documents referred to in the complaint, and official public records submitted by defendants.[1]

       1.      **The Parties**

David Portnoy is a Massachusetts resident and the founder of Barstool Sports, a sports and pop culture blog.  (Compl. ¶¶ 1, 9).  According to the complaint, since its founding in 2003, and under Portnoy's leadership, Barstool Sports has become one of the most widely known sports media and pop culture enterprises in the world.  (*Id.* ¶ 3).

Insider, Inc. is a Delaware media corporation with its principal place of business in New York.  (*Id.* ¶ 10).  According to the complaint, in 2020, traffic across all Insider's websites, including Businessinsider.com and Insider.com, averaged 114 million unique U.S. visitors per month, and more than 100,000 paid subscribers.  (*Id.*).

Henry Blodget is a resident of New York and the co-founder and chief executive officer of Insider.  (*Id.* ¶ 11).  Nicholas Carlson is a New York resident and the global editor-in-chief of Insider.  (*Id.* ¶ 12).  Julia Black and Melkorka Licea are both New York residents and reporters at Insider.  (*Id.* ¶¶ 13-14).

---

[1] On a motion to dismiss, the court may properly take into account four types of documents outside the complaint without converting the motion into one for summary judgment:  (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint.  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *see also Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1014-15 (1st Cir. 1988) (considering allegedly libelous article submitted by defendants with motion to dismiss).  Here, the parties have submitted the following undisputed documents that are central to plaintiff's claims and specifically referred to in the complaint:  Compl. Ex. A (Insider's first allegedly defamatory article), Compl. Ex. B (Insider's second allegedly defamatory article), Defs.' Ex. 2 (defendant Carlson's editor's note), and Defs.' Ex. 5 (the Nantucket police report).

### 2. Insider's Allegedly Defamatory Articles

#### a. The First Article

According to the complaint, Portnoy received an e-mail from Black in April 2021, requesting an interview for an upcoming "profile."  (*Id.* ¶ 18).  In her e-mail, Black allegedly wrote, "There's no particular angle here—I'd like to cover the full gamut, from building a media empire to becoming the face of the meme stock movement."  (*Id.*).  Portnoy declined the request.  (*Id.*).

The complaint alleges that shortly thereafter, Portnoy began receiving messages from friends, acquaintances, and strangers informing him that Black was working on an article portraying him as a sexual predator.  (*Id.* ¶ 19).  On November 1, 2021, Black sent a comment request e-mail to Portnoy with a bullet-point list of 38 allegations and allegedly demanded that he respond within 24 hours.  (*Id.* ¶ 20).

Three days later, on November 4, 2021, Insider published an online article titled, "'*I was literally screaming in pain': Young women say they met Barstool Sports founder Dave Portnoy for sex and it turned violent and humiliating*" (the "first article").  (*Id.* ¶ 21; Compl. Ex. A).

According to the complaint, readers were required to sign up for Insider's paid subscription service to access the full article, which centered primarily on Portnoy's alleged sexual relationships with two anonymous young women, referred to as Allison and Madison.  (Compl. ¶¶ 21, 24).

The complaint asserts that Insider used the first article to launch its new promotion on premium subscriptions, circulating a "68% off" promotion the day the first article was published.  (*Id.* ¶ 56).  In addition, according to the complaint, the publication of the article coincided with the quarterly earnings announcement of Penn National Gaming, which owns a 36% stake in Barstool Sports.  (*Id.* ¶ 21 n.2).  Finally, the complaint alleges that Insider employees began

contacting the advertisers of Barstool Sports in the days following the first article's publication to discourage those advertisers from partnering with Portnoy.  (*Id.* ¶ 60).

### b.  The Second Article and Editor's Note

The complaint alleges that just minutes after Insider published the first article, Black tweeted a request for "tips" concerning Portnoy or Barstool Sports to her thousands of Twitter followers, and "pinned" the tweet to her Twitter profile to reach a wider audience.  (*Id.* ¶ 53).

On January 18, 2022, about two and a half months after the first article's publication, Black and Licea allegedly asked Portnoy to provide a comment for a second article that Insider was ready to publish.  (*Id.* ¶ 62).  The complaint alleges that he was given 48 hours to respond to the e-mail's 28 bullet points of allegations.  (*Id.*).

According to the complaint, Portnoy's counsel transmitted a letter to Insider the next day, stating that the article contained provably false allegations, providing Insider with documentary evidence that purportedly contradicted the article's allegations, and demanding that Insider refrain from publishing the article.  (*Id.* ¶ 63).

On February 2, 2022, Insider published "*Three more women say Barstool Sports founder Dave Portnoy filmed them without asking during sex.*"  (*Id.* ¶ 64; Compl. Ex. B).  That same day, Insider published an editor's note authored by defendant Carlson, titled "*Why Insider published its Dave Portnoy articles.*"  (Compl. ¶ 80; Defs.' Ex. 2).

The second article centers on Portnoy's alleged encounter with a woman referred to as Kayla.  (Compl. ¶ 65).  According to the complaint, the article was published the day before the next earnings announcement of Penn National Gaming.  (*Id.* ¶ 64 n.4).

### 3.  The Allegedly Defamatory Statements

The complaint asserts that both the first and second articles falsely imply that Portnoy had sexual encounters with women that were "not consensual" and "so impermissibly violent as

4

to constitute a sexual assault." (*See* Compl. ¶¶ 27, 71). The complaint further contends that the "clear and essential gist and sting" of Insider's publications are that Portnoy is "a rapist, an abuser of women, and a person who secretly records women having sex without their consent." (*Id.* ¶ 85). The complaint also specifically challenges, "[w]ithout limitation," 16 allegedly defamatory statements in the two articles and the editor's note. (*See id.* ¶¶ 85((a)-(p))).[2]

Some of the allegedly defamatory statements are to the effect that the sex with Portnoy was violent. For example, the first article reports that one woman was choked without permission. (*Id.* ¶ 85(o)). The second article reports that four women who spoke with Insider said the sex began consensually, "but then turned violent and frightening beyond what they would have agreed to had they been asked." (*Id.* ¶ 85(b)). Several women stated that their encounters with Portnoy had taken a toll on their mental health. (*Id.* ¶¶ 85(k), 85(p)).

There are also statements that Portnoy filmed sexual encounters, openly, but without permission of the women. (*See, e.g.*, *id.* ¶¶ 85(b), 85(k), 85(m), 85(o)).

Other statements identified in the complaint suggest that Portnoy attempted to initiate anal sex without permission. (*See id.* ¶ 85(e)). For example, according to Kayla, who is quoted in the second article, Portnoy "didn't ask—he just like, tried to force it in." (*Id.* ¶ 85(h)). The second article further recounts that she allegedly "told him 'no' three or four times because she 'knew it would have been excruciating,'" and that "[e]ventually, . . . he listened to her and 'gave up.'" (*Id.* ¶ 85(i); Compl. Ex. B at 9).

The complaint also challenges two statements from the editor's note, in which Carlson writes that Insider "published [its] stories on Dave Portnoy because we consider them to be in the public interest and newsworthy." (Defs.' Ex. 2 at 2). The editor's note states that "[i]t is wrong

---

[2] The statements identified in the complaint are set forth in Appendix A to this Memorandum and Order.

to take a sexual encounter that began consensually and turn it violent without first asking one's sexual partner for permission," and that "[w]hen a rich, famous, and powerful person uses their power in a way that is harmful to other people, it is newsworthy."  (*Id.*; *see also* Compl. ¶¶ 85(f), 85(g)).  The editor's note further contends that "[w]hen such a person faces such accusations from credible sources and denies them—and then more accusers make new, credible accusations that corroborate and add detail to the alleged pattern of behavior, it is newsworthy."  (Defs.' Ex. 2 at 2).

The complaint asserts that the allegedly defamatory statements have humiliated Portnoy and caused significant and irreparable damage to his reputation and profession.  (Compl. ¶ 82). The complaint further alleges that Barstool Sports has lost at least $12 million in advertiser revenue since Insider published the first article.  (*Id.* ¶ 61).

### B.   <u>Procedural Background</u>

On February 7, 2022, Portnoy filed a complaint seeking damages.  The complaint asserts two claims:  (1) defamation by libel and (2) invasion of privacy in violation of Mass. Gen. Laws ch. 214, § 1B and common-law rights to privacy.

Defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   <u>Standard of Review</u>

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Defamation (Count 1)

Defendants have moved to dismiss the defamation claim for failure to state a claim on which relief can be granted. They contend that the complaint challenges statements that plaintiff cannot prove to be false; that the statements are protected under the First Amendment; and that the complaint fails to plausibly allege that the statements were made with actual malice. Because the Court finds that the complaint does not adequately plead that defendants published the allegedly defamatory articles with actual malice, it need not reach a conclusion as to the other two issues.[3]

#### 1.   Legal Framework

"Modern defamation law is a complex mixture of common-law rules and constitutional

---

[3] In *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012), the First Circuit, "[l]ike the district judge," skipped over whether the plaintiff's complaint plausibly alleged defamation and, in affirming the grant of the defendants' motion to dismiss, focused instead on whether the plaintiff had adequately pleaded actual malice, reasoning that this was "the simplest way to pinpoint [the plaintiff's] problem." *Id.* at 56; *see also Diaz v. Gazmey Santiago*, 2020 WL 1042041, at *6 (D.P.R. Mar. 3, 2020) ("On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court is not concerned with whether the complaint plausibly alleges defamation[,] . . . but rather with whether plaintiff 'la[id] out enough facts from which malice might reasonably be inferred.'") (quoting *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018)).

doctrines." *Pan Am. Sys., Inc. v. Atlantic Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir.

2015).  Under Massachusetts law, "[d]efamation is the publication, either orally or in writing, of

a statement concerning the plaintiff which is false and causes damage to the plaintiff." *Yohe v.

Nugent*, 321 F.3d 35, 39-40 (1st Cir. 2003) (citing *McAvoy v. Shufrin*, 401 Mass. 593, 597

(1988)).

To establish a defamation claim, a plaintiff must satisfy four elements.  First, to be

"defamatory," the statement must "hold the plaintiff up to contempt, hatred, scorn, or ridicule or

tend to impair his standing in the community, at least to his discredit in the minds of a

considerable and respectable class in the community." *Id.* at 40 (quoting *Tartaglia v. Townsend*,

19 Mass. App. Ct. 693, 696 (1985)) (internal quotation marks omitted); *Phelan v. May Dep't.

Stores Co.*, 443 Mass. 52, 56 (2004).  Second, to satisfy the "publication" element, "the

statement must have been [made] to at least one other individual other than the one defamed."

*Yohe*, 321 F.3d at 40 (citing *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56 (1966)); *Phelan*,

443 Mass. at 56.  "Third, where the speech is a matter of public concern, a defamation plaintiff

must prove not only that the statements were defamatory, but also that they were false." *Yohe*,

321 F.3d at 40 (citing *Dulgarian v. Stone*, 420 Mass. 843, 847 (1995)).[4]  Fourth, "the plaintiff

must show that he suffered special damages and must set forth these damages specifically." *Id.*

(citing *Lynch v. Lyons*, 303 Mass. 116, 119 (1939)).  However, "the imputation of a crime is

defamatory per se, requiring no proof of special damages." *Phelan*, 443 Mass. at 56.

"On the constitutional side, the Supreme Court—reading the First Amendment (made

---

[4] That additional element in cases involving matters of public concern derives from First Amendment principles.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (holding that, where the speech at issue is a matter of public concern, there is a "constitutional requirement that the plaintiff bear the burden of showing falsity").  That constitutional requirement has superseded traditional common-law rules that truth was an affirmative defense and that the defendant, therefore, bore the burden of proving the statement was true.  *See id.*; *Pan Am Sys.*, 804 F.3d at 66.

binding on the states through the Fourteenth)—'has hedged about defamation suits' with lots of 'safeguards designed to protect a vigorous market in ideas and opinions.'"  *Pan Am. Sys.*, 804 F.3d at 65 (quoting *Desnick v. American Broad. Co.*, 44 F.3d 1345, 1355 (7th Cir. 1995)); *see also McKee v. Cosby*, 874 F.3d 54, 60 (1st Cir. 2017) (noting that these First Amendment safeguards are "[s]uperimposed on any state's defamation law").  First, as already noted, in cases involving matters of public concern, the plaintiff bears the burden of showing that the communications at issue are false.  *See Philadelphia Newspapers*, 475 U.S. at 776.  Second, because statements must be false to be actionable, "defamatory statements are not punishable unless they are capable of being proved true or false."  *Pan Am Sys.*, 804 F.3d at 65.  Accordingly, subjective statements and statements of opinion are protected under the First Amendment as long as they do not "present[] or impl[y] the existence of facts which are capable of being proven true or false."  *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990).  Finally, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth," or, in other words, with "actual malice."  *Milkovich*, 497 U.S. at 20.

## 2. Whether the Heightened Standard for "Public Figures" Applies

In the interest of protecting public debate, the First Amendment prohibits public figures or officials from recovering damages for defamatory statements unless they can "prove[] that the statement[s] [were] made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (applying that standard to public officials); *accord Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (applying same standard to public figures); *Gertz v. Robert*

*Welch, Inc.*, 418 U.S. 323, 342 (1974).  "Public officials" are generally limited to high-level government employees, *see Stone v. Essex Cnty. Newspapers, Inc.*, 367 Mass. 849, 863 (1975), while "public figures" include those who "command[] sufficient continuing public interest and [have] sufficient access to the means of counter-argument to be able to expose through discussion the falsehood and fallacies of the defamatory statements."  *Curtis Publ'g Co.*, 388 U.S. at 155 (internal quotation marks omitted).

Public figures can be either "general-purpose public figure[s]"—those who have achieved "such pervasive fame or notoriety" that they are public figures "for all purposes and in all contexts"—or "limited-purpose public figure[s]"—those who "voluntarily inject[]" themselves or are "drawn into a particular public controversy" and thereby become public figures "for a limited range of issues" defined by their "participation in the particular controversy giving rise to the defamation."  *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011) (quoting *Gertz*, 418 U.S. at 351-52).  "Either way, a public-figure plaintiff bears the 'heavy, and often insurmountable' burden of proving that the defendant acted with 'actual malice.'"  *McKee*, 874 F.3d at 61 (quoting *Lluberes*, 663 F.3d at 14).

The parties do not dispute that plaintiff is a public figure.  The complaint itself alleges that plaintiff is not only "the well-known founder of Barstool Sports," but also "one of Massachusetts's most well-known entrepreneurs and media personalities."  (Compl. ¶¶ 1, 3).  Furthermore, the complaint alleges that Insider viewed plaintiff as "the perfect target" because of his "celebrity and notoriety."  (*Id.* ¶ 3).  Accordingly, because plaintiff is a public figure, the complaint must plausibly allege facts amounting to actual malice.  As set forth below, the complaint does not clear that high bar.

### 3.    Whether the Complaint Plausibly Alleges Malice

To allege a plausible claim of "actual malice," the complaint must "lay out enough facts

from which malice might reasonably be inferred." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).  "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice . . . should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.").  Rather, the plaintiff must demonstrate that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984).

"In a case . . . involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'"  *Harte-Hanks Commc'ns*, 491 U.S. at 688 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).  Actual malice may also be found "where a publisher fabricates an account, makes inherently improbable allegations, . . . or deliberately ignores evidence that calls into question his published statements." *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009) (citing *Harte-Hanks Commc'ns*, 491 U.S. at 684-85; *St. Amant*, 390 U.S. at 732).  However, "mere negligence in conducting an investigation or weighing the evidence is not enough." *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 252 (1st Cir. 2000) (citing *Harte-Hanks Commc'ns*, 491 U.S. at 688; *Masson*, 501 U.S. at 510).

Here, the complaint fails to lay out sufficient facts from which it may be inferred that defendants published the articles with actual malice.  The complaint contends in general terms that defendants made the allegedly defamatory statements "with a knowing and reckless disregard of the truth," but its specific factual allegations do not support that conclusion.  (*See*

Compl. ¶ 85).

### a.      Allegations That Defendants Had an Improper Motive

First, the complaint alleges that defendants engaged in a "targeted smear campaign" to destroy plaintiff's reputation.  (*Id.* ¶ 5).  According to the complaint, Insider published its articles on dates coinciding with the quarterly earnings announcements of Penn National Gaming, which owns a 36% stake in Barstool Sports.  (*Id.* ¶ 2).  Furthermore, the day after Insider published the first article, Carlson allegedly tweeted, "Penn National plummets 20% after weak earnings and allegations against Dave Portnoy."  (*Id.* ¶ 59).  "Perhaps most indicative of [d]efendants' malicious intent," the complaint contends, is the fact that Insider employees allegedly contacted Barstool Sports' advertisers in the days following the first article's publication to encourage them to stop doing business with plaintiff.  (*Id.* ¶ 60).

Such allegations of animosity or ill will, however, do not suffice to plead actual malice. *See, e.g.*, *Schatz*, 669 F.3d at 52 (describing "actual malice" as "legalese that might suggest ill will or evil motive to the uninitiated but really means knowledge of falsity or reckless disregard for the truth"); *Franchini v. Bangor Publ'g Co. Inc.*, 2020 WL 1879012, at *4 (D. Me. Apr. 15, 2020) ("[A] bare assertion of bias, without further facts demonstrating that the alleged bias was accompanied by knowledge of or reckless disregard for falsehood, has little purchase in the actual malice assessment . . . .").

Next, the complaint alleges that defendants used plaintiff "as bait" for Insider's subscription service, and that Insider's "smear campaign" sought to increase its viewership and subscription revenue.  (Compl. ¶¶ 5, 7).  While "it cannot be said that evidence concerning motive . . . never bears any relation to the actual malice inquiry," *Harte-Hanks Commc'ns*, 491 U.S. at 668, the fact that defendants published the articles behind a paywall, and that they sought to increase revenue by publishing the stories, does not give rise to an inference of actual malice.

12

*See id.* at 667 ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases . . . would be little more than empty vessels."); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020) ("*Newsweek*'s desire 'to increase its profits' and sluggish sales does not make out actual malice either."). "Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth." *Harte-Hanks Commc'ns*, 491 U.S. at 667.

As set forth below, the complaint does not plausibly allege that defendants published the allegedly defamatory statements with a reckless disregard for the truth. Accordingly, the complaint's allegations of improper motive, standing alone, fail to "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

      b.      **Allegations That Defendants Published the Statements with a Reckless Disregard for the Truth**

         i.      **Whether Defendants Made Inherently Improbable Allegations**

The complaint alleges that defendants knew prior to publishing their articles that the three women's accounts were either "fabricated," "entirely fabricated," or "pure fiction." (*See* Compl. ¶¶ 25, 41, 43, 65, 72). Plaintiff, however, does not dispute that he had sex with the women, or that he filmed them during sex. (*See id.* ¶¶ 33, 43, 72, 83). Nor does he dispute that one of the women told him that she injured her rib during one of their sexual encounters, and that she allegedly "boasted to [him] that he 'still holds [her] title for most aggressive sex.'" (*Id.* ¶ 75). Thus, "the complaint . . . itself point[s] to undisputed facts that preclude [the Court] from inferring" that the women's accounts of violent, unenjoyable sexual encounters with plaintiff "would have seemed so implausible as to cast doubt" on defendants' belief that they were true. *See Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (noting that while the undisputed information regarding the plaintiff's activities did not "itself evidence[] any

wrongdoing, it certainly provided ample background against which the reports from unnamed

sources . . . hardly seemed surprising").

### ii.    Whether Defendants Recklessly Published That Plaintiff Committed the Crimes of Rape or Sexual Assault

Having admitted several of the underlying facts in the women's accounts, the complaint

next asserts that defendants—despite being in possession of contrary evidence—maliciously

published "as fact" that plaintiff had "'violently' raped and sexually assaulted three unnamed

females." (*See* Compl. ¶¶ 2, 5(ii)).  However, "when a written instrument contradicts allegations

in the complaint to which it is attached, the exhibit trumps the allegations."  *Cheng v. Neumann*,

2022 WL 14354608, at *4 (1st Cir. Oct. 25, 2022) (quoting *Clorox Co. Puerto Rico v. Proctor &*

*Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000)).  Plaintiff cannot seek to establish actual

malice by challenging statements that defendants did not publish.  And as plaintiff himself

concedes, Insider's articles do not expressly accuse him of criminal sex assault.  *See* Pl.'s Opp'n

to Defs.' Mot. Dismiss at 1.[5]

Nor does the fact that the articles do not expressly accuse plaintiff of sexual assault itself

give rise to an inference of actual malice.[6]  While it is true that "defamation can occur by

innuendo as well as by explicit assertion," *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995)

(citing *Mabardi v. Boston Herald-Traveler Corp.*, 347 Mass. 411, 413 (1964)), the articles do not

---

[5] In reviewing a motion to dismiss for failure to state a claim, the Court "can consider . . . 'concessions' in plaintiff's 'response to the motion to dismiss.'"  *Schatz*, 669 F.3d at 55-56 (quoting *Arturet-Velez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005)).

[6] In his opposition to defendants' motion to dismiss, plaintiff contends that "[d]efendants went to great lengths in an attempt to *avoid* expressly accusing Mr. Portnoy of criminal sexual assault . . . because they *knew* their anonymous sources lacked credibility and because they *knew* they lacked a factual basis to make and support such an accusation."  Pl.'s Opp'n to Defs.' Mot. Dismiss at 1 (emphases in original).  However, plaintiff does not cite any case supporting the proposition that an inference of actual malice should be drawn where defendants carefully *avoid* making an express defamatory accusation.

dispute that the women acknowledged that the encounters were at least initially consensual, if ultimately unwelcome or distressing.  (*See, e.g.*, Compl. Ex. A at 15 ("Allison does not describe what happened to her as sexual assault but said she was still deeply disturbed by the experience."); Compl. Ex. B at 7 ("'I always think back to it,' she said, 'like, Yes, it was technically consensual sex, but that was not the sex I consented to.'"); Compl. Ex. B at 16 ("Four of them said the sex that was recorded started consensually but then turned violent and frightening beyond what they would have agreed to had they been asked.")).[7]

However, even assuming that the articles imply that plaintiff sexually assaulted one or more of the women, the complaint nevertheless fails to plausibly plead facts alleging that defendants published the articles with a reckless disregard for the truth.  The complaint does not allege that Insider's anonymous sources were fake, or that the articles misrepresented what the women told defendants.  Furthermore, plaintiff admits that Insider investigated its first article for months, requested an interview with him, sought his comment before publication, included his denials, and hyperlinked to his press conference and his lawyer's full denial letter, thus "undercut[ting] any inference of actual malice."  *See Lemelson*, 903 F.3d at 24 (finding that the plaintiff failed to plausibly allege actual malice where the publisher had, prior to publication, "reached out repeatedly to secure an interview with [the plaintiff] and to otherwise solicit his comment, and then published his denial").

And while (unlike in *Lemelson*) the complaint alleges that defendants knowingly relied

---

[7] The complaint challenges an abbreviated version of the quotation from Kayla:  "That was not the sex [she] consented to."  (*See* Compl. ¶ 85(j)).  Plaintiff, however, cannot "maintain a claim . . . by excising an isolated statement from a document and importing it into the complaint."  *See Clorox Co.*, 228 F.3d at 32 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).  Instead, the Court must consider the allegedly defamatory statement "in its totality in the context in which it was uttered or published . . . [and] consider all the words used, not merely a particular phrase or sentence."  *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 73 (1st Cir. 2005) (quoting *Foley v. Lowell Sun Publ'g Co.*, 404 Mass. 9, 11 (1989)).

on biased sources, Insider's articles make clear—and plaintiff does not deny—that defendants corroborated the women's accounts with photographs, text and social media messages, videos, medical reports, police documents, an Uber receipt, and statements from at least three friends who saw or spoke with the women soon after their interactions with plaintiff.  (*See, e.g.*, Compl. Ex. A at 2, 14, 15; Compl. Ex. B at 2, 5, 6, 8, 10).  Defendants' independent verification of the women's accounts thus further undercuts an inference of actual malice.  *See St. Amant*, 390 U.S. at 733 (reliance on single source with clear bias did not permit inference of actual malice where defendant "had verified other aspects" of source's information); *see also Tavoulareas v. Piro*, 817 F.2d 762, 792-93 (D.C. Cir. 1987) (explaining that "evidence of personal animus" between the source and the plaintiff "was not indicative of the defendants' actual malice in view of their independent corroboration").

Finally, the complaint's assertion that plaintiff told Insider that the allegations were fabricated is "not sufficient to support the contention that [d]efendants published the allegations knowing them to be false or with reckless disregard for their falsity, because 'such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"  *See Lemelson v. Bloomberg LP*, 253 F. Supp. 3d 333, 340 (D. Mass. 2017) (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 691 n.37); *see also Worrell-Payne v. Gannett Co.*, 49 F. App'x 105, 108 (9th Cir. 2002) (rejecting the plaintiff's argument that "statements she made in her own defense at a press conference, [and] the contents of a 'corrective' information packet she provided . . . should have made it obvious to [the defendant] that the statements being made in its articles and editorials about her were false").  And while the complaint further asserts that plaintiff's denials were accompanied by "exculpatory" evidence that defendants intentionally ignored, that allegation is contradicted by

the allegedly defamatory articles themselves:  the articles clearly disclose that the women met

plaintiff for the express purpose of having sex, that one of the women had discussed her "rape

fantasy" with plaintiff prior to having allegedly violent sex with him, that one woman who found

his recording "odd and creepy" nevertheless chose to meet him again for sex, and that some of

the women continued to communicate with plaintiff—sometimes in sexually explicit language—

even after having allegedly unpleasant sex with him.  (*See, e.g.*, Compl. Ex. A at 1, 2; Compl.

Ex. B at 6, 13).  Accordingly, the complaint does not plausibly allege that defendants

intentionally ignored contrary evidence.

### iii.  Whether Defendants Recklessly Implied That Plaintiff Committed the Crime of Surreptitious Recording

The complaint further asserts that defendants "published directly and via innuendo" that

plaintiff committed the crime of surreptitious recording despite possessing text and social media

messages "showing just the opposite."  (Compl. ¶ 5(ii)).  Because the articles do not reasonably

suggest that plaintiff secretly—as opposed to openly—recorded his sexual partners, the

allegation that defendants acted with actual malice in accusing him of unlawful recording fails.[8]

The crime of surreptitious recording under Mass. Gen. Laws ch. 272, § 105(b) requires

recording with an "intent to *secretly* conduct or hide such activity, when the other

person . . . would have a reasonable expectation of privacy in not being so photographed . . . *and*

without that person's knowledge and consent."  *Id.* (emphases added).  A lack of consent is

therefore not enough; the recording must also be done in secret.

While Insider's publications describe plaintiff as recording without the women's

"advance permission" or "consent" (*see* Compl. ¶ 85), the articles make clear that he did not do

---

[8] "[W]hether a statement is reasonably susceptible of a defamatory meaning is a threshold question for the court."  *Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012).

so secretly and that the women did not voice any contemporaneous objections.  (*See, e.g.*, Compl. Ex. A at 3 ("Madison said she first became uncomfortable when Portnoy pulled out his phone and started filming her—without asking permission—as she performed oral sex on him."); Compl. Ex. B at 9 ("Shortly after, Portnoy placed his iPhone on the pillow in front of [Kayla]. She said she felt too intimidated to ask him to stop recording."))[9]  Accordingly, that allegation fails to support a claim of actual malice.

### iv.      Whether Defendants Recklessly Implied That Plaintiff Was Being Investigated for a Crime

Finally, the complaint contends that defendants "falsely suggested that [plaintiff] was under criminal investigation" by the Nantucket Police Department, despite knowing that the police report did not contain allegations of rape or sexual assault.  (*See* Compl. ¶¶ 28, 29).  That claim is also a red herring, as the article in which the challenged statements appear does not state or suggest that the police were investigating plaintiff for a crime.  The first article states that after Allison's mother found plaintiff's messages on her daughter's telephone, she called the Nantucket Police Department and told the police, "Go put somebody outside his door because you're going to see every day there's some young girl being dropped off."  (Compl. Ex. A at 15). Insider's article, however, had previously stated that Allison was 19 years old when she had sex with plaintiff, and that while she was "deeply disturbed by the experience," she "does not describe what happened to her as sexual assault."  (*Id.* at 13, 15).  Thus, when read in context, the article does not reasonably suggest that the police were investigating plaintiff for sexual assault or rape.  *See Levesque*, 560 F.3d at 88 ("[A] court should consider the context in which

---

[9] While the second article does state that this recording began earlier than Kayla initially realized, the article does not reasonably suggest that plaintiff had an *intent* to secretly record her, as the crime of surreptitious recording would require.  *See* Mass. Gen. Laws ch. 272, § 105(b).  Rather, the second article makes clear that he "showed her the video he'd taken."  (*See* Compl. Ex. B at 9).

the challenged statement is made, viewing it within the communication as a whole."); *see also Schatz*, 669 F.3d at 57 ("[W]hile we must draw all reasonable inferences in the plaintiff's favor, we need not accept every imaginable inference.") (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514-15 (1st Cir. 1988)).

Accordingly, because the complaint fails to plausibly allege that any of the statements at issue were published with actual malice, the Court will grant the motion to dismiss the defamation claim.[10]

### B.   <u>Invasion of Privacy (Count 2)</u>

Count 2 alleges that defendants violated Mass. Gen. Laws ch. 214, § 1B and the common-law right to privacy by publishing "highly personal" text and social media messages exchanged between plaintiff and several of the women described in the articles.  (Compl. ¶ 93). The Court will address only the statutory claim for invasion of privacy, as Massachusetts does not recognize a common-law cause of action for invasion of privacy.  *See Spencer v. Roche*, 659 F.3d 142, 150 n.6 (1st Cir. 2011) ("To the extent that the appellant couches his invasion of privacy claim in the common law, Massachusetts has never recognized such a tort, and it is not our place to create new causes of action under state law.") (citations omitted).

The Massachusetts Privacy Act establishes "a right against unreasonable, substantial or serious interference with . . . privacy."  Mass. Gen. Laws ch. 214, § 1B.  The statute protects individuals from "disclosure of facts . . . that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  *Dasey v. Anderson*, 304 F.3d 148, 153-54 (1st Cir. 2002) (quoting *Bratt v. International Bus. Machs. Corp.*, 392 Mass. 508, 518 (1984)).

---

[10] Accordingly, the Court need not reach the question whether plaintiff must "bring home" the allegations of actual malice to the individual defendants without the benefit of discovery.  *See* Defs.' Mot. Dismiss at 18-19.

Generally, the statute is concerned with the dissemination of information that is actually private. *See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 517 n.4 (1991); *Cefalu v. Globe Newspaper Co.*, 8 Mass. App. Ct. 71, 77-78 (1979).  Courts therefore recognize that the right does not extend to matters that are a part of the public domain or to matters of public concern.  *See, e.g.*, *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 103 (D. Mass. 2006) ("[T]here can be no invasion of privacy where the facts, though highly personal, are already in the public domain."); *Boston Herald, Inc. v. Sharpe*, 432 Mass. 593, 612 (2000) ("When the subject matter of [the] publicity is of legitimate public concern, . . . there is no invasion of privacy.").  Furthermore, "[i]n light of the constitutional implications, courts have been generous to publishers in determining that private information relates to issues of legitimate public concern." *Bonome v. Kaysen*, 2004 WL 1194731, at *6 (Mass. Super. Mar. 3, 2004) (granting motion to dismiss privacy claim under Massachusetts Privacy Act where "highly personal" and sexually explicit details were included to develop and explore "the issue of when undesired physical intimacy crosses the line into non-consensual sexual relations" in the context of author's undiagnosed physical condition).

Defendants contend that the claim for invasion of privacy should be dismissed on the ground that the Insider articles contain constitutionally protected speech on a matter of public concern.  Specifically, defendants assert that Insider's reporting about "Portnoy's troubling behavior towards much younger women . . . is part of 'the broader social context' of the #MeToo movement." *See* Defs.' Mot. Dismiss at 23.  Plaintiff contends that the allegations of sexual misconduct fall outside the #MeToo movement because the women neither worked for Barstool Sports nor had any hierarchical relationship with plaintiff.  *See* Pl.'s Opp'n to Defs.' Mot. Dismiss at 30.  The Court declines to adopt that narrow view of newsworthiness.  Issues of

consent and power imbalance in sexual relationships are very much matters of current public concern, and the legitimate public interest in those issues is not limited to matters that arise only in the employment context.

In short, under the circumstances, plaintiff had no reasonable expectation of privacy in the text and social media messages published by Insider.  Accordingly, the Court will grant the motion to dismiss the privacy claim.

**IV.**     **Conclusion**

For the foregoing reasons, defendants' motion to dismiss is GRANTED.


**So Ordered.**

                                                        /s/ F. Dennis Saylor IV
                                                        F. Dennis Saylor IV
Dated: November 7, 2022                  Chief Judge, United States District Court

**Portnoy v. Insider, Inc. et al., 22-10197-FDS**
**Appendix A**

**<u>Allegedly Defamatory Statements</u>**

1. The first article's headline:  "'*I was literally screaming in pain': Young women say they met Barstool Sports founder Dave Portnoy for sex and it turned violent and humiliating*."  (Compl. ¶ 85(a); Compl. Ex. A at 1)

2. "Five women have now told Insider that Portnoy filmed them during sex without seeking permission.  Four of them said the sex that was recorded started consensually but then turned violent and frightening beyond what they would have agreed to had they been asked."  (Compl. ¶ 85(b); Compl. Ex. B at 16)

3. The second article's headline:  "*Three more women say Barstool Sports founder Dave Portnoy filmed them without asking during sex*."  (Compl. ¶ 85(c); Compl. Ex. B at 1)

4. "The sex during her second encounter was far rougher than she had anticipated or would have agreed to had she been asked."  (Compl. ¶ 85(d); Compl. Ex. B at 7)

5. "He attempted to have anal sex without her permission."  (Compl. ¶ 85(e); Compl. Ex. B at 9)

6. Mr. Portnoy took "a sexual encounter that began consensually and turn[ed] it violent without first asking [his] sexual partner for permission."  (Compl. ¶ 85(f); Defs.' Ex. 2 at 2)

7. Portnoy is "a rich, famous, and powerful person [who] uses [his] power in a way that is harmful to other people."  (Compl. ¶ 85(g); Defs.' Ex. 2 at 2)

8. "He didn't ask—he just like, tried to force it in."  (Compl. ¶ 85(h); Compl. Ex. B at 9)

9. "She told him 'no' three or four times because she 'knew it would have been excruciating.'"  (Compl. ¶ 85(i); Compl. Ex. B at 9)

10. "That was not the sex [she] consented to."  (Compl. ¶ 85(j); Compl. Ex. B at 7)

11. "These women told Insider the experiences with Portnoy turned frightening and humiliating and had taken a toll on their mental health.  Two of the women also said Portnoy filmed their encounters without their consent."  (Compl. ¶ 85(k); Compl. Ex. B at 2)

12. "I kept trying to get away and he was like, 'Stop running away from me.  Stop running away from me.'"  (Compl. ¶ 85(l); Compl. Ex. A at 4)

13. "She first became uncomfortable when Portnoy pulled out his phone and started filming her—without asking permission—as she performed oral sex on him."  (Compl. ¶ 85(m); Compl. Ex. A at 3)

14. "Another, who has had depression, said she was suicidal after the two had sex."  (Compl. ¶ 85(n); Compl. Ex. A at 6)

15. "She was both choked and filmed without advance permission."  (Compl. ¶ 85(o); Compl. Ex. A at 6)

16. "Three of these women said they had sex with Portnoy, now 44, and that the encounters turned into frightening and humiliating experiences that have taken a toll on their mental health.  Two, including Madison, said Portnoy both choked and filmed them without advance permission."  (Compl. ¶ 85(p); Compl. Ex. A at 6)